**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | | |
|---|---|---|
| MICHAEL A. SCOTT, *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:21-cv-00034-SAG |
| | ) | |
| BALTIMORE COUNTY, MD, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

 Kraig B. Long (Fed. Bar No. 25747)    Jennifer R. Frankovich (Fed. Bar No. 26052)
Jeffrey T. Johnson (Fed. Bar No. 19876)    Veronica N. Love (Fed. Bar No. 21531)
Nelson Mullins Riley & Scarborough, LLP    Baltimore County Office of Law
100 S. Charles Street, Suite 1600    400 Washington Ave, 2nd Floor
Baltimore, MD 21201    Towson, MD 2104
Tel: 443-392-9460    Tel: 410-887-4420
Fax: 443-392-9499    Fax: 410-296-0931
Kraig.Long@nelsonmullins.com    *JFrankovich@BaltimoreCountyMD.gov*
Jeffrey.Johnson@nelsonmullins.com    *VLove@BaltimoreCountyMD.gov*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

PROCEDURAL BACKGROUND........................................................................................3

STATEMENT OF UNDISPUTED FACTS .........................................................................4

     I.     The Department of Corrections ("DOC") and Department of Public Works
          ("DPW"). ...............................................................................................................4

     II.    The DPW Operates the MRF as the Hub of Recycling Operations in the County..5

          A.    The County sells recyclables to offset the costs of its waste management
                   operations and save landfill space................................................................6

          B.    The County does not track all expenses of the MRF and often operates the
                   facility at a loss. ..........................................................................................8

     III.   The DOC's Rehabilitative Work Programs. ...........................................................9

          A.    Inmates approved for work release are able to leave BCDC without
                   supervision and work for private employers in the community**.** ...............12

          B.     Inmates are assigned to work details to obtain structure, develop job skills
                   and prepare for reentry into the community. ...............................................12

     IV.   The Work Detail Program at the MRF Sought to Achieve the Rehabilitative Aims
          of the Community Corrections Program......................................................14

          A.    Inmates assigned to the MRF work detail remained in custody throughout
                   their workday. .............................................................................................16

          B.    Inmates were subject to removal from the MRF for violation of the BCDC
                   Code of Inmate Offenses. ...........................................................................19

          C.    The MRF work detail was used a steppingstone **to** work release or
                   potential permanent employment................................................................21

          D.    The MRF work detail is suspended in response to the COVID-19
                   pandemic. ....................................................................................................21

STANDARD OF REVIEW .................................................................................................22

ARGUMENT .......................................................................................................................23

I.     The FLSA and MWHL Serve the Same Purpose and Define............................................23

     II.    The FLSA Does Not Envision that Inmates Working for Their Custodians are
          Entitled to a Minimum or Overtime Wage. .........................................................24

          A.    Plaintiffs' participation in the MRF work detail serves a rehabilitative,
                   rather than pecuniary, goal........................................................................29

B.    Inmates are in a custodial rather than employer-employee relationship....32

C.    Inmates do not require wages to maintain their "standard of living" and "general well-being." .................................................................................34

D.    The County did not obtain an unfair competitive advantage through the MRF work detail. .........................................................................................34

III.    Courts Applying the Economic Realities Test Have Uniformly Held that Inmates Compelled to Work for, and Paid By, their Custodians are Not "Employees" Under the FLSA. ......................................................................................................37

IV.    Assuming, Arguendo, that Plaintiffs are Covered by the FLSA, they Have Failed to Supply Any evidence to Satisfy their Burden to Show a Willful Violation. ......41

CONCLUSION...............................................................................................................................43

INDEX OF EXHIBITS......................................................................................................................1

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alexander v. Sara, Inc.*,
 721 F.2d 149 (5th Cir.1983) ..................................................38

*Amaya v. DGS Constr., LLC*,
 479 Md. 515 (2022) ..................................................23, 24

*Barrentine v. Arkansas-Best Freight Sys., Inc.*,
 450 U.S. 728 (1981) ..................................................23

*Beale v. Hardy*,
 769 F.2d 213 (4th Cir. 1985) ..................................................22

*Bennett v. Frank*,
 395 F.3d 409 (7th Cir. 2005) ..................................................25, 28

*Burrell v. Lackawanna Recycling Center, Inc.*,
 No. 3:14-CV-1891, 2021 WL 3476140 (M.D. Pa. Aug. 6, 2021) ..................................................40, 41

*Butler v. DirectSat USA, LLC*,
 800 F. Supp. 2d 662 (D. Md. 2011) ..................................................23

*Carter v. Dutchess Community College*,
 735 F.2d 8 (2d Cir. 1984), *holding modified by Danneskjold v. Hausrath*, 82
 F.3d 37 (2d Cir. 1996) ..................................................38, 39

*Causey v. Balog*,
 162 F.3d 795 (4th Cir. 1998) ..................................................22

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ..................................................23

*Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*,
 365 F.3d 435 (6th Cir. 2004) ..................................................35

*Danneskjold v. Hausrath*,
 82 F.3d 37 (2d Cir. 1996) ..................................................39

*Davis v. Baltimore Cnty. Dep't of Corr.*,
 No. CV ELH-21-2268, 2022 WL 3975160 (D. Md. Aug. 31, 2022) ..................................................41

*Desmond v. PNGI Charles Town Gaming, L.L.C.*,
 630 F.3d 351 (4th Cir. 2011) ..................................................41, 42

iii

*Fraternal Order of Police Lodge No. 89 v. Prince George's County, Maryland,*
  645 F. Supp. 2d 492 (D. Md. 2009), *rev'd on other grounds*, 608 F.3d 183
  (4th Cir. 2010).................................................................................................................22

*Friolo v. Frankel,*
  373 Md. 501, 819 A.2d 354 (2003) ................................................................................24

*Gilbreat*h v. *Cutter Biological,*
  931 F.2d 1320 (9th Cir. 1991) ........................................................................................38

*Hale v. Arizona,*
  967 F.2d 1356 (9th Cir.1992) .........................................................................................38

*Hale v. State of Ariz.,*
  993 F.2d 1387 (9th Cir. 1993) ........................................................................................38

*Harker v. State Use Industries,*
  990 F.2d 131 (4th Cir. 1993) .................................................................................. *passim*

*Henthorn v. Dep't of Navy,*
  29 F.3d 682 (D.C. Cir. 1994)........................................................................24, 39, 40, 41

*Hooven-Lewis v. Caldera,*
  249 F.3d 259 (4th Cir. 2001) ..........................................................................................23

*Hudgins v. Hart,*
  323 F.Supp. 898 (E.D. La. 1971) ...................................................................................38

*Huntley v. Gunn Furniture Co.,*
  79 F.Supp. 110 (W.D.Mich.1948) ..................................................................................38

*Matherly v. Andrews,*
  859 F.3d 264 (4th Cir. 2017) ....................................................................................27, 29

*Matsushita Electric Industries Co. v. Zenith Radio Corp.,*
  475 U.S. 574 (1986).........................................................................................................22

*McFeeley v. Jackson St. Ent., LLC,*
  47 F. Supp. 3d 260 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir. 2016)................................24

*McLaughlin v. Richland Shoe,*
  486 U.S. 128 (1988).........................................................................................................42

*Mould v. NJG Food Serv. Inc.,*
  37 F. Supp. 3d 762 (D. Md. 2014) ..................................................................................42

*Ndambi v. CoreCivic, Inc.,*
  990 F.3d 369 (4th Cir. 2021) .................................................................................. *passim*

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015)................................................................................................23

*Robinson v. Empire Equity Group, Inc.*,
   2014 WL 6698407................................................................................................42

*Sims v. Parke Davis & Co.*,
   334 F.Supp. 774 (E.D.Mich.1971)........................................................................38

*Turner v. Human Genome Sci., Inc.*,
   292 F.Supp.2d 738 (D.Md.2003)...........................................................................24

*Vanskike v. Peters*,
   974 F.2d 806 (7th Cir. 1992) ...........................................................................33, 39

*Villarreal v. Woodham*,
   113 F.3d 202 (11th Cir. 1997) ..............................................................................39

*Watkins v. Brown*,
   173 F.Supp.2d 409 (D.Md.2001)...........................................................................24

*Watson v. Graves*,
   909 F.2d 1549 (5th Cir. 1990) .........................................................................38, 39

**Rules**

Fed. R. Civ. P. 12(b)(6)...................................................................................25, 26

Fed. R. Civ. P. 23 ...................................................................................................3

Fed. R. Civ. P. 30(b)(6)............................................................................................6

Fed. R. Civ. P. 56(a) ..............................................................................................22

Fed. R. Civ. Proc. 56(c) .........................................................................................22

Jones Rule 30(b)(6).................................................................................................20

**Statutes**

29 U.S.C. § 201 *et seq*............................................................................................1

29 U.S.C. § 202(a) .....................................................................................23, 25, 28

29 U.S.C. § 203(e)(1)..............................................................................................24

29 U.S.C. § 203(g) ..................................................................................................24

29 U.S.C. § 213(a) ..................................................................................................24

29 U.S.C. § 216(b) .............................................................................................3

29 U.S.C. § 255(a) ...........................................................................................42

FLSA ...............................................................................................................24

**Other Authorities**

Ashurst-Sumners Act .......................................................................................34

Fair Labor Standards Act ........................................................................... *passim*

H.R. 2098, 113th .............................................................................................36

H.R. 2112, 112th .............................................................................................36

Maryland Wage and Hour Law .........................................................................3

Maryland Wage Payment and Collection Law ..................................................3

Md. Ann. Code LE art. 3-401 *et seq* ................................................................3

Md. Code Ann., Correctional Services § 11-203 ............................................34

Md. Code Ann., Labor and Employment § 3-402(b) .......................................24

*Review of Federal Prison Industries*, *supra*., at p. 26 .....................................35

## INTRODUCTION

Plaintiffs – all current or former inmates at the Baltimore County Detention Center ("BCDC") – ask that the Court ignore established precedent holding that the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA" or "the Act"), does not apply to those in custodial settings.  While the Fourth Circuit has affirmed this rule on three separate occasions, Plaintiffs assert that they were entitled to be paid a minimum and overtime wage while sorting recyclables as part of a work detail at Baltimore County, Maryland's ("the County") Materials Recovery Facility (the "MRF work detail") during their incarceration.  However, application of the FLSA would undisputedly contravene the very purpose of the Act and run contrary to several decades of case law holding that "Congress has operated on the assumption that the FLSA does not apply to inmate labor."  *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369, 375 (4th Cir. 2021) and *Harker v. State Use Industries*, 990 F.2d 131, 136 (4th Cir. 1993).

As demonstrated below, there is no material factual dispute that the FLSA does not apply to Plaintiffs for the very reasons discussed in *Ndambi* and *Harker*.  First, unlike the "the traditional employment paradigm" covered by the FLSA, Plaintiffs worked "not to turn profits for their supposed employer, but rather as a means of rehabilitation and job training."  *Harker*, 990 F.2d at 133.  Specifically, it is undisputed that Plaintiffs' participation in the MRF work detail was performed in exchange for a reduction in their sentence, while also obtaining skills that could "help reduce recidivism[,]" including "time management," "structure from being on the detail," "getting up in the morning, going to work," taking instruction from a supervisor, and working a full day.  Phil Pokorny Deposition Excerpts, attached hereto as **Exhibit A**, at p. 66:3-21; Gail Watts Deposition Excerpts, attached hereto as **Exhibit B**, at pp. 119:8-120:5; Justin Halligan Deposition Excerpts, attached hereto as **Exhibit C**, at pp. 172:19-174:2, 197:10-199:19.

