**IN THE U.S. DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **Michael A. Scott, et al.** | * | |
| **Plaintiffs** | * | |
| **v.** | * | **Case No. 1:21-CV-00034-SAG** |
| **Baltimore County, Maryland** | * | **ORAL ARGUMENT REQUESTED** |
| **Defendant** | * | |

_____/

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR**
**SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

/s/ *Howard B. Hoffman*
Howard B. Hoffman, Esq. Bar No. 25965
Jordan S. Liew, Esq. Bar No. 20509
Hoffman Employment Law, LLC
600 Jefferson Plaza, Suite 204
Rockville, Maryland 20852
(301) 251-3752
hhoffman@hoholaw.com
jliew@hoholaw.com

_/s/_ *(with permission)*
Bradford W. Warbasse, Esq.
Attorney at Law
Bar No.: 07304
P.O. Box 1284
Brooklandville, Maryland 21022
(443) 862-0062
warbasselaw@gmail.com

*/s/ (w/ permission)*
Stephen J. Springer, Esq.
*Pro Hac Vice*
Rittenhouse Plaza
1901 Walnut Street, Unit 4A
Philadelphia, Pennsylvania 19103
(215) 732-8229 (tele)
springerlaw@msn.com

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................... 1

II.    FACTS ........................................................................................................................ 1

   A.   Sorting Labor At The MRF Generally ..................................................... 3

   B.   The MRF Was Defendant's Commercial Enterprise ........................... 4

   C.   The Terms and Conditions of Inmate Employment At The MRF. ............................... 11

   D.   Inmate Working Conditions And Complaints At The MRF. ........................................ 15

   E.   The MRF Detail Provides No Rehabilitative Value To Inmate Workers. ..................... 17

III.   OPPOSITION ARGUMENT ...................................................................................... 22

   A.   The FLSA's Definition Of "Employee" Is Intended To Have The Broadest Possible Reach To Protect Workers And Complaint Industries. ............................................................. 22

   B.   The FLSA Coverage May Be Extended To Inmate Workers, And This Is The Appropriate Case. ................................................................................................................ 25

   C.   Defendant's Motion For Summary Judgment Must Be Denied .................................... 29

     i.   A Reasonable Jury Could Conclude That The Predominant Purpose Of The MRF Detail Was To Serve The County's Pecuniary Benefit And Not To Rehabilitate Inmates. ............ 30

     ii.   A Reasonable Jury Could Conclude That Inmates Worked Within A "Traditional Employment Paradigm" And Were Not Subject To The Same Level of Custody In The MRF Workplace. .......................................................................................................................... 32

     iii.   Inmates Used Wages To Maintain Their General Well-Being. ............................. 37

     iv.   Defendant's DPW Was Engaged In A Commercial Business Venture That Competed In The National Economy. ........................................................................................................ 38

     v.   There Is No Genuine Dispute The Work Is Voluntary And Not Compelled.  Moreover, The Work Was Paid By DPW and Not DOC ............................................................................. 41

     vi.   A Jury Could Conclude That Defendant's Violations Were Willful. ....................... 44

IV.   CROSS MOTION FOR SUMMARY JUDGMENT ...................................................... 46

   A.   No Reasonable Jury Could Conclude That This Was Anything Other Than A Work Release Program In Disguise.  As Such, Defendants Are Liable To The Class As A Matter of Law. ... 46

   B.   The Court Should Enter Summary Judgment As To Liability In Favor Of At Least Those Plaintiffs Who Were Recommended For Work Release. ................................................. 48

   C.   The Court Should Enter Summary Judgment Against Defendant's Claim That The Work Was Involuntary. .................................................................................................................. 49

V.   CONCLUSION ......................................................................................................... 50

Plaintiff Michael A. Scott ("Plaintiff"), on behalf of himself and other Opt-In and Rule 23 Class Members (hereinafter "Plaintiffs"), opposes Defendant's Motion for Summary Judgment (ECF 169) and cross moves for Summary Judgment and states:

## I.    INTRODUCTION

In an inmate FLSA case, the two most significant material facts are (i) whether the inmate performs work within a prison; and (ii) whether the inmate performs "prison housework" or work in a prison industry. Those facts are simply not present in this case. Rather, Plaintiffs were used by Defendant in a commercial-like operation; were paid not by Defendant's Department of Corrections ("DOC") but paid and controlled by Defendant's Department of Public Works ("DPW"); that contrary to Defendant's allegation, the inmate work was voluntary and done for mutual economic gain. Consequently, Summary Judgment must be denied to the Defendant.

## II.    FACTS

Some jurisdictions hire private companies like Waste Management to recycle its residents' waste materials,[1] but Defendant picks up, sorts, bales, and sells recyclable waste materials that county residents leave at their curbside. (Exh. 2; Carpenter 30b6., 12). Defendant was motivated to cut out that "middle person." (Exh. 3; Homan, 143-44). This activity occurs at Defendant's Central Acceptance Facility (CAF) in Cockeysville, which contains the "Material Recovery Facility" ("MRF").[2] Defendant sorts and bales scrap metal, cardboard, mixed paper, four types of plastic, aluminum and tin. (Exh. 4; Beichler, 43). This waste material arrives at the MRF in a combined (mixed) state, and it is dumped and then placed on a conveyor system and sorted from this "single stream," hence Defendant's the process being referred to as "single stream recovery"

---

[1]    Waste Management's systems are basically the same thing as Defendant's system, just larger. (Exh. 1; Jones Indv., 123).
[2]    Although they are technically different (MRF is within CAF), CAF and MRF are used synonymously by witnesses. The terms are synonymously used herein unless otherwise noted.

("SSR").  (Exh. 1; 24-33).  The SSR program at the MRF began in 2013 when Defendant contracted with Maryland Environmental Service ("MES") to operate its MRF.[3]

Defendant consists of separate government agencies, (Exh. 3; 15), led by different agency heads, who report to the County Administrator.[4]  (Exh. 3; 17).  For all times pertinent, John Jones ("Jones") was the Plant Manager of the MRF, Willie Bruce ("Bruce") was the Operations Manager, and there were three supervisors in sorting.  (Exh. 1; 37-38, 46).  One of those supervisors was Anthony Robinson ("Robinson").  (Exh. 6; Robinson, 31).  The MRF was generally operated by DPW's Bureau of Solid Waste ("BSW"), whose Chief was Michael Beichler ("Beichler").  (Exh. 4; 37, 48).  However, Beichler was removed and "banned" from supervising the MRF (including supervising Jones and his staff) and was replaced by Robert Burke ("Burke"), a leading member of "Operational Excellence" ("OpEx")[5] within Defendant's Office of Information and Technology. (Exh. 2; 103); (Exh. 4; 188, 190, 205, 207-08, 241-42).[6]  What is material is that Beichler, Jones and his DPW supervisory staff at the MRF, including Robinson, are not DOC staff and are not supervised by DOC. (Exh. 4; 50-51, 224-226); (Exh. 3; 22).

Defendant's BSW handles, markets, and sells recyclables, not Defendant's DOC.  (Exh. 2; 13-14); (Exh. 5; 42-43).  After arriving and being dumped at the MRF, the materials are sorted

---

[3]     Recycling was done prior to 2013 in a dual stream.  It is not material that Defendant has been using inmates in its recycling program for as long as anyone can seemingly remember.

[4]     For most of the time pertinent to this lawsuit, the County Administrator was Frederick Homan ("Homan") who retired and was replaced by Stacy Rodgers.  (Exh. 5; Watts, 180-81).

[5]     The purpose of OpEx is to implement "process improvement to business operations in County agencies," including by utilizing "Lean/Six Sigma, Organizational Change Management, operational risk management analysis, and data and financial analysis." (Exh. 9; 14); (Exh. 8; Burke 2, 254).  In regards to the MRF, its mission was to "[u]pdate and improve County recycling operations to optimize revenue generated by the sale of [SSR] products.  Improve asset management processes and implement cost controls. Improve product bid/sales process.  Develop management metrics to better manage and monitor overall operations.  Analyze staffing needs and updated organizational structure to improve production efficiency." (Exh. 9; 17).

[6]     To be sure, there is a dispute among Defendant's own witnesses over this, the materiality of this dispute will be explained *infra* at II.B.

which is done by machine and human sorter. (Exh.1; 24-33). The purpose of sorting "is to separate each commodity to have a specific value to sell on the market." (Exh. 4; 41). Once sorted the specific materials are baled together according to their material component. (Exh. 1; 34-36). But materials for recycling can be wet, dirty, and messy. (Exh. 6; 23-24, 58-59); (Exh. 1; 163-64); (Exh. 4; 77). Contaminated recyclables reduce value for purchasers. (Exh. 4; 76-77). The quality of baled materials is reflected in their auctioned sales price per the market conditions. (Exh. 4; 100); (Exh. 2; 33). The better the quality the better the price received. (Exh. 1; 54); (Exh. 2; 47-48). Bales of recyclables are not for used by the DOC. (Exh. 2; 35). Defendant does not engage in the sale of any other goods, services, or commodities, other than bales recycled materials. (Exh. 3; 55-56); (Exh. 10; Carpenter Indiv., 100); (Exh. 1; 132).

### A.   Sorting Labor At The MRF Generally

Aside from DPW supervisors and heavy machine (forklift) operators, the majority of labor involves sorting materials to create bales of harvested recyclables to sell. The <u>material and undisputed fact</u> is that sorting was done (during the times pertinent to this lawsuit) by inmates confined at the DOC <u>and</u> non-incarcerated "temps," who are paid the full minimum wage by "temp agencies" like "Titos."[7] (Exh. 1; 150); (Exh. 6; 91); (Exh. 11; Brown Decl.); (Exh. 12). Naturally, using temp labor was more expensive than using inmates, and using inmates to reduce costs was the goal. (Exh. 4; 110-11 (referring to the "sweet spot")); *see also* documents in Exh. 13. Temp labor naturally results in Defendant making even less money off of the MRF. (Exh. 4; 143). Inmates were used to replace the need for temp labor. (Exh. 1; 192-93); (Exh. 14; Pokorny, 91).

Temps performed "the same work" as inmates, (Exh. 1; 49), and both inmates and temps were supervised by DPW supervisors. (Exh. 4; 250) (temp labor performed same sort of job as

---

[7]      Defendant neglects to address this fact within its brief.

inmates and reported to DPW supervisors).[8]   Temp workers had a set of responsibilities that overlapped with inmate workers.  (Exh. 16; Burke 1, 75).  Robinson was involved in supervising the inmates (Exh. 6; 143), and also involved in supervising temps.  (Exh. 6; 91).  Inmate and temp labor were correlated.  (Exh. 17; Jones 30b6, 16); (Exh. 18)).  Inmate workers and temp workers are located next to each other on an organizational chart.  (Exh. 2; 41); (Exh. 57).  Both groups received the same orientation, and temps got the same orientation, just through their supervisor.  (Exh. 1; 76-77, 80-81).  Temps are also told, like inmates, not to scavenge for items on the line.  (Exh. 1; 80).  Both had "lead" persons on their team, but the inmate lead was not an official designation.  (Exh. 6; 94).  While inmates and temps worked at the same time that the MRF was running/operating, the temps worked in two separate shifts and the inmates in one.  (Exh. 4; 145-46).  Neither inmates nor temps were trained on heavy equipment, like forklifts or front-end loaders.  (Exh. 1; 146).  While inmates and temps get the same break time, they would eat in different locations.  (Exh. 1; 215-17).  Inmates and temps were also segregated to separate work areas and told not to communicate, with DPW supervisors enforcing this rule.  (Exh. 1; 180-81).  The inmates and temps wore different colored vests.  (Exh. 6; 105).  DPW regulated the attendance of temps and inmates in the same way via a sign-in sheet.  (Exh. 1; 72-74).  Like in any workforce, temps present discipline and performance issues just like inmates.  (Exh. 1; 74-75).  DPW monitors the working environment for both inmates and temps for potential safety issues.  (Exh. 1; 75-76).

Temps would work less hours than inmates.  (Exh. 1; 183).  When temps left for the day, inmates would replace the temp at their work location.  (Exh. 1; 184); (Exh. 17; 31).

### B.  The MRF Was Defendant's Commercial Enterprise

It is a <u>material and undisputed fact</u> that the work of inmates generated revenue, (Exh. 2;

---

[8]      *See also* (Exh. 2; 104-05); (Exh. 6; 11-13); (Exh. 15).

11), based on sales of bales of recyclables. (Exh. 1; 21-36). The MRF processes more than 85,000 **tons** of recyclables per year, including 24,000 **tons** from Harford County. (Exh. 2; 108-09); (Exh. 58). Defendant received $41 million dollars from the sale of recyclables commodities, or $488,000.00 per month, from January 2014 through December 2020. (Exh. 2; 109). Defendant's former County Executive, Kevin Kamenetz, has been quoted as saying Defendant was turning a "$2 million a year in profit" and turning "trash into cash." (Exh. 3; 94); (Exh. 59). Homan agreed with Kamenetz's statements. (Exh. 3; 95). Beichler proclaimed that MRF recycling was a "business decision that makes economic efficiencies." (Exh. 4; 267); (Exh. 60). Beichler also admits to publicly claiming the BSW operates in an "entrepreneurial manner."[9] (Exh. 4; 268).