Furthermore, Plaintiffs remained in a "detainer-detainee" relationship with the County at all times while participating in the MRF work detail, baring no resemblance to the "free labor situation of true employment" addressed by the FLSA.  *Ndambi*, 990 F.3d at 372.  Plaintiffs cannot dispute that they were assigned to work at the MRF at the sole discretion of the DOC, remained under the supervision of correctional officers throughout their workday, were prohibited from leaving their workstation or even using the restroom without permission of a correctional officer, and were subject to removal from the work detail if they violated BCDC's Code of Inmate Offenses.  Thus, unlike a worker in the private sector, inmates "certainly [were] not free to walk off the job site and look for other work." *Id.*  Moreover, while the FLSA was passed to allow workers to maintain their "standard of living" and "general well-being," Plaintiffs here had no such need, as they concede that they were provided their food, water, lodging, clothing and healthcare free of charge from the County.

Lastly, there is no admissible evidence that the County obtained an unfair advantage over private businesses in the recycling field as the result of the MRF work detail by seeking to "undercut" or undersell such private entities.  In any event, the Fourth Circuit has observed that public policy concerns about any unfair advantage from the use of inmate labor are best left for Congress, rather than the courts.  The Fourth Circuit's reasoning applies with particular force in the case at bar, as Federal Prison Industries – a government corporation created by Congress – also uses inmates paid sub-minimum wages at prisons across the county to process and sell e-waste recycling in a similar manner to the County.  Thus, Congress is certainly aware of the use of inmate labor to process and sell recyclables, and it is Congress's duty, not the courts, to change and expand the scope of those covered by the FLSA.

The County therefore respectfully requests that the Court rule that there is no dispute of material fact and dismiss all claims in this matter.  Further, should any portion of Plaintiffs' claims survive, the County respectfully requests that the Court grant summary judgement on Plaintiffs' claims for willful violation of the FLSA, as Plaintiffs have failed to supply admissible evidence that the County knew or should have known that Plaintiffs were owed a minimum and overtime wage while incarcerated.

## PROCEDURAL BACKGROUND

On January 5, 2021 Plaintiff Michael Scott ("Plaintiff Scott"), a former inmate at BCDC, filed a five-count Complaint on behalf of himself and other former inmates, raising claims under the FLSA, Maryland Wage and Hour Law, Md. Ann. Code LE art. 3-401 *et seq* ("MWHL"), and the Maryland Wage Payment and Collection Law, Md. Code Ann., LE art. 3-501 *et seq.* ("MWPCL").  ECF No. 1.  In the Complaint, Mr. Scott alleges that he and others similarly situated were required to be paid a minimum and overtime wage while participating in the MRF work detail during their incarceration at BCDC.  On April 26, 2021, this Court conditionally certified the present case as a collective action under the FLSA, 29 U.S.C. § 216(b), consisting of:

> Workers who, within the last three years of filing this lawsuit, have performed work for Baltimore County's Department of Public Works at its Materials Recovery Facility in Cockeysville, Maryland through the work detail program of Baltimore County's Department of Corrections, and who have not received at least $7.25/hour (and $10.87/hour when working over 40 hours in a single workweek)) for their labor.

ECF No. 20.  On December 12, 2021, this Court certified two classes under Fed. R. Civ. Proc. 23, covering all persons who, from January 5, 2018 to the present, participated in the MRF work detail.  ECF No. 94.  The Court certified one class covering those who did not receive the

minimum wage established under Maryland law, and the other covering those who did not

receive the overtime rate set by Maryland law. *Id.*

On July 12, 2022, the parties submitted a joint status report in which Plaintiff Scott

advised that he:

> is abandoning his individual and class claims for overtime under the Maryland
> Wage Hour Law and claims seeking treble damages under the Maryland Wage
> Payment and Collection Law. The individual and class claim for minimum wage
> damages under the Maryland Wage Hour Law remains. Plaintiff submits that it
> may be most efficient for the Court to dispose of the overtime MWHL and
> MWPCL claims at Summary Judgment, as abandoned.

ECF No. 136 at pp. 2-3.  Plaintiff's Counsel also sent an email to Defense Counsel on March 1,

2022 advising that: "[w]e will be dismissing the MWHL overtime claim, along with all MWPCL

claims."  Consequently, the individual and class claims under Counts IV (Overtime under the

MWHL) and V (MWPCL) have been abandoned, and the only claims remaining are the

individual and collective claims under the FLSA (Counts I and II), and the individual and class

claims for minimum wage under the MWHL (Count III).

## STATEMENT OF UNDISPUTED FACTS

### I.    The Department of Corrections ("DOC") and Department of Public Works ("DPW").[1]

The Executive Branch of the County consists of various operating agencies.  Frederick

Homan Deposition Excerpts, attached hereto as **Exhibit D**, at p. 15:14-16; Organizational Chart

for the County, attached hereto as **Exhibit E**.  Each agency is led by a Director who reports to

the County's Chief Administrative Officer.  Exhibit D at p. 19:4-7.  The County's Chief

Administrative Officer reports to the County Executive, the highest elected official in the

County.  Exhibit D at p. 14:8-10.  Both the DPW and DOC are operating agencies within the

---

[1] Effective May 3, 2021, the DPW has been renamed the "Department of Public Works and
Transportation."

County.   Def. Responses to Plaintiff Scott's First Set of Requests for Admissions, attached hereto as **Exhibit F**, at Response No. 3.   Although the DPW and DOC have their own agency heads and organizations, both agencies are united under the umbrella of the County, and therefore cooperate with one another to achieve the County's objectives.   Exhibit D at pp. 15:13-16:4, 19:4-21:6.

## II.   The DPW Operates the MRF as the Hub of Recycling Operations in the County.

The County considers recycling a "necessary, vital aspect of serving the citizens of Baltimore County."  Burke Deposition Excerpts (Vol. 2), attached hereto as **Exhibit G**, at pp. 348:1-2.   The DPW, through its Bureau of Solid Waste Management, is responsible for "managing the County's Waste Prevention and Recycling Program[,]" including, *inter alia*, "collecting single family residential curbside residential trash, recyclable and yard materials … and operating the County's solid waste management facilities: the Eastern Sanitary Landfill Solid Waste Management Facility (ESL), the Central Acceptance Facility (CAF), and the Western Acceptance Facility (WAF)."  *See* Solid Waste Workgroup Final Report, attached hereto as **Exhibit H**, at BC 23123.   These operations include the weekly collection of recyclables for more than 300,000 single family homes, town homes, apartments, and condominiums complexes in the County.  *Id.*

In November 2013, Baltimore County converted from a dual stream recycling system to a single stream recycling system.   Michael Beichler Deposition Excerpts, attached hereto as **Exhibit I**, at pp. 80:16-81:1.   The dual stream recycling system required residents to separate their recyclables by type (aluminum, paper, plastic, etc.).   Exhibit I at pp. 80:16-81:15; John Jones Deposition Excerpts, attached hereto as **Exhibit J**, at p. 24:14-18.   The single stream recycling system did not require residents to sort recyclables.  *Id.*  Residents could commingle their recyclables, which were then sorted and processed by the County.  *Id.*  Although switching

to single stream recycling increased the risk of contamination among recyclables, it made recycling more convenient for residents, which encouraged greater participation in the County's recycling program.  Exhibit I at pp. 266:2-268:1, and Exhibit 14 attached thereto.

The MRF, located at the Central Acceptance Facility ("CAF") in Cockeysville, is the hub of the County's recycling operations, and receives, sorts, and prepares recyclables for sale.  The 55,000 square feet facility is comprised of a "system of 86 conveyor belts, six sorting screens, three optical sorters, and two bailers."  *See* 2016 Recycling Systems Excellence Award, attached hereto as **Exhibit K**, at MES 4425.  Recyclables are delivered to the MRF by a network of hauling contractors engaged by the County.  Exhibit J at pp. 29:18-30:11; Exhibit H at BC 23124.  Once recyclables are received at the MRF, they are loaded into the system of conveyor belts by a County employee operating a front-end loader.  Exhibit J at pp. 26:19-27:8. Recyclables thereafter undergo a system of automated and manual sorting, the latter of which is performed by personnel stationed at the conveyor belts.  *Id.* at pp. 31:21-33:4.  Manual sorters either remove non-recyclable materials from the conveyor belts or place similar types of recyclables in large bins referred to as bunkers.  *Id.* at pp. 32:21-36:2.  Once in the bunkers, like recyclables are compacted into bales.  These bales are stored at the MRF until they are sold.  *Id.* at p. 36:3-10.

**A.  The County sells recyclables to offset the costs of its waste management operations and save landfill space.**

Once a month the County conducts an online auction for the sale of the baled recyclables processed at the MRF.  *Id.* at p. 53:9-19; Matthew Carpenter Rule 30(b)(6) Deposition Excerpts, attached hereto as **Exhibit L**, at p. 34:1-8.  The County accepts bids for its recyclables and sells the bales to the highest bidder, who is responsible for transporting the recyclables from the MRF. *Id.* at pp. 35:21-36:5; Matthew Carpenter Deposition Excerpts, attached hereto as **Exhibit M**, at

6

pp. 27:12-28:17.   Once the highest bidder obtains the recyclables, they are invoiced by the County's Office of Budget and Finance, who deposits all funds received in the County's General Fund.  Exhibit M at pp. 102:12-103:17, and Ex. 5 attached thereto.  Since the proceeds from the sale of recyclables are deposited in the County's General Fund, those funds are used to pay for a variety of government services, including community improvements, government buildings, public schools, fire and police departments, and the upkeep of streets, highways, and waterways in the County.  Exhibit M at p. 57:16-19; Exhibit G at p. 350:5-16; Declaration of Matthew Carpenter, attached hereto as **Exhibit N**, at ¶ 19.

While the County generates revenue from the sale of recyclables, former County Administrative Officer, Frederick Homan ("Mr. Homan"), who oversaw the County's conversion to a single stream operation, testified that the generation of profit was not the goal of constructing and operating the recycling facility at the MRF.  Exhibit D at pp. 98:10-100:6; 135:10-136:18; 81:4-7.  According to Mr. Homan, the County designed the MRF to create a positive impact on the environment, as well as to provide tax-saving benefits for its residents, by reducing the amount (and associated cost) of materials being put in the County's landfill, diverting solid waste from regular garbage collection, and saving non-renewable resources.[2] Exhibit I at pp. 108:9-21, 266:2-268:1, and Exhibit 14 attached thereto; Exhibit M at p. 54:16; Exhibit D at pp. 140:5-12; 135:10-136:18; 81:4-7; Exhibit N at ¶ 6.  Mr. Homan emphasized that the County would have operated the MRF "whether it was going to simply break even, suffer a small loss, or make a profit."  Exhibit D at p. 139:17-20; Exhibit N at ¶ 5.

---

[2] *About Our Materials Recovery Facility*, Baltimore County Government (July 26, 2022) https://www.baltimorecountymd.gov/departments/publicworks/recycling/countymrf.html.