It is an <u>undisputed material fact</u> that Defendant referred to the MRF using terms such as "maximize revenue,"[10] "profit," "business" and "quotas." *See, e.g.* (Exh. 9; 1 ("Maintain position as market leader to maximize revenue"), 43, 46 (more consistent inmate numbers increases net revenue), 57 ("CAF is a profitable County function."), 60 (MRF purpose is to maximize revenues), 66, 73 (low attendance "not helping SSR operationally or financially"), 78 ("The objective of both us and DPW is to bring in revenue."); *see also* (Exh. 6; 39, 123-24); (Exh. 2; 11, 57-58).

But Defendant did not just seek to cut out a firm like Waste Management. There is no *genuine* material dispute, given the substantial evidence, that Homan prioritized maximizing revenue and minimizing expenses at the MRF.[11] This was accomplished in a number of ways.

---

[9]    Carpenter testified in his individual capacity that he was not surprised that Beichler would refer to Solid Waste as operating in an entrepreneurial manner, and agreed it was entrepreneurial because Defendant is selling commodities. (Exh. 10; 98-100). However, when he testified as Defendant's 30(b)(6) witness, Carpenter denied that Solid Waste is run in an entrepreneurial manner. (Exh. 2; 86).

[10]   Defendant's 30(b)(6) witness Carpenter first testified that "maximizing revenue" was not a "stated goal" of Defendant, but then was impeached and forced to admit that maximizing revenue has been expressed as a goal by Defendant. *Compare* (Exh. 2; 38-39) *with* (Exh. 2; 40).

[11]   Beichler testified that Homan had a great interest in the MRF, and did not have a similar

First, Homan terminated MES, the long-time partner of Defendant which ran the MRF, (Exh. 19), which was a "heavily financial" decision. (Exh. 20). Homan claimed that he did so in order for Defendant to save $800,000.00 annually. (Exh. 3; 112) (removing MES was a way to "limit our expenditures"); (Exh. 10; 51). However, once Defendant removed MES, there was an "enhanced effort" to make more money on the sales of recyclables, (Exh. 2; 60), and that Homan was "very focused on the finances of [the] MRF" and the money it was generating (Exh. 2, 32, 61); (Exh. 21) (Dozens of regular updates from Carpenter to Homan regarding MRF sales of recycled commodities). Once MES was terminated, Beichler, the long-time administrator, was banned from the MRF and Burke was put in charge.[12] (Exh. 4; 188, 205). Beichler testified that Homan wanted to run two shifts of inmates per day to increase production bringing in more material from other counties, that Homan "wanted to go bigger," but Beichler said it would not work mechanically. (Exh. 4; 205-07). There is also evidence Homan wanted to remove temp laborers entirely and rely solely on inmates. (Exh. 22) (Homan "strictly directed that the use of temporary labor in the MRF, as was in place with MES, cease and detail worker labor be put into place."). Defendant's 30(b)(6) witness admits this occurred as well. (Exh. 2; 87-88).

OpEx consisted of business process analysts and data analysts, to introduce into County

---

interest in other waste acceptance facilities that did not recycle materials (including the overall CAF facility) and create a revenue stream for Defendant. (Exh. 4; 70-71). Homan "always had a particular interest in the MRF." (Exh. 4; 81).

[12]   Burke conveniently and frequently claimed he could not recall relatively recent facts, even after being confronted with a document to refresh his alleged poor recollection, denies this occurred. (Exh. 16; 47, 54). Burke did admit that he visited the MRF several times a week "during the time I was working at the County[,]" (Exh. 16; 57-58), did admit that he was aware of tension between Homan and Beichler, (Exh. 16; 72), and most importantly, it is the position of Defendant's 30(b)(6) designee that Burke operated the MRF for a period of time. (Exh. 2; 103). Former Deputy County Administrator Donna Morrison also testified that Burke was put in charge of the MRF after Defendant terminated MES. (Exh. 23; Morrison, 47-48). Finally, notes indicate Homan instructed "[a]ll management decisions and communication will flow through Burke to Homan directly." (Exh. 24). Ironically, this document was produced by Burke himself.

government a "better way, a better process, a business process… ." (Exh. 16; 18); (Exh. 8; 253-54) (Exh. 9; 14) ("formed in FY14 in response to the need for examining County business operations."). OpEx assesses "business processes" and utilizes the business process "Lean / Six Sigma." *Id*. According to Burke, "[t]here is a business process that applies to government process." (Exh. 16; 26). Specifically with respect to the MRF's SSR, OpEx did the following:

> Update and improve County recycling operations to optimize revenue generated by the sale of Single Stream Recycling products. Improve asset management processes and implement cost controls. Improve product bid/sales process. Develop management metrics to better manage and monitor production efficiency. Develop maintenance management and improved safety programs

(Exh. 9; 14-15).

OpEx had data analysts working on the marketing of recyclables with the goal of improving sales and the amount of revenue that the County received. (Exh. 16; 60-61, 73). The MRF was one of the bigger priorities and "one of the longer" projects Burke led, (Exh. 16; 103-04), and there was not another OpEx project where he was more involved. (Exh. 8; 313). According to Robinson, once Defendant took over the MRF from MES, the operation hours were extended, and "it was strictly business." (Exh. 6; 33-36). Robinson further testified that working at the MRF was like working for a private sector employer, and Defendant was trying to maximize greater revenue from the MRF than MES. (Exh. 6; 37, 39). Robinson testified Defendant did not run the MRF any differently than any other industrial plant he previously worked at. (Exh. 6; 14, 130).

Defendant operated like a private business insofar as it directed OpEx to make deals with *neighboring counties* to accept their recyclable materials *for free*. Plaintiff is producing many of OpEx's agenda meetings. (Exh. 25); (Exh. 13; 16). These documents routinely indicate under the title "Business Planning and Strategy," "[o]ptimize profitability of Single Stream operations. Increase revenue. Improve asset management processes and implement cost controls. Improve

product bid/sales process." *Id*. No other agenda item had similar headings.

The second step Defendant did was to build market share. Agenda items reveal Defendant even obtained copies of Waste Management contracts with local jurisdictions. (Exh. 25; 8) ("Parallel efforts [were] underway to obtain greater volume of incoming Single Stream" and inmate labor was discussed[13].). OpEx developed "financial management documents including Budget, Profit & Loss Statement and Pro-Forma." (Exh. 25; 1, 8, 15). The April 13, 2018 weekly highlights indicate that Defendant was working deals to accept recycling from Carroll County, Cecil County, Frederick County, York City/York County (PA), and Lancaster County (PA). (Exh. 25; 29). Research was "ongoing to identify other jurisdictions for single stream deal." *Id*. Burke admits that these jurisdictions "would have brought a greater volume of material to the MRF" and "[t]he only reason that they would want greater volume would be to generate more revenue from recycling." (Exh. 8; 290-91). Beichler testified that OpEx's main inquiry to him was how to double MRF production. (Exh. 4; 246). While some efforts to recruit other counties were unsuccessful, it is an <u>undisputed material fact</u> that Defendant did process the recyclable waste of Harford County and Cecil County. (Exh. 2; 23-26, 68). It is <u>undisputed</u> that Plaintiffs handled these recyclables. (Exh. 2; 62). Beichler testified that running Defendant and Harford County's recycling together created a "goldilocks" system, (Exh. 4; 104), and Homan testified that this was another way to maximize revenue. (Exh. 3; 116). OpEx ultimately recommended <u>against</u> a deal with Carroll County, because the added risks to machinery to not be worth the "marginal revenue gained from this endeavor[.]" (Exh. 9; 9).

The third step Defendant did to maximize revenue and minimize expenses was to engage in marketing efforts for its baled commodities, just like a private business. Defendant employed

---

[13]     Defendant was similarly receiving 5,000 tons of material, annually from Republic Services, another private waste disposal company. (Exh. 25; 61); (Exh. 26).

Richard Keller, a unique individual who is a recognized expert in the recycling commodities marketplace. (Exh. 27). Keller serves as the "Recycling Marketing and Promotion Manager."[14] *Id*. Keller runs the bid operations for the commodities, (Exh. 2; 34) and is the marketer within DPW who specifically handles the bidding process, has detailed knowledge of the market and has been doing this work for 30 years. (Exh. 10; 56); *see also* (Exh. 16; 148-49). Defendant also uniquely engaged in "bale breaks" to show potential purchasers the quality of the goods that they are bidding upon. (Exh. 2; 47); (Exh. 4; 100). When commodity brokers see the higher quality of Defendant's bales, Defendant commands "higher prices than anywhere else as compared to Anne Arundel or Montgomery County or places like that." (Exh. 4; 100). Producing quality clean bales of recycled material bales was critical to Defendant; as Homan testified, Defendant knew it had to manufacture clean bales, because "everybody understood the cleanliness of the bales had to do with how much money you could get for the sale of recyclables, particularly as you focused in on paper and cardboard." (Exh. 3; 129). Like any business venture, Defendant had a very heavy emphasis on maximizing revenues. (Exh. 16; 156); *see, supra* (Exh. 9).

Fourth, in order to increase production run times but maintain low levels of contaminants, Defendant needed more human sorters to staff the MRF, so Defendant prioritized the inmate labor at the MRF.[15] (Exh. 17; 15-16). For example, it is undisputed that Homan terminated a roadway cleanup work detail and transferred those inmates at the MRF, (Exh. 4; 87); (Exh. 14; 80).[16] While no witness has exercised the basic candor and been willing to testify to it, there is shocking *documentary* evidence that Defendant's Deputy County Administrator (Donna Morrison)

---

[14]    Defendant's Interrogatory Answer sought to conceal the true title and marketing nature of Keller, by listing him as the "Recycling and Waste Prevention Manager." (Exh. 28; Rog 1 Resp.).

[15]    Despite the shortage of sorting labor at the MRF, Defendant never considered permanent hires for the MRF. (Exh. 4; 91-92).

[16]    Defendant also transferred all the men off the animal shelter detail to the MRF detail for the purpose of maintaining a minimum of 30 inmates at MRF. (Exh. 30); (Exh. 61).

contacted County Circuit Court Administrative Judge Cox to get inmates to be *sentenced* to work at the MRF.  (Exh. 25; 15) ("Donna contacted Judge Cox about sentencing offenders for community service to CAF – OpEx following up for status"); (Exh.8; 271-74); (Exh. 23; 20-28).[17] Defendant struggled to incentivize inmates to work at the MRF, and there is a broad amount of documentary evidence that clearly establishes this point as undisputed, attached herein as Exh. 29; *see also* (Exh. 62); (Exh. 63); (Exh. 64); (Exh. 65), (Exh. 61); (Exh. 9; 19, 26, 33); (Exh. 2; 96-97); (Exh. 8; 245); (Exh. 66).  Additionally, Defendant admits that Homan put pressure on DOC to supply a certain number of inmates to the MRF.  (Exh. 31; Halligan, 162).  The pressure within Corrections came from the Deputy Director and Director Watts, who in turn were under pressure from Homan.[18] (Exh. 31; 169-71); (Exh. 32) (dozens of daily emails from Watts to Homan on the number of MRF inmates); (Exh. 33).  Defendant also admits that DPW pressured DOC.  (Exh. 31; 172); (Exh. 6; 123-24).  Defendant admits that DOC was required to provide a certain number of inmates to the MRF.  (Exh. 31; 105-06).  DPW sets the number and DOC worked to comply.[19] (Exh. 31; 137).  Furthermore, DPW pressured DOC not just on the number of inmates, but even their timeliness, with Jones sending Watts a letter declaring (not requesting) that the inmates' shift would be extended "by the cumulative amount of daily production time lost due to tardiness or mechanical failures caused by DOC workers."  (Exh. 67)[20] To potentially satisfy the pressure for

---

[17]    Morrison conveniently testified that she could not remember contacting Judge Cox.

[18]    Director of DOC Gail Watts perjured herself, when she denied that any concerns were ever brought up about not sending enough inmates to the MRF.  (Exh. 5; 161-62).

[19]    Despite Halligan's admissions, Halligan first testified that there was no minimum number of inmates that DOC was required to provide and that the **maximum** number of inmates was 30. (Exh. 31; 131-33).  But after being impeached with a document, Halligan admitted that there was a 40 inmate **quota** placed on DOC.  (Exh. 31; 136-37); (Exh. 68).

[20]    Jones testified he did not remember sending this letter but admitted that these were all issues and concerns he had raised previously with DOC and Watts.  (Exh. 17; 76-78).  He further insisted that despite the letter, they didn't actually engage in this practice, although there is no record evidence to support that.  (Exh. 17; 78).

sorters, there was even discussion of utilizing inmates on *home detention* to work at the MRF. (Exh. 31; 169); (Exh. 9; 19); (Exh. 34).  Having a cheap source of labor was so important that Burke even wanted the DOC to collaborate with the *Baltimore City* Department of Corrections to supply the County MRF with *City* inmates.  (Exh. 8; 224-27) (Exh. 69).  Defendant admits that its use of the term "quota" in connection with inmate labor signifies pressure to place inmates at the MRF.  (Exh. 17; 14).