**B. The County does not track all expenses of the MRF and often operates the facility at a loss.**

The County has operated the MRF for many years at a loss, meaning that the expenses of operating the facility are greater than the revenues obtained from the sale of recyclables. Exhibit D at pp. 133:13-134:16, 146:8-147:19; Exhibit N at ¶ 15. Moreover, even in the years when the County showed positive revenue from the sale of recyclables, those numbers are misleading because the County does not capture or report all of the expenses associated with operating the MRF. Exhibit D at pp. 47:10-49:19; 97:8-100:6; Exhibit N at ¶¶ 7-10. According to the County's Chief of Budget and Administration and former Budget Analyst for DPW, Matthew Carpenter ("Mr. Carpenter"), the County tracks expenses such as the cost of labor performed at the MRF, repairs and maintenance of equipment, and fuel for vehicles and heavy machinery against the budget line-item number "7605." Exhibit M at pp. 15:10-14, 32:2-34:1, 48:9-49:15. However, there are additional expenses like electricity and utilities, debt service, administrative support (legal, accounting etc.), and fringe benefits for County employees, which are not included in the operating expenses of the MRF tracked under the 7605 budget number. Exhibit M at pp. 32:2-34:1, 131:2-132:20; Exhibit N at ¶ 8. Consequently, the County does not track whether it is making a profit off the MRF, and only tracks the revenue from its sales against a limited subset of expenses. Exhibit M at pp. 32:2-34:1; Exhibit L at pp. 112:8-113:12, and Exhibit 5 attached thereto; Exhibit N at ¶ 10. Even a comparison of the partial expenses associated with the operation of the MRF against the revenue from the sale of recycled materials during fiscal years 2019 through 2021 (July 1, 2018 to June 30, 2021), reveals that the County operated the MRF at a loss in two of the three years:

| Fiscal Year | Revenue | Expenses Tracked Under 7605 Budget | Difference |
|---|---|---|---|
| 2019 | $4,380,153 | $4,572,291 | ($192,138) |
| 2020 | $3,173,680 | $4,136,820 | ($963,140) |
| 2021 | $7,016,469 | $4,495,898 | $2,520,571 |

Exhibit N at ¶¶ 11-15, and Exhibits 1 and 2 attached thereto.[3]

In addition to eschewing a goal of profit maximization, the County seeks to avoid competing against other governments or private industry in its sale of recyclables. The County does not set the price for its recyclables or attempt to "undercut" the market by selling its recycled materials for less. Exhibit L at pp. 36:12-38:9. The County does not even examine what other entities are selling their recyclables for when putting its recyclables out to bid. Exhibit L at pp. 36:12-38:9. The County also does not collect or process recycling from commercial businesses in the County because it does not wish to compete with private sector entities who have contracted with County businesses to provide commercial recycling. Exhibit I at p. 38:4-11; Exhibit G at pp. 336:17-341:4, and Exhibit 13 attached thereto. The County simply sells its recyclables to the bidder who is willing to pay the most, which is dictated by the quality of its bales (the level of contamination or non-recyclable residue) and the global market for recycled commodities. Exhibit L at pp. 33:11-18, 47:3-9, 47:21-48:11.

## III. The DOC's Rehabilitative Work Programs.

The County's Department of Corrections ("DOC") is charged with the operation of BCDC. The DOC is responsible for "[p]roviding public safety by confining pretrial detainees and sentenced offenders in a clean, safe, and secure detention facility," and "provid[ing] self-improvement opportunities for community reentry."[4] BCDC houses 900 to 1200 male and

---

[3] Fiscal year 2019 was the first year the County separately tracked expenses associated with the MRF using the 7605 budget number. Exhibit N at ¶ 12.

[4] *Department of Corrections*, Baltimore County Government, https://www.baltimorecountymd.gov/departments/corrections/index.html#:~:text=The%20missio

female "pretrial and sentenced inmates" at any given time.  Exhibit B at pp. 17:4-9, 19:18-20:10; Exhibit C at p. 111:10-20.

The Community Corrections Program is a subdivision of the DOC that seeks to reduce the recidivism of inmates through work programs, and "provides resources and work details to prepare inmates for reentry into the community."  Exhibit B at p. 34:4-11; Audra Parrish Deposition Excerpts, attached hereto as **Exhibit P**, pp. 135:8-136:2.; Exhibit A at pp. 57:8-58:3. For example, Community Corrections staff coordinate job search activities and career training and hold resource fairs for inmates and others with criminal convictions.  Exhibit P at pp. 146:11-148:12.  These resource fairs, which were held in the gym at BCDC, were open to all inmates and covered such topics as, "substance abuse treatment, mental health treatment, housing, community assistance programs, job training programs/workforce development, [and] child support assistance programs."  Exhibit P at pp. 149:10-152:5; November 27, 2018 Email from Audra Parrish, attached hereto as **Exhibit Q** (BC 113373).  The Community Corrections Program also partnered with the Baltimore County Department of Workforce Development to have a mobile career center visit BCDC once a week to assist inmates with writing resumes, preparing job applications, and preparing for interviews.  Exhibit C at pp. 59:12-64:10; Exhibit P at pp. 62:21-63:13.  The Community Corrections Program is supervised by a Community Corrections Supervisor, who is responsible for overseeing the specific functions of the program and managing its staff.[5]  Exhibit A at p. 15:7-18.  Included among the staff are Classifications

---

n%20of%20the%20Department,improvement%20opportunities%20for%20community%20reent ry.(last accessed Oct. 17, 2022); Defendant's Objections and Answers to Plaintiff Dulaj's Second Set of Interrogatories, attached hereto as **Exhibit O**, at Answer No. 23.

[5] During the period of 2013 to April of 2020, the Community Corrections Program was supervised by Phillip Pokorny ("Mr. Pokorny") (until June of 2017) and Audra Parrish ("Ms. Parrish") (from June of 2017 onwards).  Exhibit A at p. 15:5-11, Exhibit P at pp. 24:2-5.

Officers, who are responsible for determining whether an inmate is eligible for the DOC's

rehabilitative work programs.  Exhibit A at pp. 32:5-9, 63:2-6; Exhibit B at p. 45:9-16, Exhibit P

at pp. 49:16-50:2, 153:6-156:20; Classifications Policy Directive, attached hereto as **Exhibit R**.

Inmates "who have been recommended by the courts for work release[,]" inmates who

"are assigned to work details[,]" and "inmates who are placed on home detention" are eligible to

participate in the Community Corrections Program.  Exhibit B at p. 21:3-12.  Inmate work

assignments must be approved by a Classifications Officer.  *See* Inmate Workers Policy

Directive, attached hereto as **Exhibit S**, at BC 7350. To that end, shortly after their arrival at

BCDC, inmates are interviewed by a Classifications Officer to determine the inmate's security

designation, determine what housing unit the inmate will be assigned to, and further assess the

inmate to determine whether he or she is an appropriate fit for a work program.  Exhibit P at pp.

55:8-60:4.  As part of this process, a Classifications Officer examines whether the inmate would

be a security risk, and may decide, in concert with the Community Corrections Supervisor, that

an inmate is not an appropriate fit for some or all work programs based on the inmate's previous

institutional behavior, disciplinary violations, or criminal history.  Exhibit B at pp. 45:9-16, 46:4-

7, Exhibit A 104:3-108:4.

Although inmates are not entitled to choose which work program they are assigned to,

they can request a specific assignment via an inmate request form (referred to as a Form 118),

and the Community Corrections staff will attempt to accommodate the inmate if there are any

vacancies.  Exhibit S at BC 7351; Exhibit P at pp. 104:4-10, 105:2-19, 266:4-18; Exhibit A at pp.

46:13-47:8.  Notwithstanding, the DOC requires that all sentenced inmates work during their

incarceration, either in a Work Detail or Work Release program.  An inmate's "refusal to work"

is considered a violation of the DOC's Code of Inmate Offenses for which an inmate could

receive an institutional infraction.  Exhibit C at pp. 110:16-111:5; Inmate Handbook, attached hereto as **Exhibit T**, at BC 23239-23241; Exhibit P at pp. 112:5-19, 113:7-19; Exhibit A at p. 47:6-8; Exhibit S at BC 7350 ("[s]entenced inmates have the right to decline participation in activities, services, and programs, <u>with the exception of work assignments</u>[.]") (emphasis added).

### A. Inmates approved for work release are able to leave BCDC without supervision and work for private employers in the community.

As mentioned above, the Community Corrections Program manages the DOC's work release program.  Inmates who are selected for work release are permitted to leave BCDC without the supervision of correctional officers to work at either an employer that the inmate worked for prior to being incarcerated, or an employer that agreed to hire the inmate during incarceration.  Exhibit A at pp. 58:4-60:10.  At the end of the workday, the inmate must return to BCDC to continue their incarceration.  Exhibit A at pp. 58:4-60:10.  To facilitate work release – which must be authorized by an inmate's sentencing judge – the Community Corrections staff would post listings in the BCDC housing units of private employers who were willing to hire work release inmates.  Exhibit P at pp. 41:16-21, 61:10-62:15.  Community Corrections also contacted local employers to inquire about work release opportunities for approved inmates. Exhibit P at pp. 143:17-146:2, 275:8-276:6.  Former Community Corrections Supervisor, Phil Pokorny, sought to develop partnerships with local business, such that inmates approved for work release who did not have gainful employment could obtain a job with a private employer while incarcerated and ideally "maintain that employment upon their release."  Exhibit A at pp. 101:1-102:9.

### B. Inmates are assigned to work details to obtain structure, develop job skills and prepare for reentry into the community.

The Community Corrections Program also managed the work detail program at BCDC. Like work release, the work detail program allowed qualified inmates to work while incarcerated

in an effort to prepare them "for reentry into the community."   Exhibit B at pp. 34:15-35:9, 118:10-17.   However, unlike work release, inmates placed on a work detail work for the County and remain under the constant supervision of correctional officers throughout the workday. Exhibit B at pp. 118:3-119:3.   Community Corrections viewed the work detail program as a steppingstone for inmates to transition to the work release program.   If an inmate performed well and did not get into any trouble on a work detail, a Classifications Officers would write a letter to the inmate's sentencing judge and request that the inmate be approved for work release.   Exhibit P at pp. 64:12-65:21.   To further facilitate the reintegration of inmates into the community, the Classifications Officer could later request that the inmate be transitioned from work release to home detention, thereby allowing the inmate "some time in the community, in their actual home, to try to transition back [to the community.]"   Exhibit A at pp. 57:11-58:3.

During the relevant period, the Community Corrections Program offered several work details, working at the County's animal shelters, maintaining the front lobby of BCDC, loading and unloading shipments at the BCDC loading dock, maintaining the grounds outside and around BCDC, setting up for, or cleaning up after, events put on by the Baltimore County Chamber of Commerce, and sorting recyclables at the MRF.[6]   Exhibit C at pp. 85:12-86:20; 85:6-86:2; Exhibit B at pp. 95:8-96:7, 105:21-106:14, and Exhibit 6 attached thereto.   Inmates who participated in work details, including those who were assigned to the MRF, were housed in a separate housing unit within BCDC.  Exhibit C at p. 86:3-20.

---

[6] There were also several work details that were not run by the Community Corrections Program, including barbers, kitchen workers, floor workers (performing cleaning and janitorial tasks), librarians, and gym workers inside the BCDC.  Exhibit C at p. 86:8-17.

**IV.  The Work Detail Program at the MRF Sought to Achieve the Rehabilitative Aims of the Community Corrections Program.**

The work detail at the MRF – also referred to as the CAF or MES[7] detail – was one of the County's work details during the relevant time period.  Watts Dep. at p. 118:5-17.  The County used inmates in connection with its recycling operations long before the construction of the single stream operations at the MRF in 2013.  *See* Exhibit K at MES 4426.  While the County does not have records of when the use of inmates began, Gail Watts ("Ms. Watts"), the current Director of the DOC, testified at deposition that inmates were working at the CAF when she was supervising the Community Corrections Program in 2007.  Exhibit B at pp. 36:15-21, 38:20-39:3.  Director Watts, who has worked with DOC for more than 30 years (since 1990), further testified that she did not know when the use of inmates began, and that "someone with 30 or more years as an employee with the [the DOC] or Baltimore County" would be needed to answer the question of when inmates began working in the County's recycling operations.  Exhibit B at pp. 12:7-13, 39:4-13.  Michael Beichler – who worked in various capacities in the County's recycling operations since 1997 – testified that inmates from BCDC were working at the

---

[7] When the single stream recycling facility at the MRF first opened in 2013, the County had a contractual agreement with Maryland Environmental Services ("MES") to operate the facility.  Exhibit M at pp. 50:12-20, 51:10-53:1; Exhibit L at p. 26:6-11.   MES is a government entity characterized as "not-for-profit business unit of the state of Maryland" created by the Maryland General Assembly in 1970 to assist with environmental projects throughout the State.  *About Us*, Maryland Environmental Service, https://menv.com/about/ (last accessed Oct. 17, 2022); Exhibit M at p. 51:10-13.  In 2017, County Administrative Officer Frederick Homan decided that the County would take over operations of the MRF from MES as a cost-saving measure, designed to eliminate administrative and overhead expenses which MES was charging back to the County for its operations. Exhibit M at pp. 50:21-51:9; Exhibit L at pp. 28:12-29:4, 31:14-32:18; Exhibit D at pp. 39:11-40:20.  Thus, the County assumed operations of the MRF from MES on July 1, 2017.  Exhibit L at p. 28:8-11. Both before and after the County assumed operations of the MRF from MES, inmates were present at the MRF as part of a work detail, sorting recyclables along the system of conveyor belts.  Exhibit D at pp. 33:21-34:2; Exhibit B at pp. 94:6-96:7; Exhibit J at pp. 121:18-122:12, 32:18-36:2.