However, like any business venture, MRF revenues fluctuated depending on market conditions. (Exh. 3; 147); (Exh. 2; 33).  Price depends upon general market commodity conditions including worldwide economic markets and foreign government intervention.  (Exh. 2; 48); (Exh. 4; 84 (revenue for recyclables is a "wild, up-and-down, peek-value business.")).  Homan testified the market worsened after China ceased purchasing recyclables.[21]   (Exh. 3; 99).

## C.  The Terms and Conditions of Inmate Employment At The MRF.

There is no *genuine* dispute that the work performed by inmates at the MRF is optional and voluntary.  Watts, unequivocally testified that inmates are not required to perform work in a detail. (Exh. 5; 126-27).   According to Phil Pokorny, former Supervisor of DOC's Community Corrections, inmates asked to work at the MRF detail.  (Exh. 14; 43).  Inmates could resign from the work at any time ("they could stop working if they didn't want to continue to work").  (Exh. 14; 46).  Of course, inmates were not sentenced to work at the MRF, (Exh. 31; 110) and were not required to work at the MRF.  (Exh 31; 119).  The decision to work at the MRF is left to the agreement of DOC and the inmate.  (Exh. 31; 120).  Homan stated inmates were "making the decision to work there.  They were not being taken their against their will." (Exh. 3; 168).  Homan further agreed inmate work at the MRF was voluntary (Exh. 3; 169), and "no one was made to

---

[21]     For more information, please see https://e360.yale.edu/features/piling-up-how-chinas-ban-on-importing-waste-has-stalled-global-recycling  (last visited November 17, 2022).

work there." (Exh. 3; 62). Burke testified that he thought the voluntary nature of the work was the problem with maintaining adequate staffing levels. (Exh. 16; 78). Defendant admits that there are sentenced inmates at DOC who are not working. (Exh. 31; 113). DOC did not just pick an inmate and say "[t]omorrow your going to MES, and if you don't do that, there's going to be some kind of sanction." (Exh. 14; 51-52). Employment at the MRF would be terminated "if the inmate decided they did not want to work the CAF detail[.]" (Exh. 31; 36-37).

To be sure, it is undisputed that if an inmate agreed to work at the MRF detail they were given, in exchange, housing in the Community Corrections unit. Like any employee who fails to appear for their job, failing to work at the MRF created its own set of problems in maintaining consistent inmate workers at the MRF. (Exh. 14; 51-52). So, there was a general expectation that if an inmate asked to work, they were expected to work, *id.*, and it is undisputed that if the inmate declined to work any detail while in Community Corrections, they were removed from this housing unit and returned to general population. For example, Watts further testified that inmates may decline to work at the MRF, but if they do, they will be removed from the Community Corrections housing unit. (Exh. 5; 128); (Exh. 31; 122-23) ("because [refusal to work is] not an egregious offense in custody in Corrections, we would just transfer them to another housing unit."); (Exh. 30; 110) ("So when we way whether or not it's voluntary or involuntary, we can really say its both."). But Community Corrections would attempt, before returning an inmate to general population, to find them an alternative work detail. (Exh. 31; 120-21). None of the class members were ordered to work or threatened with sanction for failing to work. (Exh.42; Berman Decl.; ¶4); (Exh. 43; Dulaj Decl., ¶2); (Exh. 44; Martin Decl.; ¶2).

The inmate class earned $20/day. (Exh. 6; 160). This was the highest work detail payment available to inmates. Homan testified that was a reflection of "the willingness of individuals to

work in the various areas. … it was supply and demand… .  Fewer inmates were interested in working at recycling so the stipend paid was higher at the recycling facility."  (Exh. 3; 42); (Exh.2; 96-97) (compensation was an incentive "for enticing individuals to work at" the MRF).  Pay rates came from DOC based "upon feedback that they were getting from the inmates who were eligible to do that work."  (Exh. 3; 44).  It is also an underlined material fact Defendant also provided an attendance bonus, which was a further incentive conceived by Homan and Burke.  (Exh. 10; 63); (Exh. 4; 153-54); (Exh. 63).   There was also a "food incentive, (Exh. 4; 151-54); (Exh. 63) developed by Beichler after inmates complained about the food they brought from the DOC (Exh. 4; 161-62), as a means to keep inmates, happy, motivated and productive.  (Exh. 4; 151).  The goal was to keep production up, and to do that, Beichler realized that he needed "happy" inmate workers.  (Exh. 4; 153).  According to Beichler, the food incentive – based on bale production – was so successful "it allowed us … to bring in extra material from Harford County."  (Exh. 4; 152); (Exh. 10; 78) (food incentive based on production); (Exh. 6; 131-40) (DPW provided food incentives based on inmates hitting a certain amount of bales per day); (Exh. 9; 2) ("Increasing quality of life and subsequently production worth of DW labor").  Inmates would even check bales of production to determine if they would get fed.  (Exh. 1; 98).  It is undisputed that a substantial amount of documentary evidence clearly establishes that the Defendant sought to use these forms of payment to incentivize inmates. *See* (Exh. 29).  Defendant's designee claimed that DOC staff requested that DPW or MES provide incentives to increase inmate labor participation, (Exh. 31; 150), but when asked why there would need to be an increase in pay if there was an alleged requirement to work, Halligan responded "[w]e cant force somebody to work so providing incentives would make them want to work the [MRF] detail."  (Exh. 31; 157).

All incentives were paid from the DPW budget.  (Exh. 4; 151); (Exh. 10; 58); (Exh. 31; 87,

91-92); (Exh. 30; 240); (Exh. 63); (Exh. 64); (Exh. 65).  Indeed, DOC had no authority to increase the pay of MRF inmate workers.  (Exh. 31; 152).  However, it is also an underlined material fact that all other male inmate work details were paid *from the DOC budget*.[22]  (Exh. 31; 90-91); (Exh. 70).  Inmates received diminution "industrial" credits for time working at the MRF.

DPW controlled the manner and means of the work performed by the inmates.  DOC provided no work equipment to inmates.  (Exh. 4; 175).  DPW provided all work gear, including optional safety equipment including dusk masks or poor quality gloves.  (Exh. 6; 47, 83-84, 105); (Exh. 31; 210, 212); (Exh. 10; 51).  DPW provided the orientation, which the Correctional Officers who accompanied the inmate labor never performed.  (Exh. 6; 77).  DPW provided the bus and the bus driver to transport the inmates to the MRF.  (Exh. 31; 102); (Exh. 2; 49-50).  Jones handled the hiring and firing and let supervisors handle discipline.  (Exh. 1; 41-42).  DPW could terminate an inmate and have them returned to DOC, with the majority of those decisions made by Jones. (Exh. 1; 68, 88, 119); (Exh. 35; 25), (Exh. 36).  For example, inmates whose gloves were wet and cold and didn't want to work as a result were marked as "refuses to work" by DPW which would trigger DOC to not send that inmate back to the MRF.[23]  (Exh. 6; 75-76).  While most of the inmates "did a decent job" DPW provided corrective counseling to inmates.  (Exh. 1; 70).  DPW adjusted break times and set the schedule.  (Exh. 1; 95, 111).  Inmates could make a request to a DPW supervisor with respect to the type of work they wanted to perform.  (Exh. 1; 145).  DPW would listen to suggestions from inmates on work processes, because "[y]ou might get lucky." (Exh. 1; 154-55).  DPW kept work records from which payments were made, (Exh. 37), DPW would mark an inmate as "DNP" (do not pay) if DPW deemed it appropriate.  (Exh. 1; 196); *but*

---

[22]     Defendant contends that the female work detail at Animal Control was paid by Animal Control, (Exh. 70), but there are no documents produced that substantiate this contention.
[23]     Defendant's designee refused to testify whether DPW exercised the power to terminate employment more than DOC.  (Exh. 31; 35).

*see* (Exh. 6; 70) (DNP means "do not place").   Correctional officers would not delegate work duties nor would they keep an eye on whether inmates were working, as DPW staff exclusively handled that. (Exh. 6; 111-13); (Exh. 15).

There is a dispute of fact, including among Defendant's own witnesses,[24] concerning the length of the day for MRF inmate labor.   Generally, inmates worked hours according to the flow of recyclables received, which could vary.  (Exh. 4; 144-45).  According to Jones, during the busy season, inmates worked from 6 am to 5:30 pm, excluding breaks and lunch.  (Exh. 1; 93-94). Defendant's designee testified inmates MRF workers leave DOC at 6 am and return "[a]round 6:30." (Exh. 31; 72).  However, Robinson testified that inmates would *arrive* at DPW at 6 am.[25] (Exh. 6; 45).  Record evidence suggests that inmates could work as late as 7:30 pm and not return to the Detention Center until 8:00 pm.  (Exh. 71). Inmates could also be required to work *seven* days per week at the MRF.  (Exh. 31; 31).   Beichler admitted that at times, he thought it was too much work for the inmate sorters, but it "didn't make any difference" when raised with Homan. (Exh. 4; 147).  The MRF detail was cancelled due to fears of CV-19 and not resumed because of fears of this litigation.  (Exh. 38; Watts 30b6, 204); (Exh. 71).

### D.  Inmate Working Conditions And Complaints At The MRF.

Working conditions for inmates at the MRF were dangerous, dirty, and poor.   It is undisputed material fact that inmates would seek to negotiate, even collectively, to improve conditions.  *See* (Exh. 31; 204); (Exh. 17; 53) (Jones handled work stoppages); (Exh. 14; 31).

The MRF was either "extremely cold or extremely hot." (Exh. 6; 80, 157).   According to Robinson, it was worse than working outdoors and they had no heat.  (Exh. 6; 81, 85).  The cold

---

[24]    Plaintiff objects on the basis of hearsay the use by Defendant of their own interrogatory answer as to work schedule.  FRCP 56(c)(2)
[25]    Discovery being bifurcated, this issue need not be addressed because it is undisputed that a full workweek for an inmate would be well over 40 hours per week.

would impact the number of inmates willing to perform work at the MRF.  (Exh. 17; 32).  When cold, Robinson would personally wear three and four pairs of socks to protect himself.  (Exh. 6; 80).  Inmates were subjected to "extremely cold temperatures" and were in contact with metal surfaces with "not enough clothing on to protect themselves."  (Exh. 6; 85).  Inmates would complain about the temperatures.  (Exh. 1; 166-67).  Inmates could have a family or friend bring them a coat (drop off at DOC), (Exh. 30; 242), or failing that, they might get a coat from DPW but Robinson admitted "they weren't adequate."  (Exh. 6; 99).  All DOC *might* do is hold a clothing drive (seek donated items) and assign excess clothes left behind by other inmates.  (Exh. 31; 207-08).  Finding clothes was a struggle.  (Exh. 39).  Beichler acknowledged that the DOC did not provide the inmates with proper clothing to address the cold temperatures and DPW provided coats, and that the coats had "fleas and lice" and "we had to wash them and care for them… ." (Exh. 4; 170-72).  DPW provided "substandard" gloves.  (Exh. 6; 47, 102).  The gloves would become wet resulting in inmates complaining.  (Exh. 4; 174).  Defendant's designee admitted that while DOC was concerned enough about the inmate's lack of suitable outwear to have an occasional clothing drive,[26] it was not concerned enough to purchase the clothing from *its own budget.*  (Exh. 31; 210-211).  Defendant's designee also admitted that gloves are a form of outwear, and that inmates complained about them.  (Exh. 31; 212).  It is also undisputed that the air quality was poor with many contaminants, with no precaution taken over concerns like asbestos and toxic materials.  (Exh. 6; 81-82); (Exh. 4; 177).  Inmates would also get motion sickness.  (Exh. 6; 67).

According to Homan, inmates workers were able to "bargain" for more money.  (Exh. 3; 155) ("they got to choose whether they were going to work at the facility and they got money and quite frankly they were able to bargain for more money"); (Exh. 73) (email to Watts stating that

---

[26]      How often the clothing drives occurred is not known. (Exh. 31; 212).

after talking with inmates, pay rate recommended was $5/hour). It is also undisputed that there were also inmate complaints about toilets overflowing into the eating areas and porta-potties that were frozen with waste unremoved. (Exh. 6; 132); (Exh. 17; 54-55); (Exh. 74). Beichler can recall a collective work stoppage by inmates. (Exh. 4; 165). Jones handled work stoppages by inmates. (Exh. 17; 53). There were harassment complaints by inmates, including a complaint by inmates in 2016 indicated that they were being "driven like slaves." (Exh. 31; 157); (Exh 75). These complaints were left by DOC for DPW/MES to handle. (Exh. 75). Defendant's designee (Halligan) admitted that inmates made complaints about working conditions and did so collectively and individually. (Exh. 31; 204). Valid complaints were addressed. (Exh. 3; 65). There were complaints over long working hours, just like any other employee in the private sector. (Exh. 14; 43-44). Inmates also raised concerns that there wasn't enough food given to them for the length of the day that they worked, (Exh. 14; 45); (Exh. 6; 136-37) ("some-kind-of-meat" sandwich not enough nourishment for "people to be on their feet for 12 hours or more a day"); (Exh. 4; 161-62). Robinson was personally so upset by the hunger of the inmates that he turned a blind eye to inmates eating food that came through the lines, even though this was a violation of the rules. (Exh. 6; 137-38). It is undisputed that a substantial amount of documentary evidence clearly establishes that inmates complained about working conditions, with Defendant occasionally seeking resolution. *See* documents in (Exh. 41); (Exh. 74); (Exh. 76).