County's dual stream recycling facility since at least when he started in 1997.  Exhibit I at pp. 37:3-6, 39:1-14, 93:10-94:10.

Throughout the relevant time period, the County assigned only sentenced inmates assigned to the MRF work detail and paid them $20 per day.  Exhibit I at pp. 95:5-12; Exhibit C at pp. 90:16-91:6, 158:13-18, and Exhibit 4 attached thereto; Exhibit P at pp. 58:9-16, 269:8-270:8.  Inmates also worked at the MRF from 6 a.m. to 3:30 p.m. Monday through Saturday, with increased hours of 6 a.m. to 5:30 p.m. from December 23, 2019 to February 9, 2020 (coinciding with when the MRF received an influx of recyclables around the holiday season).  Def. Objections and Answers to Plaintiff Scott's First Answers to Interrogatories, attached hereto as **Exhibit U**, at Answer No. 15.  From December 23, 2019 to February 9, 2020, the County paid inmates an attendance bonus of $20 for working their entire first workweek at the MRF (Monday through Saturday), and an additional $30 bonus for working their entire second week.  Exhibit U at Answer No. 15; Exhibit C at p. 92:12-15.

Inmates assigned to the MRF work detail received their room and board, three meals a day, healthcare and medications free of charge (except for a $4 charge for visiting the BCDC infirmary).  Exhibit C at pp. 178:12-179:8, 205:11-207:3; Exhibit B at pp. 86:2-87:17.  Inmates working at the MRF also would receive food bonuses consisting of pizzas and submarine sandwiches in exchange for producing a certain number of bales of recyclables during a shift. Exhibit C at pp. 158:13-18.  In addition, inmates assigned to a work detail earned up to 5 days per month of "industrial time" or "industrial credits" – which are credited to reduce their sentences.  Eric Brooks Deposition Excerpts, attached hereto **Exhibit V**, at pp. 8:20-9:5, 9:9-12; Exhibit C at pp. 202:6-9; Diminution of Time Directive, attached hereto as **Exhibit W**.  The ability to earn industrial credits was one of the most common reasons provided by inmates for

desiring to be placed on a work detail. Exhibit A at pp. 66:3-67:6; Michael Scott Deposition Excerpts, attached hereto as **Exhibit X**, at pp. 150:13-151:3.

**A. Inmates assigned to the MRF work detail remained in custody throughout their workday.**

Inmates assigned to the MRF were woken up by a correctional officer in their housing unit between 5:00 and 5:30 a.m. to attend the work detail. Exhibit X at pp. 163:19-165:4. Inmates were then provided breakfast on a cart wheeled into their housing unit. Exhibit X at pp. 165:17-166:4. Inmates would then access lockers assigned to them in their housing unit to change into civilian or "street" clothing. Exhibit X at pp. 164:13-165:16. Once changed, inmates were escorted by a correctional officer to the entrance of the Community Corrections Housing Unit, where two correctional officers assigned to supervise the MRF work detail would meet the inmates and perform a head count. Michael Dais Declaration, attached hereto as **Exhibit Y**, at ¶ 9. One of the correctional officers would then search the bus used to transport inmates to and from the MRF for contraband, and then escort the inmates on to the bus to be transported to the MRF. Exhibit B at pp. 64:3-67:2, and Exhibit 1 attached thereto at p. 3; Exhibit Y at ¶¶ 11-12. Inmates were provided bag lunches from the BCDC kitchen when placed on the bus and were allowed to take one commissary food item to the detail. Exhibit B at pp. 64:3-67:2, and Exhibit 1 attached thereto at p. 3; Exhibit X at p. 188:11-13. Once on the bus, the two correctional officers assigned to supervise the work detail would perform another head count to ensure that all inmates assigned to the detail were present.[8] Exhibit X at pp. 169:17-170:17; Exhibit Y at ¶ 14. Inmates were then directed to remain seated while they were driven from

---

[8] Justin Halligan, the current Supervisor of the Community Corrections Program, testified that Correctional Officer Assistants also supervised inmates at the MRF work detail, and that these officers are indistinguishable from correctional officers, with the exception that they are often retired correctional officers who come back to work for the County. Exhibit C at pp. 93:17-95:3, 191:6-194:9.

BCDC in Towson to the MRF in Cockeysville.  Exhibit X at pp. 170:18-171:12, Exhibit B at pp. 47:16-48:7l; Exhibit Y at ¶ 12.

 Once the bus arrived at the MRF, the two correctional officers assigned to supervise the work detail would have all inmates exit the bus and perform an additional head count.  Exhibit B at pp. 64:3-67:2, and Exhibit 1 attached thereto at p. 3; Exhibit Y ¶ 16.  Officers would then conduct a security inspection of the break room at the MRF for contraband before instructing inmates to enter the break room to obtain safety equipment and job assignments.  Watts Dep. at pp. 64:3-67:2, and Exhibit 1 attached thereto at p. 3; Dais Declaration at ¶ 17.  While the correctional officers remained at the MRF to handle all security and behavioral issues, staff affiliated with DPW trained and instructed the inmates on their work assignments.  *See* Def Second Amended Answers to Plaintiff Scott's Interrogatories, attached hereto as **Exhibit Z**; Exhibit Y at ¶¶ 19-22.  On an inmate's first day of work at the MRF, the inmate would receive an orientation, covering a variety of safety topics and how to perform the sorting tasks.  Exhibit X at p. 173:1-21; Exhibit J at p. 76:16-78:10l; Exhibit Y at ¶ 19.  Inmates were further provided with necessary safety equipment by DPW, including safety goggles, reflective vests, hard hats and safety gloves. Exhibit Y at ¶ 20. Inmates then went to the workstations on the recycling line to perform their sorting responsibilities.  Exhibit J at pp. 142:11-143:7; Exhibit I at pp. 40:10-41:17; Exhibit X at p. 173:4-21.

 Inmates who worked at the MRF were supervised by correctional officers at all times during the workday.  Michael Wells Deposition Excerpts, attached hereto as **Exhibit AA**, at pp. 44:13-45:7; Exhibit Y at ¶ 21.  Correctional officers "were always present[,]" and floated throughout the day to address any issues concerning the inmates.  Exhibit I at p. 255:5-256:8; Exhibit Y at ¶ 22.  The DOC's Policy Directive on the MRF work detail provided that

correctional officers are required to "position themselves so that they [could] continuously monitor all inmate workers on the production line."  Exhibit B at pp. 64:3-67:2, and Exhibit 1 attached thereto at p. 4; Exhibit P at p. 234:17-20.

Inmates at the MRF were instructed not leave their workstation unless they had permission from one of the correctional officers.  Exhibit X at p. 184:13-18; Exhibit Y at ¶ 26. Inmates were required to obtain approval from one of the correctional officers to leave their workstation to use the restroom, were escorted to and from the restroom by a correctional officer, and were subject to a frisk search both before and after using the restroom.  Exhibit X at p. 184:13-18; Exhibit B at pp. 64:3-67:2, and Exhibit 1 attached thereto at p. 5; June 26, 2019 Email from Officer Michael Dais, attached hereto as **Exhibit BB**; Exhibit Y at ¶ 27.  Inmates received a 45-minute break for lunch, and three 20-minute breaks when working extended hours during the MRF's busy season and received a 30-minute lunch break with two 15-minute breaks when they were working a regular schedule.  Exhibit J at pp. 102:10-103:3, 106:1-16.  During breaks, inmates were advised that they were only permitted in the breakroom and the restroom at the MRF, and were not permitted to be present anywhere else.  Exhibit X at pp. 216:18-217:4; Exhibit Y at ¶ 28.  Inmates were aware that they were not free to leave the MRF during the workday, Exhibit AA at p. 45:8-10, and MRF staff knew to alert a correctional officer and call the police if an inmate attempted to leave.  Exhibit J at p. 201:1-18; Exhibit Y at ¶ 29.

At the conclusion of the workday, a bell would sound to signify the end of the workday. Exhibit J at p. 94:8-15.  At this time, inmates were directed to return to the break room, deposit all safety equipment in a cabinet, and wait for the bus to return and transport them back to BCDC.  Exhibit X at pp. 221:17-222:14; Exhibit B at pp. 64:3-67:2, and Exhibit 1 attached thereto at p. 6; Exhibit Y at ¶ 31.  Any items brought back from the MRF by an inmate were

prohibited and considered contraband. Exhibit B at pp. 64:3-67:2, and Exhibit 1 attached thereto at p. 6.  As such, before boarding the bus to return to the detention center, inmates were frisked and searched.  Exhibit B at pp. 64:3-67:2, and Exhibit 1 attached thereto at p. 6; Exhibit Y at ¶ 32.  Once at the detention center, inmates were strip searched and required to undergo a "breath alcohol screening."  Exhibit B at pp. 64:3-67:2, and Exhibit 1 attached thereto at p. 6; Exhibit X at pp. 222:21-223:14; Exhibit C at pp. 81:12-82:9; Community Corrections Orientation Materials, attached hereto as **Exhibit CC**; Exhibit Y at ¶ 34.  Inmates were then required to enter the changing area of the housing unit and change back into their BCDC jumpsuits, which were stored in their lockers while at the work detail.  Exhibit X at pp. 149:1-13, 164:4-10; Exhibit Y at ¶ 35.  After changing into their BCDC-issued uniforms, inmates were returned to the common area of the Community Corrections Housing Unit, where they would receive dinner prepared in the BCDC kitchen.  Exhibit X at pp. 223:15-224:17.

### B. Inmates were subject to removal from the MRF for violation of the BCDC Code of Inmate Offenses.

Inmates could be removed from the MRF detail for a variety of reasons,[9] including if they received an "OIC" or "offense in custody[,]" meaning they were found guilty of a violation of BCDC's Code of Inmate Offenses.  Exhibit C at p. 36:10-21; Exhibit P at p. 245:8-12.  Notably, offenses occurring either at BCDC or at the MRF could be cause for an inmate to be removed

---

[9] Inmates would also be removed from the MRF work detail if they were recommended for work release by their sentencing judge and obtained "outside employment" with a private employer. Exhibit C at 42:4-43:18.  Also, if an inmate expressed that they no longer wanted to work at the MRF, a Classifications Officer or the Community Corrections Supervisor would attempt to find them a different work details with vacancies to assign them to.  Exhibit C at pp. 120:12-121:5, Exhibit P at pp. 109:20-110:18; Exhibit A at pp. 52:14-53:20.  However, if the inmate refused to work all together they could be charged with violation of BCDC's Code of Inmate Offenses and required to attend a disciplinary hearing where they would be found guilty/not-guilty and receive potential punishment.  Exhibit C at pp. 118:6-119:13, 122:11-123:4; Exhibit P at pp. 112:14-113:19, 119:3-18; Exhibit A at pp. 50:16-51:8.

from the MRF work detail.  If an inmate was found guilty of a violation of the DOC's code of conduct, the inmate would be placed on 60-day program hold, meaning that they could not participate in a work program or other institutional program for 60 days.  Exhibit P at pp. 229-17-231:15.  For example, Plaintiff Scott was barred from working at the MRF work detail on two occasions, the first of which involved a BCDC disciplinary infraction for possessing suboxone in his assigned locker at BCDC, and the latter of which involved an infraction for possessing tobacco in the same locker.  Exhibit X at pp. 250:3-13, 254:1-7; Michael Scott Disciplinary Documents, attached hereto as **Exhibit DD**, at BC 449.  Plaintiff Scott was also permanently removed from the MRF work detail for a third "offense in custody" and placed in restrictive housing after he threatened another inmate while at the MRF.[10]  *See* Exhibit DD at pp. BC 84058-84059.  According to a January 23, 2018 email from Ms. Parrish, the number of inmates removed from the MRF work detail for "OIC's" was at least partially responsible for the County's difficulty in assigning an adequate number of inmates to the detail at that time.[11]  John Jones Rule 30(b)(6) Deposition Excerpts, attached hereto as **Exhibit GG**, at pp. 28:11-29:21, and Exhibit 5 attached thereto.