**E.  The MRF Detail Provides No Rehabilitative Value To Inmate Workers.**

The purpose of the MRF is not to "rehabilitate" inmates but to sort, bale and sell recycled materials. (Exh. 4; 254-55); (Exh. 31; 196-97). Defendant could not identify a single document to substantiate the claim that the principal purpose of the inmate MRF work detail was rehabilitative. (Exh. 17; 46-47, 25-26); (Exh. 77).

Watts testified that the main focus of DOC's Community Corrections was to provide

"resources and work details to prepare the inmates for reentry into the community." (Exh. 5; 34, 36). The Defendant's designee testified that "[t]he purpose of the Community Corrections Program is for sentenced inmates to be able to provide for the family, to deal with any court obligations as well mainly to help them gain skills and to reduce their chance of coming back and reduce their recidivism while they were in our program." (Exh. 31; 59). The Defendant's designee also testified that DOC wanted inmates to be gainfully employed outside of the MRF and to divert inmates from the MRF to outside employers. (Exh. 31; 42-44).

But there is no *evidence* to support any of these claims. Community Corrections does not draw on any expert advice on how to reduce recidivism among inmates. (Exh. 31; 76), let alone on how to make the MRF rehabilitative. Rather, Parrish testified that her goal as supervisor of Community Corrections was to "always make sure that the CAF detail was fully supplied with adequate inmate labor." (Exh. 30; 156-57). As far as making it a goal to have inmates employed in private sector positions (non-MRF work release), Defendant admits that inmates who worked at the MRF were recommended for private work release, (Exh. 31; 45), and that there were two sub-groups of inmates at the MRF (with same responsibilities): (i) those recommended for private work release by Courts; and (ii) those who had not received such recommendation. (Exh. 31; 57). Defendant's designee contends that inmates who were work release recommended did not have outside jobs, but he admits that he is uncertain of this. (Exh. 31; 45-46). There is evidence that inmates who were recommended for work release by the Courts and had outside jobs were routinely forced into working at the MRF. For example, Harold Snyder, a career firefighter with the Baltimore City Fire Department ("BCFD"), was only allowed to work at the MRF even though DOC officials knew that he was work release recommended by the Court and that he needed to work for the BCFD in order to keep his job while serving his sentence. (Exh. 45; Snyder Decl.,

¶2-4). Thus, Mr. Snyder was forced to retire from the BCFD (damaging his pension rights) to avoid being discharged for not reporting to work (and losing all of his pension and other benefits). *Id.* ¶5-6. Similarly, Adam Dulaj, a truck driver who was work release recommended by the Court, was forced into working at the MRF for almost three months despite DOC officials knowing he had a higher paying job waiting for him. (Exh. 43; ¶1-5).

The MRF was no "stepping stone" to private work release.[27]  There was no routine practice of seeking work release recommendations after 30 days of working at the MRF. (Exh. 42; ¶5); (Exh. 43; ¶1-5); (Exh. 45; ¶1-5); (Exh. 50; ¶2); (Exh. 51; ¶7-8); (Exh. 55; ¶2).  Out of 52 Plaintiffs, only <u>two</u> letters seeking work release recommendations have been produced[28], despite numerous Plaintiffs working over 30 days at the MRF.  (Exh. 46; 1-9).  It is <u>undisputed</u> that Defendant's claim to such a practice appear in none of the over 100,000 documents Defendant produced in this case. (Exh. 31; 43-44).  Contrary to Defendant's claim, there is ample record evidence that inmates continued to work at the MRF, even after being sentenced, recommended or approved for work release.  (Exh. 35) (Exh. 43A; Exh. A to Dulaj Decl.).

Although Homan testified that the MRF detail provided inmates with "meaningful work experience[,]" (Exh. 3; 141-42), detail workers were not given the benefit of good training.  (Exh. 16; 95).  The MRF inmate work detail "wasn't any of kind of rehabilitation or training opportunity" or an apprenticeship or introduction to working for DPW. (Exh. 6; 128-30); (Exh. 1; 220).  After all, it was picking through refuse. Defendant considered providing forklift certification training, not to provide job skills to reduce recidivism but as a way to entice inmates to join the MRF work

---

[27]     Plaintiffs object to Defendant's claim pursuant to FRE 406.

[28]     There is evidence of one more letter being sent through a specific line item on a summary chart of activities, but the actual letter has not been produced.  (Exh. 46; 10).  The line item shows the work release recommendation letter was not sent until the inmate had worked 2 months at the CAF already. No other specific line item mentions a work release recommendation letter being sent for any other inmate.

detail – however that idea apparently went nowhere. (Exh. 8; 243-45); (Exh. 66). The MRF inmate work detail was also not a "stepping stone" to employment with DPW. (Exh. 1; 220).

Defendant did not hire sorters. Out of the hundreds, there are only a few former inmates that became employed, but they are doing different work (not sorting), and Burke told Jones to hire them. (Exh. 1; 206-07, 209).[29] Of all the hundreds of class members in just three years, Robinson can recall only four individuals hired. (Exh. 6; 129). Defendant does criminal background checks on applicants, (Exh. 47; 1), and Homan himself agrees that jobs might not be made available to former inmates. (Exh. 3; 166). Allegedly, inmates were told by DOC and DPW that their experience might lead to a job. (Exh. 6; 125-26); (Exh. 31; 82-83), but this fact is in dispute (Exh. 1; 100). Yet, not only is there a lack of evidence of a routine practice of hiring inmates post-incarceration,[30] Defendant made no effort put former inmates in connection with the "temp service" used by the County. (Exh. 3; 167). Homan claimed that Defendant was "hoping to give individuals an opportunity to seek a career path" (Exh. 3; 163), but when asked to explain, Homan simply replied that inmate's mere presence *at* the recycling facility "meant that they could be in contact right there with the people that were working with and ultimately be working for if they were accepted for a job." (Exh. 3; 164-65); (Exh. 30; 142-43); (Exh. 14; 69-70) (inmates could apply for any opening like anyone else). However, the MRF did not even give job references to inmates. (Exh. 1; 103).

In contrast to Defendant's claims of rehabilitative opportunities, if anything participating in the MRF work detail would <u>actually</u> prevent an inmate from taking part in any meaningful job

---

[29]    Burke denies that OpEx did any hiring for DPW, (Exh. 16; 146) and claims to not know whether inmates were hired. (Exh. 8; 328); *compare* (Exh. 47; 1, 3).

[30]    Of the thousands of inmates who have passed through the MRF, Defendant has only hired 6 inmates. Moreover, all of those inmates were hired within a six-month period during the transition of the MRF from MES to Defendant. (Exh. 47; 4-5). By Defendant's own account, they have failed to hire even a single inmate since February 26, 2018. (ECF169-35; ¶4).

"resource" fairs put on for all inmates or engage in substance abuse classes.  (Exh. 42; ¶15-18); (Exh. 43; ¶17-20); (Exh. 44; ¶9-13); (Exh. 45; ¶12-16); (Exh. 50; ¶8-11); (Exh. 51; ¶21-24); (Exh. 54; ¶18-21); (Exh. 55; ¶12-15).  The MRF work detail hours were so long that they interfered with practically everything that could possibly occur during normal hours.  Indeed, the Resource Fairs touted by Defendant (which began in 2018) always occurred on weekdays, and ended by mid-afternoon, well before MRF inmates would return to the Detention Center.[31]  (Exh. 48; 29, 31, 34, 36).  Moreover, only inmates that had 90 days or less remaining in their sentence could attend. (Exh. 48; 37).  Community Corrections was so fixed on their MRF inmate quota that they prevented inmates going to the dentist, to avoid missing MRF work.  (Exh. 31; 74); (Exh 78). Similarly, Defendant operated a "Community Reentry Group," with the laudable goal of helping inmates reenter society upon release, (Exh. 31; 66) but was forced to admit that there is documentary evidence of at least one instance where an inmate was required to continue working at the MRF rather than attend the Community Reentry Group.  (Exh. 31; 70); (Exh 79; 2).[32] Defendant's designee testified that he did not know what was more important: working at the MRF or attending this group meeting.  (Exh. 31; 71-72).

Defendant falls back on the typical refrain that inmate work reduces idleness and provides "structure," gets people "up in the morning," requires them to listen to a supervisor, or just "able to get in the outdoors."  (Exh. 31; 173-74); (Exh. 5; 119-20); (Exh. 3; 156).  But these beliefs are

---

[31]     Defendant also mentioned a mobile career center would visit the Detention Center. Defendant has produced no record evidence for when this mobile career center van would visit during the relevant years, but old calendars produced by Defendant for 2014 and 2015 are still instructive, and show that the mobile career center never visited the Detention Center on Sundays, and that the latest it ever stayed at the Detention Center was to about 3:15 PM.  Incidentally, the calendars also show that there were virtually no classes, programs or services scheduled for Sundays, which would have been the only day MRF inmate workers would have been at the Detention Center during regular business hours.  (Exh. 48; 1-28).

[32]     Defendant also pulled inmates out of the substance abuse program (START) in order to provide coverage for MRF. (Exh. 49).

not based on any expert's opinion;[33] rather they are *admittedly* based on the personal opinion of Defendant's witnesses.  (Exh. 31; 176).  Not all inmates lacked those skills,[34] and *any* job – including private work release if allowed by DOC – would serve these same alleged benefits.  (Exh. 31; 174); (Exh. 3; 168).  Of course, Defendant's designee testified, as he must, that harsh working conditions serve no rehabilitative purpose nor does the length of a day serve a rehabilitative purpose.  (Exh. 17; 48-49).

It is undisputed that being in the MRF work detail allowed an inmate to be part of Community Corrections.  But it is also undisputed that this status did not confer any special rehabilitative value or privilege, either.  (Exh. 42; ¶19); (Exh. 43; ¶21); (Exh. 45; ¶17); (Exh. 50; ¶12); (Exh. 51; ¶25); (Exh. 54; ¶22); (Exh. 55; ¶16).  Community Corrections provides no job counseling, no listing of open work release positions, and has no job counselors.  (Exh. 31; 75-77). There were allegedly social workers in Community Corrections (the number unknown), between January 1, 2018 to April 10, 2020, but they worked during the weekday when inmates would be at the MRF.  (Exh. 31; 77).  There were no job fairs just resource fairs, (Exh. 30; 146); (Exh. 48; 29), which Plaintiffs contend, and the documentary evidence shows, they would never have been able to attend.  (Exh. 48; 31, 34, 36, 37).  Community Corrections were not responsible for finding inmates work upon their release.  (Exh. 14; 70-71, 101); (Exh. 5; 35).

### III.    OPPOSITION ARGUMENT

#### A. The FLSA's Definition Of "Employee" Is Intended To Have The Broadest Possible Reach To Protect Workers And Complaint Industries.

"The Fair Labor Standards Act was passed by Congress to lessen, so far as seemed then

---

[33]    Plaintiff objects to the lay opinions rendered by Defendant. FRCP 56(c)(2)
[34]    Plaintiff Dulaj, for example, was a career firefighter who had served for 24 years before Defendant cut his career short by denying him the opportunity to continue working there as part of work release.  (Exh. 43; ¶2-5).

practicable, the distribution in commerce of goods produced under subnormal labor conditions." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727 (1947). "The central aim of the [FLSA] was to achieve, in those industries within its scope, certain minimum labor standards." *Mitchell v. Robert DeMario Jewelry, Inc.,* 361 U.S. 288, 292 (1960). By enacting the FLSA, Congress sought to rectify labor conditions that are "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). But the Defendant's emphasis on § 202(a), at ECF 169-1, pg. 23, overlooks considerable legal authority including from the Supreme Court, which has repeatedly emphasized:

> While improving working conditions was undoubtedly *one* of Congress' concerns, it was certainly not the *only* aim of the FLSA. In addition to the goal identified by petitioner, the Act's declaration of policy, contained in § 2(a), reflects Congress' desire to eliminate the competitive advantage enjoyed by goods produced under substandard conditions.[8] 29 U.S.C. § 202(a). This Court has consistently recognized this broad regulatory purpose. "The motive and purpose of the present regulation are plainly ... that interstate commerce should not be made the instrument of competition in the distribution of goods produced under substandard labor conditions, which competition is injurious to the commerce."

> *Citicorp Indus. Credit, Inc. v. Brock*, 483 U.S. 27, 36–37 (1987) (*quoting United States v. Darby,* 312 U.S. 100, 115 (1941)) (footnote omitted).

Thus, the FLSA was also intended to prevent unfair competition. 29 U.S.C. § 202(a)(3). The Fourth Circuit has often observed that "[T]he Supreme Court has cautioned that the FLSA 'must not be interpreted or applied in a narrow, grudging manner.' " *See, e.g., Purdham v. Fairfax Cty. Sch. Bd.*, 637 F.3d 421, 427 (4th Cir. 2011) (*quoting Tennessee Coal, Iron & R.R. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)).