---

[10] Likewise, Plaintiff Dakota Barnard was barred from working at the MRF for a period of time after loose tobacco was found concealed in his locker.  *See* Dakota Barnard Disciplinary Documents, attached hereto as **Exhibit EE**.  Plaintiff Barnard also was removed from the MRF work detail for "horse playing" with another inmate on the bus in transit to the detail.  *See* Exhibit EE at BC 68059-68060.  On December 10, 2019, Inmate Naim Hodges was removed from the MRF work detail after receiving an offense in custody for "leaving [his] designated work area without authorization[.]"  *See* Naim Hodges Disciplinary Documents, attached hereto as **Exhibit FF**.

[11] Per BCDC's policy directive on the MRF work detail, inmates who committed an offense in custody while present at the MRF work detail were to be handcuffed until transporting officers from BCDC could arrive at the MRF and return them to BCDC.  Exhibit B at pp. 64:3-67:2, and Exhibit 1 attached thereto at p. 7.

20

**C.  The MRF work detail was used a steppingstone to work release or potential permanent employment.**

Inmates assigned to the MRF work detail were told by Community Corrections staff that, if they performed well at the MRF, there was a possibility that they could obtain employment at the MRF following their incarceration.  Exhibit C at pp. 83:4-8.  Since 2017, the County hired six inmates who participated in the MRF work detail following their release from BCDC to work as full-time laborers at the MRF.  Exhibit J at pp. 202:3-206:15; Jones Declaration, attached hereto as **Exhibit HH**, at ¶¶ 2-6.  According to long-time Plant Manager at the MRF, John Jones, these inmates were hired because they performed well on the detail, and later received additional training and certifications as County employees, including how to operate a forklift.  *Id.*; Exhibit J at pp. 209:19-213:7.  Inmates were also told that, if they performed well at the MRF work detail for 30 consecutive days, a Classifications Officer would write to their sentencing judge and request that they be approved for work release (if not already approved).[12]  Exhibit C p. 141:1-18.

**D.  The MRF work detail is suspended in response to the COVID-19 pandemic.**

The MRF work detail was in operation at all times since construction of the single stream operations in 2013 until April 7, 2020.  Exhibit B at pp. 95:8-96:10.  On April 7, 2020, Ms. Watts decided to suspend the work detail at the MRF due to concerns about the transmission of COVID-19.  Exhibit B at pp. 105:21-106:4.  When the work detail was first suspended, County

---

[12] For example, FLSA-collective member Dakota Barnard was assigned to the MRF detail on August 25, 2018, and the Community Corrections Supervisor wrote his sentencing judge a letter on October 3, 2018, requesting that he be recommended for a work release.  *See* Dakota Barnard Work Release Documents, attached hereto as **Exhibit II**.  In addition, opt-in Plaintiff Adam Dulaj was assigned to the MRF Work detail on November 30, 2018, and Community Corrections Supervisor Audra Parrish sent a letter sent to Baltimore County Circuit Court Judge Colleen Cavanaugh on December 4, 2018 requesting that he be approved for work release.  *See* Adam Dulaj Work Release Documents, attached hereto as **Exhibit JJ**.  Opt-in Plaintiff Michael Wells was similarly able to work at the MRF detail for 1-2 months and thereafter obtained a work-release job at a local market.  Exhibit AA at p. 53:5-16.

employees who did not previously work at the MRF were reassigned to the MRF to work as sorters on the single stream recycling lines.  Exhibit M at pp. 39:8-41:21.  Then, in June, 2020, the County began staffing the sorting positions at the MRF exclusively with temporary labor through a staffing agency, and has maintained this arrangement at all times since.  Exhibit L at p. 100:8-102:1.

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. Proc. 56(c).  A difference of opinion does not necessarily equate to a dispute of material fact.  *Fraternal Order of Police Lodge No. 89 v. Prince George's County, Maryland*, 645 F. Supp. 2d 492, 508 (D. Md. 2009), *rev'd on other grounds*, 608 F.3d 183 (4th Cir. 2010).  The party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact requiring determination by a fact finder.  The nonmoving party cannot meet this burden through mere speculation or compilation of inferences or by resting upon conclusory allegations and denials of fact.  *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).  Rather, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  *Matsushita Electric Industries Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis added).

Although the Court must view the facts and the inferences drawn therefrom in the light most favorable to the non-moving party, a plaintiff's self-serving and conclusory allegations, unsupported by affidavits, depositions transcripts, or specific exhibits are insufficient to prevent summary judgment.  *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). Where the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial," summary judgment should be entered in favor of the moving party. *Hooven-Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

## ARGUMENT

### I.    The FLSA and MWHL Serve the Same Purpose and Define "Employee" in the Same Manner.

The FLSA was enacted in 1938 "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'" *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981) (quoting 29 U.S.C. § 202(a)).   To achieve this end, the FLSA "establish[es] a minimum wage and overtime compensation for each hour worked in excess of 40 hours in each workweek ...." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 97 (2015) (citation omitted).

"[T]he FLSA contains a 'saving clause', 29 U.S.C. § 218(a), that permits states or municipalities to enact laws that provide additional protections for employees beyond the minimum requirements established by [the] FLSA." *Butler v. DirectSat USA, LLC*, 800 F. Supp. 2d 662, 671 (D. Md. 2011).   In 1965, the Maryland General Assembly, enacted the MWHL to "establish[] a wage and hour law fixing minimum wages for employees, with certain exceptions ... and relating generally to the wages paid to and the hours worked by employees in this State[.]" *Amaya v. DGS Constr., LLC*, 479 Md. 515, 551 (2022) (citation omitted).   Much like the stated purpose of the FLSA, the MWHL is intended to, *inter alia*, "set minimum wage standards in the State to… provide a maintenance level that is consistent with the needs of the population for their efficiency, general well-being, and health[,]" and "safeguard employers and employees

against unfair competition[.]" *Amaya,* 479 Md. at 551; Md. Code Ann., Labor and Employment ("LE"), § 3-402(b).

This Court has observed that the MWHL "is the state statutory equivalent of the FLSA[,]" and that "[b]oth the MWHL and the FLSA have similar purposes, almost identical definitions of "employer," and [that] the MWHL contains internal references to the FLSA." *McFeeley v. Jackson St. Ent., LLC*, 47 F. Supp. 3d 260, 267 n. 6 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir. 2016) (citing *Watkins v. Brown*, 173 F.Supp.2d 409, 416 (D.Md.2001); *see also Friolo v. Frankel*, 373 Md. 501, 513, 819 A.2d 354, 361 (2003). Consequently, in cases where the definition of "employer" under the two statutes are at issue, the Court has ruled that a "claim under the MWHL stands or falls on the success of the[] claim under the FLSA." *McFeeley*, 47 F.Supp.3d at 267 n. 6 (citing *Turner v. Human Genome Sci., Inc.*, 292 F.Supp.2d 738, 744 (D.Md.2003)). Consistent with this precedent, Plaintiffs' MWHL and FLSA claims are analyzed under federal case law interpreting the FLSA.

## II. The FLSA Does Not Envision that Inmates Working for Their Custodians are Entitled to a Minimum or Overtime Wage.

Congress has defined covered "employees" subject to the FLSA as "any individual employed by an employer." 29 U.S.C. § 203(e)(1); *Henthorn v. Dep't of Navy*, 29 F.3d 682, 684 (D.C. Cir. 1994) (observing that the definition of "employee" under the FLSA is circular and "unhelpful."). The FLSA further defines the term "employ" as "to suffer or permit to work." 29 U.S.C. § 203(g). While Congress created several exemptions from this definition for specific positions – including certain agricultural workers, babysitters, and criminal investigators – it did not specifically address inmates or those in custody. *See* 29 U.S.C. 213(a); *Ndambi v. CoreCivic, Inc*., 990 F.3d 369, 372 (4th Cir. 2021). Judge Richard Posner, writing for the U.S. Court of Appeals for the Seventh Circuit, has explained that "[t]he reason the FLSA contains no

24

express exception for prisoners is probably that the idea was too outlandish to occur to anyone when the legislation was under consideration by Congress." *Bennett v. Frank*, 395 F.3d 409, 410 (7th Cir. 2005). This is because the FLSA was intended to prevent "labor conditions detrimental to the maintenance of the minimum standard of living…," and "people are not imprisoned for the purpose of enabling them to earn a living." *Id.;* 29 U.S.C. § 202(a).

Consistent with the Seventh Circuit's decision in *Bennett*, the Fourth Circuit, on three occasions, has held that the application of the FLSA to inmates and those in custody would be inconsistent with the Act's "legislative purpose." *Ndambi*, 990 F.3d at 372. The Fourth Circuit first addressed "whether inmates participating in prison work programs are covered by the [FLSA]" in *Harker v. State Use Industries*, 990 F.2d 131, 132 (4th Cir. 1993). The plaintiff in *Harker* claimed that he was required to be paid a minimum and overtime wage while working in various capacities at a "graphic print shop run by State Use Industries of Maryland," referred to as "SUI," during his incarceration. *Id.* at 132. This Court dismissed the plaintiff's FLSA claim under Fed. R. Civ. Proc. 12(b)(6), and the Fourth Circuit affirmed. *Id.*

On appeal, the Fourth Circuit observed that SUI was an organization within the Maryland Division of Corrections ("Maryland DOC") "created by the Maryland legislature to meet the rehabilitative needs of inmates" by "provid[ing] meaningful work experiences for offenders intended to improve work habits, attitudes, and skills with the objective of improving the employability of the offender upon release." *Id.* To achieve these rehabilitative aims, SUI operated the print shop to "resemble[e] a 'private corporate entity as closely as possible[,]" requiring that inmates go through a "voluntary application process" and "work on a regular schedule." *Id.* However, the Maryland DOC ultimately administered the SUI program, and retained all authority over the program to ensure proper performance of Maryland DOC's

statutory mission. *Id.* The Court further noted that SUI produced goods "for sale to government" entities, but also made sales in the "open market" in "limited situations, such as sales to charitable civic entities or when a surplus of goods remain[ed] unused after one year[.]" *Id.*

In affirming the dismissal of the plaintiff's FLSA claim, the Fourth Circuit observed that the "SUI programs differ substantially from the traditional employment paradigm covered by the [FLSA]" in three important ways. *Id.* at 133. First, the Court noted that "inmates work for SUI not to turn profits for their supposed employer, but rather as a means of rehabilitation and job training" by "producing useful goods in an atmosphere that mirror the conditions of a true private employer[.]" *Id.* Second, the Court commented that inmates in the SUI program have not made a "'bargained-for exchange of labor' for mutual economic gain that occurs in a true employer-employee relationship." *Id.* Specifically, the Court observed that the inmates are in a custodial relationship because they "do not deal at arms' length[,]" "enroll in SUI programs solely at the prerogative of the [Maryland DOC,]" are subject to "virtually absolute control" by the Maryland DOC, cannot "walk off the job site and look for other work[,]" and "do not leave [Maryland] DOC supervision" when their shift ends." *Id.* Finally, the Court ruled that the FLSA would not apply because "Congress added minimum wage standards in order to maintain a "standard of living necessary to for health, efficiency and general well-being of workers[,]" and "inmates have no such needs because the DOC provides them with the food, shelter, and clothing that employees would have to purchase in a true employment situation." *Id.*