In keeping with these goals, "Congress applied the FLSA broadly, as reflected in the [FLSA's] definitions of 'employee' ('any individual employed by an employer'), 'employer' ('any person acting directly or indirectly in the interest of an employer in relation to an employee'), and 'employ' ('to suffer or permit to work')." *McFeeley v. Jackson Street Entertainment, LLC*, 825 F.3d 235, 240 (4th Cir. 2016) (citing 29 U.S.C. §§ 203(d), (e)(1), & (g)). The Supreme Court has

recognized that the verb "employ," § 203(g), has such a "striking breadth, that it "stretches the meaning of "employee," § 203(e)(1), "to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326, 112 S. Ct. 1344, 1350, 117 L. Ed. 2d 581 (1992) (*citing Rutherford Food Corp.*, 331 U.S. at 728). In *Rutherford Food*, the Supreme Court noted the FLSA definitions of "employee" and "employ" are " 'comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category.' " *Rutherford Food*, 331 U.S. at 729 (*quoting Walling v. Portland Terminal Co.*, 330 U.S. 148, 150 (1947) ("The Act's purpose as to wages was to insure that every person whose employment contemplated compensation should not be compelled to sell his services for less than the prescribed minimum wage. The definitions of 'employ' and 'employee' are broad enough to accomplish this.").

But while the definition of "employee" is "exceedingly broad," "it does have its limits." *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 294 (1985). In *Tony & Susan Alamo Found.*, the Supreme Court held that a § 501(c)(3) nonprofit religious entity which ran businesses which competed with ordinary commercial enterprises, which had "associates" "most of whom were drug addicts, derelicts, or criminals before their conversion and rehabilitation…" and who received no cash wages but food, clothing, shelter, and other benefits," were employees under the FLSA, because the "payment of substandard wages would undoubtedly give [the Foundation] and similar organizations an advantage over their competitors. It is exactly this kind of 'unfair method of competition' that the Act was intended to prevent, see 29 U.S.C. § 202(a)(3), and the admixture of religious motivations does not alter a business's effect on commerce." *Tony & Susan Alamo Found.*, 471 U.S. at 298–99. This standard is particularly apposite to this case.

**B.  The FLSA Coverage May Be Extended To Inmate Workers, And This Is The Appropriate Case.**

This case presents the issue of whether inmates who were loaned by a County Detention Center to a County DPW, who were subject to DPW's exclusive control and voluntarily worked for the sole purpose of producing goods that competed in interstate commerce, and which created a significant source of revenue for the County, are covered employees under the FLSA, when their work was performed outside of the Detention Center, and did not involve work within a prison industry nor involved "prison housework." There are no cases on point from any Court.

The starting point, which Defendant fails to acknowledge, is that Circuit Courts – including cases heavily relied upon by Defendant - have consistently and without exception rejected the notion that prisoners are categorically excluded from FLSA coverage.  *See, e.g.*, *Harker v. State Use Industries*, 990 F.2d 131, 135 (4th Cir. 1993) (Wilkinson, J.) (recognizing "extraordinary circumstances" could "trigger FLSA coverage"); *Danneskjold v. Hausrath*, 82 F.3d 37, 44 (2d Cir. 1996) ("prison labor is not in all circumstances exempt from the FLSA"); *Henthorn v. Dep't of Navy*, 29 F.3d 682, 685 (D.C. Cir. 1994); *Vanskike v. Peters*, 974 F.2d 806, 808 (7th Cir. 1992). Thus, an individual's *mere status* as an inmate cannot possibly serve to exclude the inmate from the protections of the FLSA and this is critical to consider because Defendant's argument focuses entirely on the characteristics of Plaintiffs and not their relationship with their work.

As opposed to Defendant's erroneous claim that the FLSA does not cover inmates,[35] Judge Chasanow has summarized the ability of an inmate to be covered by employment rights statutes in

---

[35]     Defendant argues that the FLSA does not "[e]nvision" "[i]nmates [w]orking for [t]heir [c]ustodians," ECF Doc, 169-1, pg. 31. This argument is wildly off: Plaintiff is <u>not</u> arguing that he was working for his custodian, DOC. Rather, Plaintiff is arguing that he was working for DPW. The County is the defendant because DPW is not an agency not subject to suit. *Borkowski v. Baltimore Cnty., Maryland*, 414 F. Supp. 3d 788, 804 (D. Md. 2019) (an agency of Baltimore County is *sui juris*).

*King v. Schrader*, No. CV DKC 16-3804, 2017 WL 3730335, at *4 (D. Md. Aug. 30, 2017):

> Courts have stated generally that prisoners working directly for a prison pursuant to a state law requiring them to work are not employees protected under employment rights statutes, but may be entitled to employee protections when work is optional and done for economic reasons. *See Moyo v. Gomez*, 32 F.3d 1382, 1385 (9th Cir. 1994), *amended*, 40 F.3d 982 (9th Cir. 1994) ("[I]nmates performing work assignments that include compensation or training, or that resemble work release rather than forced labor, are employees entitled to Title VII protection."); *Watson v. Graves*, 909 F.2d 1549, 1554-56 (5th Cir. 1990) (concluding that inmates who worked for the sheriff in an unauthorized work release program and not as part of their sentence were employees for the purposes of the Fair Labor Standards Act ("FLSA")). In these situations, there is a " 'bargained-for exchange of labor' for mutual economic gain that occurs in a true employer-employee relationship." *Harker v. State Use Industries*, 990 F.2d 131, 133 (4th Cir. 1993).
>
> On the other hand, when work is part of a punishment or done for rehabilitative purposes, a prisoner does not establish an employer-employee relationship. *See Castle v. Eurofresh, Inc.*, 731 F.3d 901, 907 (9th Cir. 2013) (holding that a prison inmate was not an employee for the purposes of Title I of the ADA because the inmate was obligated to work as a condition of his confinement); *Harker*, 990 F.2d at 133 (holding a prison inmate working in a prison shop was not an employee under FLSA because the work was performed "as a means for rehabilitation and job training."); *Williams v. Mease*, 926 F.2d 994, 997 (10th Cir. 1991) (concluding a prisoner did not have rights as an employee under the Age Discrimination in Employment Act ("ADEA") or Title VII because his relationship with the prison "[arose] out of his status as an inmate, not an employee.").

Plaintiff does not quarrel with the notion that "*forced* prison labor *for the prison* is not subject to the FLSA." *See Danneskjold*, 82 F.3d at 42 (emphasis added); *see also McMaster v. State of Minn.*, 30 F.3d 976, 980 (8th Cir. 1994); *Hale v. Arizona*, 993 F.2d 1387, 1395 (9th Cir.) (en banc) (prisoners working in prison programs pursuant to Arizona law not covered by FLSA). Voluntary prison housework inside of a prison has also been recognized to be excluded from the FLSA's protections. *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369 (4th Cir. 2021). But these cases are inapposite, because the MRF inmate detail work is voluntary and is <u>not</u> performed in prison industry program. Section II.C, *supra*.

To be sure, when inmate labor is used to produce goods and services for the use of the prison, such labor can be outside the protection of the FLSA. *Danneskjold*, 82 F.3d at 43. But

26

again, it is undisputed that the labor of the MRF inmate detail does <u>not</u> produce goods or services for the use of the prison.  In short, nothing the Defendant cites is directly on point.

Defendant places near-total emphasis on *Harker v. State Use Industries*, 990 F.2d 131, 133 (4th Cir. 1993) (Wilkinson, J.), and its progeny, *Matherly v. Andrews*, 859 F.3d 264 (4th Cir. 2017) (extending *Harker* to civilly committed sexually dangerous person) and *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369, 374 (4th Cir. 2021) (extending *Harker* to immigrant detainees).  But *Harker* could not possibly be more distinguishable.  *Harker* is clearly limited to prison labor occurring *within* a prison.  *Harker* does not define the test for inmates loaned to another sister agency who is running a veritable business operation.

Specifically, *Harker*'s rejection of the economic reality test was specifically limited to "situations when an inmate works inside prison walls[.]"  *Harker*, 990 F.2d at 135.  Repeatedly, *Harker* emphasizes this critical distinction of working within a prison for a state industry.  *Harker* at 133 (Plaintiff "presupposes that inmates in SUI-style programs should be considered employees for FLSA purposes in the first instance… we see no indication that Congress provided FLSA coverage for inmates engaged in prison labor programs *line the one in this case*.") (emphasis added); *Harker* at 135 ("courts have refused to apply the FLSA to work done by inmates *behind prison walls for any type of prison-operated industry or for the prison itself*.") (emphasis added); *Harker* at 135 ("courts have almost uniformly held that the [FLSA] does not cover prisoners working *within the prison setting*.") (citing cases) (emphasis added); *Harker* at 136 (reconciling its decision with *Watson v. Graves*, 909 F.2d 1549, 155 (5th Cir. 1990), stating [*Watson*] … took pains to distinguish situations, such as Harker's, when inmates work "not in competitive market, but in 'the prison itself' "); *Harker* at 136 ("Ruling for Harker … would result in an unprecedented expansion of FLSA coverage to inmates working *within the prison setting*. … Forcing states to

pay the minimum wage to every inmate *involved in an SUI-type program* would dramatically escalate costs … and could well force correctional systems to curtail or terminate these programs altogether."). *Matherly* and *Ndambi* similarly focus on work for or within the prison. *Matherly*, 859 F.3d at 278 (whether plaintiff is an employee of Bureau of Prisons); *Ndambi*, 990 F.3d at 370 (prison "housework" involving preparing/serving meals, cleaning the facility, performing laundry, operating the library and barbershop). Indeed, the Second Circuit has observed that *Harker* turns on whether the work takes place outside prison walls. *Danneskjold v. Hausrath*, 82 F.3d 37, 42 (2d Cir. 1996) ("The Fourth Circuit has held that before a court may even consider whether the alleged employer exercises typical employer prerogatives, it must determine that the work performed by the inmate takes place outside the prison walls," *citing Harker*).

In contrast to *Harker*, two Circuit Courts have held that a prisoner may be an employee for purposes of the FLSA when the prisoner voluntarily works outside the prison for another entity that supervises and directly pays the prisoner. *See Watson,* 909 F.2d at 1554–56 (finding that inmates participating in work-release program were "employees" of private construction company where (i) inmates had not been sentenced to hard labor and (ii) company paid inmates directly); *Carter v. Dutchess Community College,* 735 F.2d 8, 15 (2d Cir.1984) (holding that college might have "employed" inmates as tutors where college made proposal to employ inmates, suggested wage, developed eligibility criteria, recommended particular inmates for positions, was not required to take inmates it did not want, decided hours inmates worked, and sent compensation directly to inmates' accounts). Other Circuit Courts have made statements consistent with *Watson* and *Carter. See, e.g., Villarreal v. Woodham,* 113 F.3d 202, 206–07 (11th Cir.1997) ("the more indicia of traditional, free-market employment the relationship between the prisoner and his putative 'employer' bears, the more likely it is that the FLSA will govern the employment

relationship" (internal quotation and citation omitted)); *Danneskjold,* 82 F.3d at 44 (holding that FLSA applies where prisoner's labor "for a private employer in the local or national economy would tend to undermine the FLSA wage scale").

In *Henthorn v. Dep't of Navy*, 29 F.3d 682, 686 (D.C. Cir. 1994), the D.C. Circuit observed that "the more indicia of traditional, free-market employment the relationship between prisoner and his putative 'employer' bears, the more likely it is that the FLSA will govern the employment relationship." *Henthorn*, 29 F.3d at 686. A prerequisite to finding that an inmate is an employee must include that the inmate free contracted with a non-prison employer to sell his labor. *Id*. at 40. When the work is non-obligatory, and paid by an outside employer, the inmate "may be able to state a claim under the FLSA for compensation at the minimum wage." *Id*. at 686-87.

Here, a reasonable jury could readily conclude that the work, performed voluntarily and outside of Defendant's DOC facility, did not serve the primary benefit of DOC but instead the primary pecuniary benefit of DPW. The work was performed for economic reasons and involves the type of traditional employment paradigm including a bargained for exchange. The application of the FLSA here would prevent the sort of substandard working conditions at the MRF as well as protect private competitors from unfair methods of competition. If Plaintiff had sorted recyclables in a Waste Management facility and was paid by Waste Management, there would be no question under existing law that he would be entitled to the FLSA protections. The only distinction here, i.e., that the work was performed not in a prison industry program but rather for a sister county agency (DPW), is a distinction without a legal difference.

### C. Defendant's Motion For Summary Judgment Must Be Denied.

Even if Defendant is correct that *Harker* and its three-factor test, *see Matherly*, *supra* at

279, *Ndambi*, *supra* at 373,[36] there exists genuine disputes of material fact precluding Summary

Judgment in favor of Defendant.[37]

> ### i.   A Reasonable Jury Could Conclude That The Predominant Purpose Of The MRF Detail Was To Serve The County's Pecuniary Benefit And <u>Not</u> To Rehabilitate Inmates.