The Court in *Harker* further rejected the plaintiff's claim that the FLSA should apply "because of its second intended purpose—preventing unfair competition in commerce." *Id.* at 134. The Court reasoned that the limited sale of SUI goods in the open market did not "threaten

fair competition in the market place[,]" and that Congress had already specifically addressed this concern in a separate law, the Ashurst-Sumners Act, which "criminalizes the transport of prison-made goods in interstate commerce in precisely those situations in which prison labor threatens fair competition." *Id.* The Court observed that the FLSA was passed three years after Ashurst-Sumners and "Congress would not have passed the FLSA knowing that it made Ashurst Sumners superfluous." *Id.* Rather, Congress passed Ashurst-Sumners to "criminalize the transport of prison-made goods" precisely because it recognized that such goods enjoyed "the unfair economic advantage of being produced by cheap (non-FLSA) labor." *Id.*

Since *Harker*, the Fourth Circuit has rejected the application of the FLSA to detainees on two additional occasions, in *Matherly v. Andrews,* 859 F.3d 264 (4th Cir. 2017) and *Ndambi v. CoreCivic, Inc.,* 990 F.3d 369 (4th Cir. 2021). In *Matherly*, the Fourth Circuit affirmed the dismissal of FLSA claims by a plaintiff who was civilly committed as a "sexually dangerous person" to the Federal Bureau of Prisons ("BOP"). There, the Fourth Circuit dismissed the claims based on *Harker*, reasoning that "(1) there is no indication that [the plaintiff] is working to turn a profit for the BOP; (2) his employment relationship with the BOP isn't the product of a bargained-for exchange; and (3) the BOP provides him with all of his necessities, satisfying the underlying purpose of the FLSA's minimum wage provision." *Id.* at 278 (citations omitted).

Most recently, in *Ndambi*, the Fourth Circuit affirmed the dismissal of FLSA claims by "former Immigration and Customs Enforcement [("ICE")] civil detainees who allege[d] that they [were] owed wages under the [FLSA] for work performed while detained." 990 F.3d at 370. There, the plaintiffs had been detained during the pendency of their immigration cases at a local correctional center operated by a private for-profit company, CoreCivic. *Id.* CoreCivic had contracted with the local government to operate the detention center and serve as an

"independent contractor for the care and safety of civilly detained immigrants." *Id.* at p. 370. The District Court in *Ndambi* dismissed the case on the grounds that courts have "declined to extend the FLSA to custodial settings[,]" and the Fourth Circuit agreed, noting that "that task is best left to Congress[.]" *Id.*

In deciding that the detainees were not "employees" subject to the FLSA, the Fourth Circuit in *Ndambi* addressed the same factors referenced in *Harker*. *Id.* at 372. First, the Court observed that the FLSA was enacted to protect those who operate "within 'the traditional employment paradigm[,]'" rather than those in "custodial detention" who are "subject to <u>too much</u> control to be considered in an employment relationship[.]" *Id.* (citations omitted) (emphasis in original). Further, the Court observed that, merely because detainees chose to participate in the work program, there is no "bargained-for exchange" because they participate in the work "solely at the prerogative of the custodian." *Id.* (citation omitted). Finally, the Court observed that, "unlike workers in a free labor market who use their wages to maintain their 'standard of living' and 'general well-being,' 29 U.S.C. § 202(a), detainees in a custodial institution are entitled to the provision of food, shelter, medicine, and other necessities." *Id.* (citation omitted).

The Court in *Ndambi* also disregarded the plaintiffs' argument that "the FLSA's aim of combatting unfair competition in the marketplace is implicated because the detention facility happens to be operated by a for-profit, private entity." The Court reasoned that:

> [w]hatever merit this observation possesses as a matter of policy cannot dictate its adoption as a proposition of law. Other circuits have held that the nonemployee-status of detainees is not altered by the private, for-profit nature of the detention facility. *See, e.g.*, *Bennett,* 395 F.3d at 409 ("The Fair Labor Standards Act is intended for the protection of employees, and prisoners are not employees of their prison, whether it is a public or a private one."). While detentions may well have an incidental monetary aspect, their aims are not primarily economic ones. "The purpose of [appellants'] detention is to ensure their presence during the

administrative process and, if necessary, to ensure their availability for removal from the United States." []The fact that CoreCivic would have to hire nondetainees for such work without detainees' participation does not eliminate the non-pecuniary goals of the VWP. As with the work programs in *Harker* and *Matherly*, the VWP's aim of reducing the "negative impact of confinement ... through decreased idleness, improved morale and fewer disciplinary incidents" remains intact.

*Id.* at 374-375 (internal citations omitted).

Here, as in *Harker*, *Matherly* and *Ndambi*, there is no material factual dispute that Plaintiffs' coverage as "employees" would be inconsistent with the legislative purpose of the FLSA, as it is undisputed that 1) Plaintiffs' participation in the MRF work detail was intended to serve the rehabilitative aims of the DOC and Community Corrections Program, rather than generate a profit, 2) Plaintiffs were in a custodial, rather than employer-employee, relationship, 3) Plaintiffs were provided all necessities of daily living from the County, and 4) the County does not obtain any unfair competitive advantage as the result of inmates working at the MRF.

## A. Plaintiffs' participation in the MRF work detail serves a rehabilitative, rather than pecuniary, goal.

Turning to the first factor identified in *Harker* and its progeny, the purpose of the MRF work detail – as well as all details under the purview of the Community Corrections Program – was to serve the rehabilitative aims of the DOC rather than any profit-making motive. Both the Director of the DOC and the Supervisors of the Community Program have testified that the intent of the Community Corrections Program was to offer programs and services to assist inmates with their reintegration into the community following their release from BCDC. Exhibit B at p. 34:4-11; Exhibit P at p. 135:8-136:2, Exhibit A at pp. 57:8-58:3. Indeed, the MRF work detail allowed inmates to "earn time off their sentence[,]" which necessarily means that inmates reintegrated into society sooner then they would have otherwise without the work detail. The MRF work detail also gave inmates a change of environment, and an opportunity to obtain

29

structure and job skills, such as waking up and getting ready for work each day, working a regimented full-day shift, and taking instructions from supervisors.  Exhibit A at pp. 57:8-58:3; Exhibit C at pp. 172:19-174:2; Exhibit D at pp. 151:20-154:20; 167:11-168:7; Exhibit B at p. 118:14-17.   In this way, the MRF work detail prepared inmates for employment upon their release, much like the inmates in *Harker* working in the SUI printshop "produc[ed] useful goods in an atmosphere that mirror[ed] the conditions of a true private employer."  990 F.2d at 132-133.  Moreover, like the work program in *Ndambi*, the MRF work detail allowed inmates to leave the detention center each day, avoid the boredom and idleness often accompanying incarceration, and engage in productive work on behalf of the County.  Exhibit A at p. 66:3-21; Exhibit B at pp. 119:8-120:5; *see Ndambi* 990 F.3d at 374 (observing that the VWP's aim of reducing the "negative impact of confinement ... through decreased idleness, improved morale and fewer disciplinary incidents" remains intact.).

In practice, the rehabilitative aims of the MRF work detail are evident from the testimony of former County Administrative Officer, Mr. Homan, who testified that the inmate work at the MRF was intended to provide a "career path" for inmates to obtain employment with the County following their release, which in fact materialized in six inmates being hired to work at the MRF post-incarceration.   Exhibit D at pp.162:18-163:16; Exhibit J at pp. 202:3-206:15.   The rehabilitative aims of the MRF are further evident from the fact that 1) the MRF work detail provided a means for inmates to work towards re-entry into the community by obtaining time off their sentence, and 2) the Community Corrections Staff would write to the court on behalf of inmates and request approval for work release if an inmate performed well at the MRF.  As noted by Mr. Pokorny, the hope in obtaining work release approval for an inmate was that the inmate would eventually progress to home detention, and remain employed with the same private

employer following their incarceration.  Thus, the MRF work detail not only provided job skills and structure to inmates, but served as a steppingstone for an inmate to progress to work release, home detention and potential post-incarceration employment.

In stark contrast to the many ways in which the MRF work detail served to assist inmates with reintegration into the community, there is no evidence that the MRF work detail was operated for the purpose of making a profit for the County.  Mr. Homan noted that the goal of constructing and operating the single stream recycling facility at the MRF was to achieve the environmental benefit of improving the County's recycling – which was something of interest to County residents.  Thus, the County would have operated the MRF "whether it was going to simply break even, suffer a small loss, or make a profit."  Indeed, the County never tracked whether the MRF was making a profit, in the sense that the revenue obtained from the sale of recyclables exceeded the complete costs of operating the MRF.  Moreover, even a comparison of the revenue generated from the sale of recyclables against the partial costs of operating the MRF reveals that the MRF was operated at a net loss in both fiscal years 2019 and 2020—the final two fiscal years that the work detail was in operation.

Even assuming, *arguendo*, that the County was making more from the sale of recyclables than it costs to operate the MRF, that alone would not undermine the rehabilitative aims of the DOC, the environmental benefit of increased recycling, and the cost savings from revenue deposited into the County's General Fund.  Even in *Ndambi* – where labor was performed for a private, for-profit entity with no relation to the government – the Court observed that "an incidental monetary aspect" of the detention did not eliminate the "non-pecuniary goals" of the work.  990 F.3d at 374.  Surely, depositing revenue – whether characterized as profit or otherwise – into the County's General Fund is a far cry from a private, publicly traded company

generating profits through the low cost of inmate labor.  This is especially so where any incidental "profit" by the County is not retained by shareholders or owners of a corporation, but rather deposited into the County's General Fund and used to pay for all functions of the County government, including the maintenance of BCDC and the very food, clothing and housing provided to the Plaintiffs while incarcerated.  Exhibit N at ¶¶ 16-21; *Harker*, 990 F.2d at 134 (observing that governments may appropriately use prison labor "to offset some of the costs of incarceration.").

### B. Inmates are in a custodial rather than employer-employee relationship.

Like *Ndambi* and *Harker*, the Plaintiffs in this case undisputedly remained in the custody of the DOC at all times while participating in the MRF work detail, and there is no admissible evidence that the work detail was "comparable to 'the free situation of true employment.'" *Ndambi*, 990 F.3d at 372.  Importantly, even assignment to the MRF work detail was contingent upon approval by the DOC staff, who decided whether to assign an inmate to the MRF work detail or other programs based on a host of factors, including previous institutional behavior, disciplinary violations, or criminal history.  Moreover, the work assignments offered by the DOC are even more indicative of a custodial relationship than *Harker* and *Ndambi* – where participation in the work programs was voluntary – as the DOC's policy directives and Code of Inmate Offenses required inmates to work, and those who refused were subject to an institutional infraction.

Further, once an inmate was assigned to the MRF work detail, they remained in custody at all times throughout their workday at the MRF.  Correctional officers travelled with inmates on the bus, remained onsite at the MRF throughout the day, and escorted inmates back to BCDC each day.  During the workday, inmates remained subject to the BCDC Code of Inmate Offenses,

were restricted to their workstations, the break room area, and the restroom, and were even escorted by correctional officers and subject to frisk search when using the restroom facilities. Like the inmates in *Harker* and *Ndambi*, inmates at the MRF work detail were neither "free to walk off the job site and look for other work[,]" nor were they free to "leave DOC supervision" when the workday ends. Quite to the contrary, the DPW staff were instructed to call the police in the event that an inmate left the worksite. Finally, at the conclusion of the workday, inmates were escorted back to their BCDC housing unit by correctional officers, subject to a strip search, and then instructed to change back into their BCDC-issued jumpsuits before having dinner in their housing unit. Both while at the MRF and at BCDC, inmates remained subject to rules unique to the custodial setting, such as prohibitions on the possession of contraband like tobacco.