Defendant states that "[t]urning to the first factor identified in *Harker* and its progeny," the

MRF work detail served a rehabilitative rather than profit-making motive.  (ECF 169-1; 36).

Defendant further notes inmates received time off their sentences and had an opportunity to wake

up, go to work and take instruction from a work supervisor, and that the MRF work detail was a

"stepping stone" to work release.  (ECF 169-1; 36-38).  Defendant states that there is no evidence

the MRF work detail was operated for the purpose of making a profit.  (ECF 169-1; 38).

However, a reasonable jury could disbelieve that the MRF work detail's predominant

purpose was rehabilitative rather than pecuniary.[38]  As stated above in Section II.E, the purpose of

the MRF was to recycle materials, and it served as no job training, apprenticeship, or introduction

to working for DPW.  (Exh. 6; 128-29; see also Exh. 4; 254-55; Exh. 31; 196-97).  Defendant

admits there is not a single document evidencing a concern for the rehabilitation or the reduction

---

[36]   *Harker* does not appear to intend to create a three-factor test to determining whether inmate coverage under the FLSA exists.  Rather, it provides reasons why the prison industry work was not employment covered by the FLSA.

[37]   Plaintiff seeks to address Defendant's arguments seriatim.

[38]   Defendant's emphasis on the term "profit" misses the mark.  No state or local government can ever literally make a "profit," and to read such a requirement into *Harker* would be tautological.  Rather, what *Harker* requires inmates to be involved in a commercial like operation (as opposed to prison industry or prison housework).  Put another way, private enterprises, which may similarly have years of loss along with profit, do not cease being commercial operations during years when they fail to make a literal profit.  To the extent profit, as a factor matters at all, Defendant's contention that they did not track profit because they did not track expenses is patently false.  (Exh. 52) (numerous spreadsheets tracking expenses at a granular level, including for legal/professional fees, postage, printing, employee benefit programs, IT, water/sewage, telephone, mileage, advertisement, office supplies, signs and stakes, books and pamphlets, grease and lubricants, insurance, subscriptions, association dues, licenses/permits).

of recidivism for inmates working at the MRF.  Homan's testimony, which Defendant relies on, admits that his assessment of the rehabilitative value of the MRF detail to inmates is not based on his being a "corrections professional," but because they got to go "outdoors" and enjoy camaraderie.  (Exh. 3; 155-56).  But all work may provide these same benefits, and if working itself is rehabilitative, just because it involves getting up each morning, going out and being directed by a supervisor, then any work performed by any inmate would also be excluded from FLSA coverage, and this cannot be true because there is no categorical exclusion under the FLSA for inmates.  This is circular baseless rhetoric which any reasonable jury could conclude lacks a foundation in fact.[39]

Defendant argues that it is rehabilitative because the inmates get diminution credits.  (ECF 169-1; 36).  It is not clear how getting a reduction of sentence time is itself rehabilitative, but Defendant's designee admits the County itself benefits from the diminution of sentences.  (Exh. 31; 202).  In other words, the County benefits from shorter sentences too.  And diminution credits are just another form of compensation, in any event.

In contrast to the weak evidence that MRF work was rehabilitative, there is extraordinary amounts of evidence that the Defendant operated the MRF as a commercial venture.  Defendant's brief does not even *acknowledge* that Defendant's business analysts were busy seeking recyclable materials from *other Counties*, so that Defendant could sort, bale and sell it, in order to maximize their revenue - a goal that designee Carpenter shamelessly denied until he was impeached with

---

[39]     And, assuming *arguendo* there is some rehabilitative value in *any job*, Defendant's argument rests on the flawed logic that the presence of any potential rehabilitative value must means the absence of an economic relationship, as if the two cannot coexist.  The stronger the showing an inmate's work produces an economic value, such as in this case, the more the Court must demand a defendant to produce compelling evidence of rehabilitative value.

documentary evidence.  (Exh. 2; 38-40).[40]  A reasonable jury could conclude that the predominate purpose of the MRF detail was commercial in nature, based on the quantum of evidence produced here that Defendant was preoccupied with maximizing revenue and increasing sales, to the extent that Defendant even considering the creation of double inmate shifts containing *Baltimore City* inmates!  A reasonable jury could readily infer that Defendant was not interested in rehabilitating inmates, by seeking out City inmates or home detention inmates or seeking to speak with a Judge about having inmates *sentenced to work* at the MRF.  A reasonable jury could also readily infer that the Defendant was not interested in rehabilitating inmates when it gutted other work details to transfer inmates to the MRF, continued assigning work release recommended inmates to the MRF, ignored any potential work/life balance by cancelling inmate dental exams, or preventing inmate participation in re-entry groups or substance abuse programs in favor of keeping the MRF staffed. A reasonable jury could readily infer that the Defendant was not interested in rehabilitating inmates when the <u>totality of internal</u> communications about the MRF detail concerned inadequate or inconsistent inmate staffing numbers, or maximizing revenue, rather than whether the inmates were developing skills and being rehabilitated at the MRF.  (Exh. 9); (Exh. 13); (Exh. 21); (Exh. 25); (Exh. 29); (Exh. 32); (Exh. 52); (Exh. 57).  Rather, a reasonable jury could conclude that the Defendant was engaged in a business, that Community Corrections was a staffing arm of DPW, and that the real goal of Defendant's actions was to make money.

> **ii.   A Reasonable Jury Could Conclude That Inmates Worked Within A "Traditional Employment Paradigm" And Were Not Subject To The Same Level of Custody In The MRF Workplace.**

Defendant next argues Plaintiff was in a custodial relationship at all times, including during

---

[40]    Though Plaintiff did not compel every single serious discovery violation in this case, the Court should be concerned about the witness' evasion and counsel's disruption.  (Exh. 2; 8-17). A reasonable jury viewing this testimony would choose to disbelieve this witness in his entirety.

their workday, and therefore, cannot be entitled to the FLSA's protections. (ECF 169-1; 39). They further argue there was no "bargained-for-exchange" as required by the second *Harker* factor. *Id.*

As an initial matter, distilled to its essence, Defendant conflates the necessity of showing a "bargained-for-exchange" required in a "traditional employment paradigm," *Harker*, *supra*, with the tautological observation that the inmates were in a custodial relationship. If being in any custodial relationship was dispositive, no inmate would ever be entitled to FLSA coverage, but there is no categorical exclusion because *Harker* took pains to distinguish itself from *Watson*. Thus, this conflated argument proves too much. Rather, this Court should follow Judge Chasanow's observation in *King*: when work is optional and done for economic reasons, there is a " 'bargained-for-exchange of labor' for mutual economic gain that occurs in true employer-employee relationship." *King*, 2017 WL 3730335, at *4.

In any event, there are genuine disputes of material facts regarding *each* of the arguments advanced by Defendant in Section II.B of Defendant's Memorandum.[41]   First, contrary to Defendant's false representation claiming the work was "required," at ECF 169-1, pg. 39, there is no *genuine* dispute that the MRF inmate worker did so voluntarily. *See* Section II.C incorporated herein by reference. Watts and Homan agree the work was voluntary. (Exh. 5; 126-27); (Exh. 3; 168). If work was compelled and violators punished, then how could inmates quit "all the time" "just like it happens with private sector employees[?]" (Exh. 1; 118).

Defendant argues that the inmates "remained in custody at all times throughout their workday... ." (ECF 169-1; 39-40). As an initial matter, this *alleged* fact is disputed but also immaterial. *Harker* and its progeny apply to work in a prison industry or performing prison housework and was careful to distinguish its ruling from *Watson*, where workers left the

---

[41]   It is an unremarkable and nonmaterial fact that the DOC had to approve participation in the MRF work detail. DOC approved work release to the private sector. (Exh. 30; 64).

correctional facility.  Here, a reasonable jury could disagree that the Plaintiffs were in the same

form, manner and level of custody in which prisoner workers toil within a prison.  *Harker*, *supra*.

For example, there were two <u>unarmed</u>[42] Correctional Officers who sometimes were even

retired (termed "Assistants") (collectively "COs").  (Exh. 30; 234-35); (Exh. 31; 94).  The number

of COs did not change regardless of whether more inmates were sent to the MRF.  (Exh. 17; 17,

11-15).  Inmates were transported on a regular school bus, driven by a DPW worker with the bus

operated through DPW's budget.  (Exh. 31; 102); (Exh. 30; 237); (Exh. 2; 49-50).  The bus was

not identified as a prison transport vehicle and was no more secure than any other commercial

vehicle a worker might travel to their free market employment.  Inmates were not secured nor

given assigned seating.  (Exh. 42; ¶7); (Exh. 44; ¶6).  In stark contrast to an inmate working *within*

DOC or other institutions like in *Harker* and its progeny, if an inmate walked away from the MRF,

which rarely happened, (Exh. 1; 201); (Exh. 5; 57) because the MRF inmates were already

screened for escape risk, (Exh. 31; 25-26), either the COs or DPW would call the police.  (Exh. 1;

201); (Exh. 6; 114-15).  Thus, unlike an inmate in DOC custody who would be actively restrained

by DOC staff (some armed) if they attempted to escape, the rare inmate at the MRF who attempted

an escape would not be physically encountered or prevented from leaving but was merely reported

by unarmed COs (some retired) to the police who then handled the matter.  (Exh. 1; 201).  The

same was true with respect to fighting: if an inmate were to engage in a physical altercation, COs

would be instructed not to break up the fight but give verbal commands.  (Exh. 53; 122-23).

(witness fight where COs did not intervene; commenting that this would never happen in the jail).

Defendant also attempts to paint a picture of an active custodial arrangement during the

work-day.  Of course, it is undisputed that work instructions and on the job supervision was

---

[42]     Plaintiffs Scott and Dulaj affirm the COs were unarmed.  (Exh. 7; 147); (Exh. 53; 122-23),

provided by DPW. (Exh. 6; 111-13); (Exh. 1; 185) (COs did not have training from DPW). COs never provided orientation. (Exh. 6; 77). COs would not always have the inmate workers in their view, and their job was to supervise and count the inmates as they enter and leave the facility (sign in/out), so payment could be made. (Exh. 6; 77, 116-17). Indeed, COs (and by extension, DOC) did not even handle workplace complaints that inmates had and neither DOC nor DPW maintained a record of workplace injuries. (Exh. 1; 159); (Exh. 17; 57-62). While COs were expected to escort inmates to the bathroom and provide security at break time, Robinson witnessed inmates moving unattended to the lunchroom or bathroom, and Robinson recalls the COs throwing food to the seagulls outside of the MRF. (Exh. 6; 119-20); (Exh. 80). Plaintiffs confirm the lack of involvement of the COs. (Exh. 42; ¶8); (Exh. 43; ¶7); (Exh. 44; ¶7); (Exh. 50; ¶14-15) (could not observe entire inmate work area from office); (Exh. 51; ¶4); (Exh. 54; ¶10); (Exh. 55; ¶4).

Thus, a reasonable jury could question the form, manner and custody arrangement, given the lack of an armed guard, and the fact that COs would not even attempt to stop an inmate escape. There was no armored bus and there were no weapons to maintain any custodial relationship. A reasonable jury could readily conclude that the COs role was quite limited and could conclude that the two "COs" were there merely as an administrative adjunct, an escort, a veritable hall-monitor, and they did not carry the sort of weight and responsibilities that traditional jailers would maintain with an incarcerated person.[43] Given the security differences between inside and outside of the DOC, a reasonable jury could disbelieve Defendant's claim that the inmates were subject to the same custodial relationship within DOC compared to their supervision at the MRF.

---

[43]    If there was any interest or role to play beyond the administrative, this would still not convert the relationship of the COs to the inmates to be one of a traditional custodial relationship like in *Harker*. A reasonable jury could conclude that the COs were present primarily for the benefit of the DOC, as opposed to maintaining a traditional custodial relationship over the inmates, because DOC was concerned with unique and extreme risk that the MRF presented in terms of the risk of contraband smuggling. (Exh. 5; 52-54).

Defendant's other arguments fare no better. Defendant's repeated emphasis that the MRF inmate workers had to return to DOC at the end of the day is unremarkable and immaterial: the focus is on Plaintiff's putative employment relationship with DPW not where Plaintiff sleeps at night. *Cf.*, *Rosslyn Concrete Const. Co. v. N.L.R.B.*, 713 F.2d 61, 64 (4th Cir. 1983) (affirming NLRB rule in *Winsett-Simmonds Engineers, Inc.,* 164 NLRB 611, 612 (1967) that the test as to whether an inmate worker shares a "community of interest" with non-incarcerated workers "depends on his status while in the employment relationship and not what ultimate control he may be subjected to at other times"). Moreover, the fact that inmates were subject to rules such as prohibitions regarding removing contraband from the MRF is similarly unremarkable and immaterial: like inmates, DPW workers were prohibited from pulling items like alcohol and drugs from the line and consuming them. (Exh. 6; 166).