Inmates also did not "deal at arm's length" and were unable to negotiate their pay, the length of their shift, their work schedule, or the tasks they were required to perform while at the MRF. In fact, several of the Plaintiffs have recognized that all inmates received the same pay, work schedule, and benefits, and that none of them were able to negotiate for anything more or different. Moreover, the amount of inmate pay and bonuses, and the length of schedules, were decided between the DPW and DOC, often with approval from the County Administrative Officer. Exhibit D at pp. 43:20-45:20, Exhibit P at pp. 212:7, 217:7-221:9, and Exhibit 4 attached thereto. Thus, while there is an exchange of money between the County and inmates for work at the MRF, there is no "bargained-for-exchange" as is the case in a free-market employment relationship. *Ndambi*, 990 F.3d at 372. As noted by the Fourth Circuit, "there is too much control to classify the [detainer-detainee] relationship as one of employment." *Id.* (citing *Vanskike v. Peters*, 974 F.2d 806, 810 (7th Cir. 1992)).

**C. Inmates do not require wages to maintain their "standard of living" and "general well-being."**

There also is no dispute that Plaintiffs received all of their basic necessities, like food, water, lodging, clothing and healthcare free of charge from the County.[13]  Consequently, unlike a person working in a true employment setting, the fundamental underpinning of the FLSA – to allow workers to maintain a "standard of living" or "general well-being" – does not support payment of a minimum or overtime wage.  Like the custodians in *Ndambi* and *Harker*, the County is constitutionally and statutorily required to provide Plaintiffs with such basic needs.  *See* Md. Code Ann., Correctional Services § 11-203 ("The managing official of a local correctional facility shall provide to an inmate in the custody of the managing official… food and board; and … any article of comfort that is considered necessary for a sick inmate by the physician attending the inmate.").

**D. The County did not obtain an unfair competitive advantage through the MRF work detail.**

Both *Harker* and *Ndambi* rejected the contention that a correctional facility gains an unfair competitive advantage vis-à-vis paying a sub-minimum wage.  The Court in *Ndambi* noted that "whatever merit this observation possesses as a matter of policy cannot dictate its adoption as a proposition of law."  990 F.3d at 374.  The Court in *Harker* further observed that Congress had passed and revised legislation – including the Ashurst-Sumners Act – intended to regulate the sale and transport of prison made goods to address this very concern.  990 F.2d at 134.  Thus, "Congress [had] operated on the assumption that the FLSA does not apply to inmate labor[,]"

---

[13] While $4 was generally deducted form an inmate's trust account for each medical visit, the DOC's policy directive provides that "inmates shall not be denied access to sick call or medical care due to lack of funds in their [trust] account."  *See* Sick Call and General Health Services Policy Directive, attached hereto as **Exhibit KK**.

and the Court declined to enter "into the arena of public policy" in extending the reach of the

FLSA.  *Id.* at 136.

Here, the reasoning of *Harker* and *Ndambi* in refusing to enter into the area of public

policy applies with equal force, as Congress has been aware that inmates are used extensively in

recycling processes for more than 20 years and has yet to expand the FLSA to address the

prospect of "unfair competition" in this area.  Specifically, in 1934, Congress created Federal

Prison Industries – known by its trade name "UNICOR" – a "for-profit" Government corporation

"to provide employment and training for federal inmates."  *Coal. for Gov't Procurement v. Fed.*

*Prison Indus., Inc.*, 365 F.3d 435, 445 (6th Cir. 2004); U.S. Department of Justice, Office of

Inspector General, *A Review of Federal Prison Industries' Electronic-Waste Recycling Program*

(October 2010) at p. ix.  Since 1997, UNICOR has accepted "computers, monitors, printers, and

other types of e-waste for recycling at federal prisons[,]" paid inmates sub-minimum wages to

process recyclables sold to wholesale vendors, and maintained "marketing agreements with

persons who sell UNICOR's e-waste on the Internet."  *See Review of Federal Prison Industries*,

*supra.*, at pp. ix, 26.[14]  Notably, many of the electronical material handled by UNICOR inmates

"eventually reaches international markets[.]"  *See Review of Federal Prison Industries*, *supra.*, at

p. 26.

UNICOR's use of sub-minimum wage inmate labor to process recyclables sold in

"international markets" is well known to Congress.  In 2009, the House of Representatives issued

a Resolution concerning "recycling, and appropriate disposal of obsolete computers[,]" and

observed that that "United States owns and operates UNICOR, the trade name for Federal Prison

Industries, Inc., which employs offenders incarcerated in correctional facilities under the Federal

---

[14]                 *UNICOR*,         Federal           Bureau          of          Prisons,
https://www.bop.gov/inmates/custody_and_care/unicor_about.jsp (last accessed Oct. 17, 2022).

Bureau of Prisons" and "operates 8 e-waste recycling facilities in direct competition to privately owned and operated e-waste disposal facilities in the United States." H.R. 938, 111th Cong. (2009). In 2012, Congress passed the Consolidated and Further Continuing Appropriations Act which gave UNICOR authority to work with private sector companies to manufacture and sell products in the commercial market, provided certain eligibility requirements are met.[15] H.R. 2112, 112th Cong. (2012). Moreover, in 2013, a bill was introduced in the U.S. House of Representatives to, *inter alia*, address UNICOR's "unfair competition with private sector firms and their non-inmate workers[,]" and require that UNICOR "increase the maximum wage rate for inmates performing work for or through Federal Prison Industries to an amount equal to 50 percent of the minimum wage prescribed by section 6(a)(1) of the [FLSA.]" H.R. 2098, 113th Cong. (2013).

Given that Congress is certainly aware that the federal government is using inmates to perform recycling on a much larger scale than the County[16] – and even addressed the FLSA in proposed legislation affecting UNICOR – the Fourth Circuit's observation that the policy of combatting "unfair competition in the marketplace" is best left to Congress remains intact. *Ndambi*, 990 F.3d at 375. As noted in both *Harker* and *Ndambi*, Congress has heavily legislated the ill-effects of inmate labor on private business and citizens, and it is not the province of the

---

[15] UNICOR's eligibility requirements for its private vendors include, but are not limited to, that the private vendor will not export any UNICOR products to any country subject to restriction under the law of the United States, that no UNICOR products will be used in the development or use of weapons of mass destruction, and that all private vendors will comply with applicable UNICOR regulations and restrictions. *Vendor Registration Packet*, UNICOR, https://unicor.gov/publications/recycling/vendor_registration_packet.pdf (last accessed Oct. 17, 2022).

[16] UNICOR's net recycling sales in 2021 were $30,393,000, with $16,343,000 reported as earnings. UNICOR, *Annual Management* Report, Federal Prison Industries, Inc. (Nov. 12, 2021) https://www.unicor.gov/publications/reports/FY2021_AnnualMgmtReport.pdf.

Court's to expand the reach of the FLSA in light of these concerns.  *Id.*; *Harker,* 990 F.2d at 135-36.

In any event, even assuming, *arguendo*, that the Court is inclined to engage in the policy considerations rejected by the Fourth Circuit, the undisputed facts here demonstrate that there is no unfair competition by the County with private entities engaged in the sale of recyclables. Rather, the County sells recyclables to the highest bidder based on current market conditions, and does not seek to undercut or undersell other entities by selling its recyclables for less.  In fact, the County has refrained from accepting commercial recycling precisely because the County does not wish to compete with private entities providing commercial recycling pick up. The County also would have picked up and sold recyclables processed at the MRF whether or not it used inmate labor, as evidenced by the fact that the County has continued to operate the MRF and sell recyclables for 2.5 years since April 2020 when the MRF work detail was suspended.[17]   Thus, the County was not harming local industry by operating the MRF work detail, and the undisputed evidence demonstrates that treatment of the Plaintiffs as "employees" would be contrary to the very purpose of the FLSA.

## III.   Courts Applying the Economic Realities Test Have Uniformly Held that Inmates Compelled to Work for, and Paid By, their Custodians are Not "Employees" Under the FLSA.

In *Harker*, the Fourth Circuit noted that courts from outside the circuit applied a four-factor "economic reality test" – considering "the totality of the work situation, including whether the alleged employer (1) hires and fires, (2) controls work schedules, (3) determines pay rates,

---

[17] To the extent Plaintiffs contend that the use of temporary labor after the suspension of the MRF work detail is indicative of an unfair competitive advantage, the Court in *Ndambi* rejected the Plaintiff's argument that the private detention center would be required to hire local civilians if not for the availability of cheap inmate labor.  *Ndambi*, 990 F.3d 369 at 374 ("The fact that CoreCivic would have to hire nondetainees for such work without detainees' participation does not eliminate the non-pecuniary goals of the VWP.").

and (4) maintains pay records" –  and "almost uniformly" held that inmates are not subject to the FLSA, even while working for "private, outside employers."  *Harker,* 990 F.2d at 135 (citing *Gilbreath* v. *Cutter Biological*, 931 F.2d 1320, 1325–26, 1328–31 (9th Cir. 1991); *Alexander v. Sara, Inc*., 721 F.2d 149, 150 (5th Cir.1983); *Sims v. Parke Davis & Co*., 334 F.Supp. 774, 782 (E.D.Mich.1971); *Hudgins v. Hart*, 323 F.Supp. 898, 899 (E.D. La. 1971); *Huntley v. Gunn Furniture Co.*, 79 F.Supp. 110, 113–16 (W.D.Mich.1948)).  *Harker* discussed one case applying the economic realities analysis – *Watson v. Graves*, 909 F.2d 1549 (5th Cir. 1990) – as an example of the "[t]he <u>extraordinary circumstances</u> necessary to trigger FLSA coverage of inmate labor."  *Id.* at 135 (emphasis added).  "There, a corrupt Louisiana sheriff and warden hired out inmates housed at the parish jail to a [private] construction company run by the sheriff's [daughter and] son-in-law."  *Id.*  *Watson* ruled that, "[u]nder a realistic analysis of the four prongs of the economic realities test, in light of the policies behind the Act," the plaintiffs were employees of the sheriff's daughter and son-in-law.  909 F.2d at 1556.

The only other reported circuit decision to hold that inmates <u>could</u> be covered by the FLSA was *Carter v. Dutchess Community College*, 735 F.2d 8, 10 (2d Cir. 1984), *holding modified by Danneskjold v. Hausrath*, 82 F.3d 37 (2d Cir. 1996).[18]  In that case, the plaintiff was employed as a teaching assistant by Dutchess Community College ("DCC") –  an entity separate from his custodian – to "act as teaching assistants" "in conjunction with several college level courses offered by DCC."  *Id.* at 10.  The district court granted summary judgment on the

---

[18] In *Hale v. Arizona*, the Ninth Circuit "held that prisoners working for a state prison industries program and for a prisoner-owned enterprise within that program were "employees" of the state under the FLSA."  *Hale v. Arizona,* 967 F.2d 1356 (9th Cir.1992).   However, the Ninth Circuit, in an *en banc* opinion, reversed and held that prisoners "who worked for programs structured by the prison pursuant to the state's requirement that prisoners work at hard labor, are not "employees" of the state within the meaning of the FLSA."  *Hale v. State of Ariz.*, 993 F.2d 1387, 1389 (9th Cir. 1993).

plaintiff's FLSA claim, finding that "the ultimate control exercised by prison officials over inmates is a dispositive consideration that precludes a finding of an employee-employer relationship between an inmate and some outside entity[.]" *Id.* at 10. The Second Circuit reversed and held that "[a] full inquiry into the true economic reality" based on the four-factor test was necessary, and that DCC "failed to demonstrate that all material facts under the economic reality test were undisputed." *Id.* at 14

Several decisions since *Carter* and *Watson* have rejected the multi-factor test as useful in analyzing inmate labor. *Villarreal v. Woodham*, 113 F.3d 202, 206 (11th Cir. 1997) ("[T]he 'economic reality' test does not apply in the inmate-jailer context because the FLSA presupposes a free-labor situation constrained by the Thirteenth Amendment, which does not apply to convicted inmates."); *Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992) (same). Even the Second Circuit which decided *Carter* has observed that "subsequent cases … have rather uniformly declined to use the four-part []test[,]" and therefore "reexamine[d] and reject[ed]" *Carter's* use of the test to analyze prison labor. *Danneskjold v. Hausrath*, 82 F.3d 37, 40–41 (2d Cir. 1996). While the Fourth Circuit has never adopted the economic realities analysis, the Court in *Ndambi* cited with approval to the D.C. Circuit's decision in *Henthorn v, Dept. of the Navy*, 29 F.3d 682 (D.C. Cir. 1994), which similarly declined to utilize the four-factor test but "look[ed] behind the 'economic reality' test" to hold that:

> where an inmate participates in a non-obligatory work release program in which he is paid by an outside employer, he may be able to state a claim under the FLSA for compensation at the minimum wage. However, where the inmate's labor is compelled and/or where any compensation he receives is set and paid by his custodian, the prisoner is barred from asserting a claim under the FLSA, since he is definitively not an "employee."