Defendant argues that inmates did not "deal at arm's length," but that is contrary to Defendant's own County Administrator who testified that inmates in fact "were able to bargain for more money… ." (Exh. 3; 155). There is very substantial evidence that the inmates made complaints and demands, both collectively and individually, regarding wages and working conditions. Section II.D, pg. 19-20, incorporated herein. Inmates even engaged in work stoppages. Defendant argues that the inmates were not allowed to negotiate anything more or different, but workers were able to negotiate small differences between themselves and others, such as placement on the line to avoid motion sickness. (Exh. 6; 66-67). Defendant claims that wages and lengths of schedule were decided between DPW and DOC, but that is disputed: there is evidence that DOC merely conveyed the wage demands of inmates (Exh. 73); (Exh. 75) and DPW clearly dictated the schedule to DOC, even to the extent that they wanted inmates to make up lost production time if the plant stopped during the day. (Exh. 17; 77); (Exh 67).

Ultimately, and based on the evidence in this case, there is evidence of <u>both</u> a bargained-for-exchange of "labor" for "mutual economic gain that occurs in a true employer-employee relationship."  Defendant made <u>millions of dollars</u> ($41 million, to be exact, between 2014 and 2020) (Exh. 2; 109), off the valuable work of the Plaintiffs.  (Exh. 2; 56-57) ("I don't think we can argue the fact that there is a benefit" economically to the County from MRF inmate labor).

### iii.    Inmates Used Wages To Maintain Their General Well-Being.

Defendant starts its argument stating there "is no dispute that Plaintiffs received all of their necessities… ."  (ECF 169-1; 41).  But the real problem with this argument is that it proves too much:  even *Harker*, who recognized the correctness of *Watson*, did not hold that all inmates are categorically excluded from the FLSA.  As Defendant notes, it is obligated by law to provide food, board and medical care *to all inmates*.  If this factor was applied in each case, every inmate would always be excluded from FLSA coverage, but that plainly is not correct.  Even *Ndambi* appeared to observe that inmate status does not turn on whether daily necessities are provided to an inmate. *Ndambi*, 990 F.3d at 373 ("any potential inadequacy of conditions is not appropriately remedied by applying the FLSA wholesale to detainees").  This argument is too tautological.

There is substantial evidence in this case that the Plaintiff and other MRF inmate workers "used their wages to maintain their 'standard of living' and 'general well-being.' "  *Ndambi*, 990 F.3d at 373 (citing 29 U.S.C. § 202(a)).  In this case, and unlike *Harker*, *Matherly* and *Ndambi*, it is <u>undisputed</u> that inmates were left freezing at work without basic protection from the elements, so they used their wages to purchase long-johns from the commissary which they used for work. For example, Parrish testified that inmate workers, to keep warm, "could purchase Long Johns. Many of them did.  They would purchase those Long Johns underwear to help keep them warm.

I'm not sure if they had sweats but I know they had Long Johns." (Exh. 30; 242-43).[44]

Moreover, because the inmates were so hungry from the lack of sufficient quantity of food supplied by DOC to feed them for a 12-hour physical labor workday, (Exh. 6; 137),[45] inmates were allowed to purchase a snack from the commissary and bring them to work – just like a worker in a free labor market. (Exh. 30; 299-303); (Exh. 76); (Exh. 5; 70, 73-74, 76-77) (describing purchasing snacks from the commissary with earnings from MRF work detail).

In both instances, the inmates were using their own earnings to provide basic necessities, just like a worker would in a free labor market, *cf. Ndambi*, 990 F.3d at 373. Additionally, unlike any of the detainees in *Harker* or its progeny, it is <u>undisputed</u> that DOC inmates are all subject to a sentence of 18 months *or less*. (Exh. 14; 56); (Exh. 5; 19). Therefore, many of these inmates still had rent, car insurance, and other family obligations to maintain. For example, Plaintiff Scott described how he used some of his earnings to send to friends to pay his rent and feed his pets (cats/dogs) that he left behind after he was incarcerated. (Exh. 53; 143-44, 239-245). Plaintiff Dulaj similarly testified that he needed money to send home to support family. (Exh. 7, 114).

In conclusion, it is plainly obvious that a reasonable jury could conclude that the Defendant was <u>not</u> providing the basic necessities for these MRF inmate workers (Section II.D). A reasonable jury could conclude that the inmates used their monies in order to satisfy their "standard of living" and "general well-being." *Ndambi*, *supra*.

### iv. Defendant's DPW Was Engaged In A Commercial Business Venture That Competed In The National Economy.

Defendant continues to frame this case as a case by the Plaintiffs against DOC, when it is

---

[44]    Four inmates attest that they either purchased long johns and socks from the commissary with their earnings or witnessed other inmates do the same to keep warm while working at the MRF. (Exh. 43; ¶12); (Exh. 50; ¶20); (Exh. 51; ¶7); (Exh. 54; ¶12).

[45]    Three Declarants attest that the sandwich given to them provided an inadequate amount of calories leaving them weak and drained. (Exh. 43; ¶11); (Exh. 50; ¶12); (Exh. 54; ¶11).

beyond peradventure that Plaintiffs contend that their employer was DPW and the County, as the suable entity, owes them unpaid wages. *See* FN 35, *supra*. Therefore, all of Defendant's reliance on the Ashurst-Sumners Act, 18 U.S.C. §§ 1761-62, misses the mark. Again, *Harker* involved goods made within a prison. In *Harker*, the Fourth Circuit concluded that there was no argument of unfair competition when Ashurst-Sumners exempted the very goods that SUI in *Harker* was producing. *Harker*, 990 F.2d at 134 ("Harker's position conflicts with this exemption, however, because he would require inmates to be paid minimum wages for producing government goods, even though Congress has concluded that such goods do not threaten fair competition."). The goods in this case are not subject to an exemption under Ashurst-Sumners, and therefore, no such argument applies.

Moreover, Defendant's odd emphasis on UNICOR and its recycling program similarly misses the mark. This is a County prison industry recycling program, not UNICOR. DPW staffed the MRF with incarcerated and non-incarcerated sorters. (Exh. 31; 57). There is no evidence that Congress was aware of Defendant's practice and silently endorsed it. Certainly, Congress did not endorse the County's $20/day for 12-hour, six-day workday plan. Before arguing that Congress' silence is evidence of approval, Defendant must show that Congress was aware of the Defendant's MRF detail pay practices.

Defendant's final argument is skeletal and states that "the undisputed facts here demonstrate that there is no unfair competition by the County with private entities engaged in the sale of recyclables." (ECF 169-1;. 44). To the contrary, a reasonable jury could conclude otherwise. *See* Section II.B, incorporated herein. Defendant does everything a competitive business would do and is recognized by competitors as a competitor. For example, Defendant employs a "Recycling Marketing and Promotion Manager" who is an expert in the recycling

commodities market.  Defendant claims it does seek to "undercut" or "undersell other entities," but Defendant's business model is purely based on having the very best quality bales of materials and quality naturally involves a comparison of one versus another.  (Exh. 4; 100).  Repeatedly, Defendant sought to secure materials to sort, bale and sell from *other jurisdictions*.  A reasonable jury could easily conclude that if municipalities and counties hire contractors like Waste Management to recycle waste (Exh. 2; 12), then Defendant's success in securing counties like Harford and Cecil County represents a loss for others, like Waste Management which Defendant's officials recognize as a business provides the exact same service as the County.  (Exh. 1; 123).  A jury could be particularly curious in the efforts by Burke's OpEx business analyst group to obtain a copy of the Waste Management contract (Exh. 25; 53-54); why else would the County need that contract unless it was seeking to extend market share and secure a competitive advantage?  Based on this evidence, a jury could disbelieve Defendant's convenient denials. (Exh.56).

Defendant's testimony, including at least one statement by their counsel on the record, establish that Defendant is in competition with other private businesses. *See generally* (Exh. 2; 76-86).  Matthew Carpenter, who hardly distinguishes himself as a credible witness by first admitting and then denying that DPW's Bureau of Solid Waste was run in an "entrepreneurial" manner, *see* FN. 9, *supra*, admitted as Defendant's designee that Waste Management's annual investor prospectus[46] could be referring to Baltimore County when it referenced "intense competition from government in its operations (Exh. 2; 76-77); (Exh. 83).  Carpenter also admitted that Waste Management stated elsewhere that it did not use prisoners for labor.  (Exh. 2; 79).  The syllogism was set and the following question asked:

```
11 Q. So Waste Management is in fact a
12 competitor of Baltimore County and does not
```

---

[46]      Plaintiff will subpoena a designee from Waste Management for Trial to attest to the authenticity of this document.

```
13 use prison labor?
14 MR. JOHNSON: Objection. Witness
15 didn't say that; the document did.
16 A. In their opinion.
```

(Exh. 2; 79, lines 14-15).

The Court should hold the Defendant to a judicial admission, based on counsel's concession and the Defendant's response. *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 477 (5th Cir. 2001) (opposing counsel's statement made during deposition questioning of client deemed a waiver).  In any event, and to his credit, Carpenter testified that the real difference between Waste Management and the MRF was that Waste Management is private sector and the MRF is being operated by Defendant.  (Exh. 2; 93).  It is undisputed that the Defendant is engaged in selling to commercial buyers (unlike *Harker*), and those commercial buyers would be relieved of purchasing similar goods from a private business-like Waste Management, because after all, there is a limited market for used cardboard, plastics, and aluminum, etc.  In sum, a reasonable jury could conclude that Defendant, with its preoccupation with production quotas and bale quality; with its interest in expanding its operations to other counties; with the OpEx takeover from DPW for the ostensible purpose to "go bigger with the MRF" (Exh. 2; 88); and the repeated references to "maximizing revenue," all could lead a reasonable jury to disbelieve Defendant's denial that they were running a commercial operation and competing with other private industry.

### v. There Is No Genuine Dispute The Work Is Voluntary And Not Compelled. Moreover, The Work Was Paid By DPW and Not DOC.

Defendant states that *Harker* observed that courts have " 'almost uniformly' held that inmates are not subject to the FLSA, even while working for 'private, outside employers.' " ECF Doc. 169-1, pg. 44-45.  Harker said nothing of the sort.  It said, that "courts have almost uniformly held that the [FLSA] does not cover prisoners working within the prison setting." *Harker*, 990 F.2d at 135 (alteration added).  Misquoting authority is a plain violation of Rule 11.

41

There is no legal authority that supports Defendant's actions here:  Defendant's DOC loaning its inmates out to support a revenue driving mission of its sister agency, the DPW.  This is <u>not</u> a case where DOC paid the inmates from its budget, provided any tools or supervised and directed work, or even set the payrates and other incentives.  The work did not occur in a prison and there are non-incarcerated workers performing the same tasks, with the purpose of *making money* for DPW as opposed to cleaning up the prison or a roadway.  There is no precedent for the behavior of the Defendant here.

Defendant surprisingly cites the D.C. Circuit's *Henthorn*, *supra* and *Burrell v. Lacawanna Recycling Ctr., Inc.*, 2021 WL 3476140, at *1 (M.D. Pa. Aug. 6, 2021) (on appeal),[47] but the Defendant's argument fails because they turn on the involuntariness the work.  Defendant refers at the bottom of ECF 169-1, pg. 47, that Plaintiffs were "compel to part with [their] labor under both DOC and Maryland regulations," but if COMAR require these inmates to have worked at the MRF Defendant certainly cites no such section.  A reasonable jury could readily find that the work was voluntary and part of a "bargained-for-exchange" for "mutual economic gain."  *Harker*, 990 F.2d at 133.  There is simply no admissible evidence, and certain no such evidence entitling Defendant to Summary Judgment, that the Defendant routine practice was to require inmates to part with their labor, and Defendant has not presented any admissible evidence that DOC's routine practice was to punish workers who refused to work at the MRF.  *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 511 (4th Cir. 1977); *U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 27 (D.D.C. 2008) (burden of establishing habit/routine-practice evidence rests

---

[47]    *Burrell* is unremarkable.  It involved a case, unlike the case at bar, where inmates failed to allege the work was voluntary.  *Burrell v. Lackawanna Recycling Ctr., Inc.*, No. 3:14-CV-1891, 2021 WL 3476140, at *22 (M.D. Pa. Aug. 6, 2021) ("Here, Plaintiffs do not allege that they freely contracted with a non-prison employer and their work at the Center was voluntary and not compelled by the Lackawanna County Prison.").

on proponent of evidence).

Critically, a reasonable jury could also find that the MRF inmate worker was *functionally indistinguishable* from private work release which is certainly covered by the FLSA, *Peterson v. M.J.J., Inc.*, No. CV JKB-16-3629, 2017 WL 4098755, at *4 (D. Md. Sept. 13, 2017) (inmates working at restaurant on work release from Baltimore County are protected by the FLSA), and this is *especially true* for those inmates were who were work release recommended and stuck working at the MRF.[48] (Exh. 43; ¶1-5); (Exh. 45; ¶1-6); (Exh. 50; ¶1-3, 7-8). Yet, it is axiomatic the label affixed by a putative employer does not control the question whether a worker is an employee under the FLSA. *Montoya v. S.C.C.P. Painting Contractors, Inc.*, 589 F. Supp. 2d 569, 577 (D. Md. 2008).