*Id.* at 686-687.

The standard announced in *Henthorn* was recently applied by the Middle District of Pennsylvania in circumstances remarkably similar to the present case.  In *Burrell v. Lackawanna Recycling Center, Inc.*, the plaintiffs had been sentenced to serve a period of incarceration for failure to pay overdue child support and were required to work at the Lackawanna Recycling Center, a privately run entity, for approximately eight hours a day at a pay rate of $5.00 per day. No. 3:14-CV-1891, 2021 WL 3476140, at *1 (M.D. Pa. Aug. 6, 2021).  The *Burrell* court observed that ""[s]ince at least March 31, 2005, the Lackawanna County Solid Waste Authority ("Authority") and Lackawanna Recycling Center, Inc. ("LRCI") have been parties to a contract (the "Operating Agreement") regarding the operations of the Lackawanna County Recycling Center (the "Center"), a recycling center owned by the Authority."  Pursuant to the Operating Agreement, the Authority was required to "provide … Prisoners from the Lackawanna County Prison[.]"  *Id.*  As a result, prison guards transported the plaintiffs and other prisoners to the Center, and remained on site to provide security.  *Id.*  Applying the standard announced in *Henthorn*, *Burrell* ruled that the plaintiffs failed to establish an employment relationship, as they did not allege that "their work at the Center was freely contracted and voluntary."  *Id.* at 22. Moreover, the Court reasoned that the Plaintiffs failed to allege that "their compensation was set by a non-prison source," and rather conceded that their compensation was set and paid by Lackawanna County, which also "operate[d] the Lackawanna County Prison."  *Id.*

In the case at bar, the reasoning of *Burrell* and application of the *Henthorn* economic reality framework leads to the same result.  First, Plaintiffs were "compelled to part with [their] labor" under both DOC policy and Maryland regulations, and were assigned to the MRF work detail at the prerogative of DOC Classifications staff.  *See Ndambi*, 990 F.3d at 372 (rejecting the plaintiff's claim that participation in the work detail was voluntary because, "[w]hile a detainee

may choose whether or not to participate in a voluntary work program, they have that opportunity "solely at the prerogative" of the custodian."); *see also* COMAR 12.14.03.06 ("the managing official of a correctional facility is responsible for … [a] written policy which ensure that right of a convicted inmate to decline to participate in activities, services, and programs with the exception of work assignments …[.]").

Moreover, the County operated both BCDC and the MRF where the Plaintiffs worked, and the County Administrative Officer exercised substantial decision-making authority over the work detail.  Specifically, Mr. Homan testified that the Directors of both DPW and DOC reported to him, that both agencies were funded by the County's General Fund, and that Mr. Homan set the amount of pay received by inmates.  Exhibit D at pp. 19:4-7, 43:20-47:21.  In fact, the DOC and DPW are not independent entities at all but rather agencies of the County, and it was the County that acted as the Plaintiffs' custodian and the owner/operator of the MRF.  *See Davis v. Baltimore Cnty. Dep't of Corr.*, No. CV ELH-21-2268, 2022 WL 3975160, at *7 (D. Md. Aug. 31, 2022) ("DOC is simply an agency of Baltimore County[.]").  Thus, like in *Burrell*, the County both operates BCDC where Plaintiffs are housed, sets inmate wages with the approval of its Chief Administrative Officer, and pays Plaintiffs for their work.  *See Burrell,* No. 3:14-CV-1891, 2021 WL 3476140, at *22 (holding that the plaintiffs failed to allege that "their compensation was set by a non-prison source" where their compensation was set by Lackawanna County, which also "operate[d] the Lackawanna County Prison.").  As such, any compensation Plaintiffs received was "set and paid by [their] custodian[.]"  *Henthorn*, 29 F.3d 682 at 686-687.

## IV.  Assuming, *Arguendo*, that Plaintiffs are Covered by the FLSA, they Have Failed to Supply Any evidence to Satisfy their Burden to Show a Willful Violation.

Whether a violation is willful impacts the length of the appropriate limitations period under the FLSA.  *Desmond v. PNGI Charles Town Gaming, L.L.C.*, 630 F.3d 351, 357 (4th Cir.

41

2011). The FLSA provides a two-year statute of limitations for non-willful violations, and a three-year statute of limitations for willful violations. *Id.* (citing 29 U.S.C. § 255(a)). Under the willfulness standard for a three-year limitations period, "only those employers who 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA]' have willfully violated the statute." *McLaughlin v. Richland Shoe*, 486 U.S. 128, 133 (1988). Negligent conduct is not enough to show willfulness, and the employee bears the burden to prove a willful violation. *Desmond*, 630 F.3d at 357. "Although this is ultimately a question of fact, a plaintiff must present sufficient evidence of willfulness to survive summary judgment." *Robinson v. Empire Equity Group, Inc.*, 2014 WL 6698407 at *5. The District of Maryland has held that a violation of the FLSA was not willful where an employer appropriately paid tipped employees less than the standard minimum wage, but did not provide the required notice of the "tip credit" to employees because of ignorance of the notice provisions in the FLSA. *Mould v. NJG Food Serv. Inc.*, 37 F. Supp. 3d 762, 772 (D. Md. 2014). There, the Court observed that "[i]n availing themselves of the tip credit allowed by the FLSA but failing to determine whether any legal conditions needed to be satisfied prior to taking such a tip credit, Defendants' conduct was unreasonable but falls short of the recklessness required for the Court to find that their violation of section 203(m) was willful." *Id.* at 773.

In the case at bar, assuming, *arguendo*, that Plaintiffs are covered by the FLSA (which they are not), they have failed to satisfy their burden to show a willful violation. In particular, there is no evidence that any County official or employee knew or showed reckless disregard for whether Plaintiffs were employees, especially in light of the Fourth Circuit's adoption of a long-standing categorical rule against FLSA coverage for inmates. Furthermore, Mr. Homan testified

that he approved the rate of pay for inmates, but never considered that inmates would be entitled to a minimum wage:

> So why didn't Baltimore County pay inmates minimum wage?
>
> MR HOFFMAN: Objection.
>
> Well, sir, as I mentioned before, if you take a look at where I believe the Corrections budget is now or even a few 21 years ago where it was, the cost per inmates using average daily population is $40,000 a year, right, which includes obviously room and board based upon a decision in court. It includes their healthcare, which we're obligated to by the law. It just never occurred to me and would have occurred to me that that was something that would have been demanded by law that we pay people who are being supported by the public are then in turn also paid minimum wage on top of that.

Exhibit D at pp. 161:5-10.  As reflected in Part II, *supra*., Mr. Homan's reasoning mirrors that of the Fourth Circuit in refusing to apply the FLSA to inmates who "are entitled to the provision of food, shelter, medicine, and other necessities" at the expense of their custodian.  Moreover, it is undisputed that the County used inmates who were paid a sub-minimum wage to sort recyclables for more than 30 years.  There is no evidence, that, in that time, the County was ever subject to any lawsuits, government audits or even informal complaints before the filing of the present lawsuit which would have provided even plausible notice that inmates were covered by the FLSA.  Consequently, the statute of limitations for all individual and collective actions claims under the FLSA (Counts I and II) must be two years.

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that this Court grant its Motion for Summary Judgment and dismiss all claims in their entirety.

October 17, 2022                                    Respectfully submitted,


*/s/Kraig B. Long*                                 */s/ Jennifer R. Frankovich*
Kraig B. Long (Fed. Bar No. 25747)                 Jennifer R. Frankovich, Fed. Bar#26052
Jeffrey T. Johnson (Fed. Bar No. 19876)            Veronica N. Love, Fed. Bar#21531
Nelson Mullins Riley & Scarborough, LLP            Baltimore County Office of Law
100 S. Charles Street, Suite 1600                  400 Washington Ave, 2nd Floor
Baltimore, MD 21201                                Towson, MD 2104
Tel: 443-392-9460                                  Tel: 410-887-4420
Fax: 443-392-9499                                  Fax: 410-296-0931
Kraig.Long@nelsonmullins.com                       *JFrankovich@BaltimoreCountyMD.gov*
Jeffrey.Johnson@nelsonmullins.com                  *VLove@BaltimoreCountyMD.gov*

**Counsel for Defendant**

44

## INDEX OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | Phil Pokorny Deposition Excerpts |
| B | Gail Watts Deposition Excerpts |
| C | Justin Halligan Deposition Excerpts |
| D | Frederick Homan Deposition Excerpts |
| E | Baltimore County, MD Organization Chart (BC 23248-23250) |
| F | Def. Responses to Plaintiff Scott's First Set of Requests for Admissions |
| G | Robert Burke Deposition Excerpts (Vol. 2) |
| H | Solid Waste Workgroup Final Report (BC 23108-23176) |
| I | Michael Beichler Deposition Excerpts |
| J | John Jones Deposition Excerpts |
| K | 2016 Recycling Systems Excellence Award (MES 04421-04435) |
| L | Matthew Carpenter Rule 30(b)(6) Deposition Excerpts |
| M | Matthew Carpenter Deposition Excerpts |
| N | Matthew Carpenter Declaration |
| O | Def. Objections and Answers to Plaintiff Dulaj's Second Set of Interrogatories |
| P | Audra Parrish Deposition Excerpts |
| Q | November 27, 2018 Email from Audra Parrish (BC 113373) |
| R | Classifications Policy Directive (BC 7347-7349) |
| S | Inmate Workers Policy Directive (BC 7350-7356) |
| T | Inmate Handbook (BC 23195-23242) |
| U | Def. Objections and Answers to Plaintiff Scott's First Answers to Interrogatories |
| V | Eric Brooks Deposition Excerpts |
| W | Dimmunition of Time Policy Directive (BC 113136-113139) |
| X | Michael Scott Deposition Excerpts |
| Y | Michael Dais Declaration |
| Z | Def. Second Amended Answers to Plaintiff Scott's Interrogatories |
| AA | Michael Wells Deposition Excerpts |
| BB | June 26, 2019 Email from Officer Michael Dais (BC 104784-104785) |
| CC | Community Corrections Orientation Materials (BC 100, 129-131) |
| DD | Michael Scott Disciplinary Documents (BC 449, 84058-85049) |
| EE | Dakota Barnard Disciplinary Documents (BC 68059-68060, 68072-68075) |
| FF | Naim Hodges Disciplinary Documents (BC 104707-104708, 86676-86677) |
| GG | John Jones Rule 30(b)(6) Deposition Excerpts |
| HH | John Jones Declaration |
| II | Dakota Barnard Work Release Documents (BC 530, 68112-68115) |
| JJ | Adam Dulaj Work Release Documents (BC 1083, 74939) |
| KK | Sick Call and General Health Services Policy Directive (BC 7357-7360) |