Throughout their brief, Defendant is really arguing that inmates don't deserve to be paid. What Defendant is really left relying on labels and circular reasoning that inmates are simply not entitled to the FLSA's protections, because the defining feature of inmate labor is that inmates are not paid. But Defendant's argument is "circular and unpersuasive" because the labels cannot disguise the reality: Defendant's business model would be flatly illegal if the inmates were loaned to Waste Management rather than to DPW. *Cf. Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2167 (2021) (Kavanaugh, J., concurring) ("Specifically, the NCAA says that colleges may decline to pay student athletes because the defining feature of college sports, according to the NCAA, is that the student athletes are not paid. In my view, that argument is circular and unpersuasive. The NCAA couches its arguments for not paying student athletes in innocuous labels. But the labels cannot disguise the reality: The NCAA's business model would be flatly

---

[48]     In its efforts to obscure the true function of the work performed by inmates, Defendant even labeled one unsupervised detail at the Chamber of Commerce as a "work release detail." (Exh. 31; 55).

illegal in almost any other industry in America.").

> **vi.    A Jury Could Conclude That Defendant's Violations Were Willful.**

If the Defendant's conduct was willful, a three-year statute of limitations applies.[49]   The determination of willfulness is necessarily fact-specific.   *Figueroa v. D.C.*, 923 F. Supp. 2d 159, 167 (D.D.C. 2013).   As such, the issue of willfulness is often left to the ultimate trier of fact. *Wilson v. Hunam Inn, Inc.*, 126 F. Supp. 3d 1, 7 (D.D.C. 2015).

The issue of willfulness should be an issue for the jury.   Homan was the responsible official who was the chief proponent of inmate labor.   Homan knew of no other arrangements like Defendant's arrangement between DOC and DPW and he failed to consult with the County Law Department or the County's Human Resource Department concerning whether its inmate work detail was lawful.   (Exh. 3; 34, 43).   On those facts, a reasonable jury could conclude that a Defendant, with law department and human resource office available to analyze these issues, recklessly disregarded the FLSA rights of the inmates.   *Cf. Quirk v. Baltimore Cnty., Md.*, 895 F. Supp. 773, 788 (D. Md. 1995) (finding no willful violation when "[t]he County consulted legal counsel and personnel specialists in neighboring jurisdictions and concluded that all employees with the rank of paramedic and above met the requirements for exemption.").   This is especially true because Homan received legal training.   (Exh. 3; 10).

A reasonable jury could also question why Homan tasked OpEx with many research projects relating to the MRF, including staffing and compensation for the inmates, (Exh. 16; 33, 53, 62, 69, 73, 84-85), but never once did he apparently ask OpEx to examine the legality of the entire scheme.   Thus, given the commercial use of inmates to produce a product for sale which

---

[49]    Because the MWHL has a three-year statute of limitations, but Plaintiff is no longer pursuing an *overtime* MWHL claim, this issue is material to the potential recovery for unpaid overtime under the FLSA.

entered commerce without payment of FLSA-prescribed wages, a reasonable jury could thus conclude that Homan's state of mind was in reckless disregard for the FLSA rights of the inmates.

Homan testified that payment of the minimum wage would have resulted in sensitive political optics for the Defendant. (Exh. 3; 71-74). While Homan denied that this was a consideration, he admitted that politically one of the benefits of inmate labor was "to show the public that [the MRF inmates] were functioning for the public benefit." (Exh. 3; 151). A reasonable jury could thus believe Homan made a political choice between not paying the inmates and showing them off as nearly-free workers. Based on his perception of the political plus of nearly-free inmate labor provided to the County, a reasonable jury could conclude Homan ignored all of the legal issues accompanying it out of concern of the *perceived* political backlash in properly paying inmates, including inmates recommended by courts for work release. Given the lack of care for inmate working conditions which Homan was made aware of and failed to remedy, from lice-filled coats to overflowing latrines, a reasonable jury could find that Homan had a contemptuous disregard for the inmate's welfare, including their rights to be paid wages for their work's economic value. Given Homan's preoccupation of the costs of housing an inmate, (Exh. 3; 68-69), a reasonable jury could conclude that Homan specifically wanted the low pay to serve as a form of restitution to Defendant in reckless disregard of the inmates' wage rights. Given the willful disregard of the inmate MRF workers' welfare, a reasonable jury could conclude that Defendant created an intentional system, based not on rehabilitating inmates, but based on exploiting them due to their status.

Moreover, a reasonable jury could disbelieve Defendant's argument that the FLSA was never a consideration. First, after Robinson himself raised questions about the length of hours worked by the inmates, Robinson recounted that Jones showed him some sort of statute that he

claimed allowed inmates to be worked as many hours and days as "we deemed necessary." (Exh. 6; 42-44). A reasonable jury could readily conclude from this testimony that the Defendant had at least considered the issue of hours of work by inmate labor, thereby undermining Homan's denial. Second, Defendant admits that there are many safety hazards at the MRF. (Exh. 17; 63). DPW provided all OSHA required equipment to inmate MRF labor, (Exh. 4; 183), thereby belying any claim that DPW did not think of them as employees, as OSHA only protects employees.[50] Yet at the same time, DPW did not maintain records of inmate workplace injuries. (Exh. 17; 62). Regrettably, a MRF inmate detail worker was injured after he was hit by a forklift, but according to Jones, this workplace injury still did not raise questions of whether an inmate would be able to make a worker's compensation claim. (Exh. 17; 63-70); (Exh. 82); (Exh. 2; 94). Based on this evidence, a reasonable jury could disbelieve Defendant's incredulous claim that no one considered the work-place rights to injury compensation after an inmate was struck by a forklift. Moreover, Defendant had the presence of mind to place OSHA required equipment in the workplace but also the presence to neglect to maintain inmate injury records. A jury could find that Defendant deliberately sought to conceal evidence and ignored potential worker compensation issues which to any reasonable organization would have triggered consideration of employee classification of inmate workers under employment laws.

### IV.   CROSS MOTION FOR SUMMARY JUDGMENT

#### A.   No Reasonable Jury Could Conclude That This Was Anything Other Than A Work Release Program In Disguise.  As Such, Defendants Are Liable To The Class As A Matter of Law.

Defendant uses the term "work detail" to justify not paying the MRF inmate workers.  By using that "label," Defendant likens the MRF inmate detail to other work details involving prison

---

[50]     https://www.osha.gov/laws-regs/standardinterpretations/1992-05-18-1

housekeeping, like those inmates working within DOC performing tasks like kitchen, regular floor workers, commissary, laundry, barbers, librarians, gym workers. (Exh. 31; 86); (Exh. 30; 69-80). However, some work details are not housed in Community Corrections. (Exh. 5; 112-13). For example, kitchen workers are not part of Community Corrections, and unlike the MRF work detail, are paid from the Corrections budget. (Exh. 5; 113-15, 117).

Community Corrections would generally only oversee certain "details" where the inmate was "outside" the facility.[51] (Exh. 30; 80-81) ("We would oversee details where maybe the inmate was outside the facility."). DOC used the term "work release detail" to refer to a detail where everyone was work release recommended by a Judge. (Exh. 31; 99).

The essential difference between a work detail and a work release, at least according to Defendant, is that an "outside work detail" versus private work release was that the work detail involved supervision and work release did not. (Exh. 31; 55-56); (Exh. 14; 59); (Exh. 5; 118-119). However, there were certainly restrictions on private work release inmates. (Exh. 5; 171-72); (Exh. 84); (Exh. 85). Private work release inmates could not be away from DOC for more than 12 hours (including travel time), whereas there is no evidence that MRF work detail inmates had a similar restriction. (Exh. 31; 109).

No reasonable jury could conclude that the level of supervision over the inmates at the MRF rose to the same custodial relationship level as compared to inside of a jail. *Compare Section III.C.ii, pg. 38-40 to Harker, Matherly, Ndambi, supra.* The test of employment under the [FLSA] is one of 'economic reality'… ." *Tony & Susan Alamo Found.*, 471 U.S. at 301 (citation omitted). "Courts must look to the economic reality of the working relationship rather than any labels given

---

[51]     One of the floor internal details were assigned to Community Corrections. Otherwise, Community Corrections oversaw animal shelter detail, CAF detail, docks and grounds and Chamber of Commerce. (Exh. 30; 80-81).

by the parties when determining liability under the FLSA and the MWHL." *McFeeley v. Jackson St. Ent., LLC*, 47 F. Supp. 3d 260, 267–68 (D. Md. 2014), *aff'd*, 825 F.3d 235 (4th Cir. 2016). The ultimate determination of employee-employer status "must be based upon the circumstances of the whole activity." *See Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 142 (4th Cir. 2017) (joint employment turns on circumstances of "whole activity").

On this record and applying the FLSA to further the remedial and humanitarian purposes (and not in a narrow, grudging manner), there is simply no question that the inmates and DPW have "made the 'bargained-for-exchange' for mutual economic gain." *Harker*, 990 F.2d at 133. This case is no different than the facts of *Watson*, where a sheriff allowed inmates to be loaned out for $20/day to perform work for a relative who competed in the private sector. *Watson*, 909 F.2d at 1554-56. Here, the inmates were loaned out to a sister agency and performed labor involving the production of goods sold in a competitive private industry. Coverage under the FLSA cannot turn on the mere label given by Defendant that Plaintiff worked in a "work detail," as opposed to "work release," nor can the FLSA's important protections turn merely on the fact that COs provided some sort of unarmed minimal escort to the MRF. As a matter of law, the work detail is functionally no different than private work release, which is undeniably covered by the FLSA. *Peterson*, 2017 WL 4098755, at *4. Because that is true, and because *all other economic reality factors*[52] point to an employment relationship, this Court must enter Summary Judgment as to liability in favor of the Plaintiffs.

### B. The Court Should Enter Summary Judgment As To Liability In Favor Of At Least Those Plaintiffs Who Were Recommended For Work Release.

Defendant admits that there are two groups of inmates who work at the MRF, those who are work release recommended and those who are not. (Exh. 31; 101); (Exh. 81).

---

[52]   *See, e.g.*, Exh. 86; Interrogatory Resp. by Plaintiff, No. 24.

There is no justification for denying work release recommended individuals, all of whom were screened just to get into Community Corrections, from the full protection of the FLSA. Any other ruling would permit a County to do what was done here: prevent private work release recommended persons from continuing higher paying private sector jobs (e.g., Snyder), or obtaining higher paying private sector jobs (e.g., Dulaj), but rather serve as a cheap and forced labor pool for sister government agency projects. These inmates were free to avail themselves of the benefits of free labor market but were used as pawns by Defendant in order to maintain their inmate worker quota at the MRF. While doing so, these workers were subject to substandard working and pay conditions and treated differently – for no reason – than their "temp" contractor counterparts. The County could have quite easily paid the work release inmates the full FLSA wages but was so preoccupied with running the MRF like a business that it deliberately and recklessly disregarded its basic legal obligations. The Court should enter Summary Judgment as to liability in favor of all Plaintiffs who were work release recommended by a Court but whom Defendant placed at the MRF.

### C. The Court Should Enter Summary Judgment Against Defendant's Claim That The Work Was Involuntary.

"It is the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.' " *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (citations omitted). In this case, there is no *genuine* dispute that the work was voluntary. See Section II.C *supra*, incorporated herein. *See Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) ("An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant."). Defendant has no admissible evidence, or evidence that could be put in an admissible form for Trial, that the work at the MRF was involuntary. Defendant cites a mere work rule without context,

but absent evidence of actual *enforcement* as a routine practice, Fed.R.Evid. 406, this is a mere scintilla of evidence that cannot defeat Summary Judgment. *Richardson v. Clarke*, 52 F.4th 614 (4th Cir. 2022) ("mere existence of a scintilla of evidence" in favor of the nonmovant's position cannot withstand the summary judgment motion). Defendant's citation to COMAR is without reference to any section cite and likely inapposite as DOC is not a State entity, in any event. There is no Baltimore County law requiring inmates to work for DOC, much less perform work for a sister agency that generates millions in revenue off that labor. Accordingly, the Court should grant Summary Judgment as to Defendant's claim that the Plaintiff's work was involuntary.

## V.    CONCLUSION

The issues raised in this case transcend the Parties' interest and have broad National implications. On a local level, granting Summary Judgment to the Defendant would surely result in the return of the MRF inmate work detail and would cause the loss of temp worker jobs currently paying the full-minimum wage. However, on a national level, a grant of Summary Judgment would be akin to approving of the Defendant's practices described herein and other local governments would certainly take notice. Local detention centers would see inmate populations as a source of exploitable labor for sister government agencies, including in jobs like these that produce goods and revenue for the government. And, if inmates can perform work that generates revenue for a sister agency, they could replace many occupations that do not generate revenue, such as your neighborhood garbage collector.

On the other hand, a grant of Summary Judgment in favor of the Plaintiffs only requires the Defendant to have staff the MRF like the actual *work release* program that it was.

Plaintiff requests that the Court deny Summary Judgment to Defendant and grant Summary Judgment to Plaintiff.

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 23rd day of November, 2022, a copy of Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment, together with all exhibits and a proposed Order, was filed via the Electronic Case Filing System (ECF) maintained by the U.S. District Court for the District of Maryland, and is available for viewing and downloading from the ECF system.

*/s/ Jordan S. Liew*
Jordan S. Liew