**EXHIBIT 45**

IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **Michael A. Scott** | * | |
| *On behalf of himself and others similarly situated* | * | |
| | * | |
| **Plaintiff** | | |
| | * | |
| v. | | Case No. 1:21-CV-00034-SAG |
| | * | |
| **Baltimore County** | * | |
| **Defendant** | * | |

## DECLARATION OF HAROLD SNYDER, JR.

I, Harold Snyder, Jr., do hereby declare, pursuant to 28 U.S.C. § 1746, as follows:

1. For over 24 years prior to being sentenced to the Baltimore County Detention Center ("Detention Center"), I was a paid career firefighter with the Baltimore City Fire Department ("Fire Department"). When I was sentenced, the judge knowing that I was a long-term paid firefighter made me work release recommended. I was committed to the Detention Center on the same day I was sentenced on April 5, 2018, and remained incarcerated until July 7, 2018.

2. Shortly after I arrived, I was transferred to the dorms on the new side of the Detention Center. I received a list of clothing items my family would be allowed (only one time) to bring to the jail for me. I never received any work clothes or socks from the Detention Center, let alone to wear while working at the MRF.

3. Shortly after being committed to the Detention Center, I met with Rodney Hicks, who I understood was responsible for work assignments outside of the facility. I explained to

1

Mr. Hicks that I was a paid firefighter with the Fire Department with 24 years of service, and that I had been recommended for work release by the court so that I could continue working for the Fire Department while serving my sentence.

4. Mr. Hicks did not dispute anything I said, but told me that I would be assigned to the Material Recovery Facility ("MRF"). He also told me that this was a work release assignment. When I protested that I needed to be able to work for the Fire Department in order to keep my job there, Mr. Hicks said "we'll get back to that at a later date."

5. Several times afterwards, I approached Mr. Hicks and urged him to assign me to work release at the Fire Department. Each time he refused to do so. I never was permitted to go back to work at the Fire Department.

6. I was afraid that I would be discharged by the Fire Department for not reporting to work and would lose my pension and other benefits. Accordingly, I had my father, who had retired from the Fire Department, submit the paperwork for my retirement from the Fire Department. I was forced to retire from the Fire Department because I was afraid that I would be discharged by the Fire Department for not reporting for work and would lose my pension and other benefits. As a result, I receive a smaller pension than I would have received if I had continued to work for the Fire Department until my normal retirement date.

7. Working at the MRF was the worst job I ever had. The MRF was freezing cold for the first few months I was there. The inmates had to stand in place, reaching and bending over to grab items off the moving conveyor belt. I generally worked for 10 or more hours per day, six days a week, with no breaks other than a half hour for lunch and no drinks allowed at our workstations. The environment at MRF was dirty, dusty and very noisy.

Doc ID: 0662786073b54e5bae0d2e789aae94712afa53c3

8. The job involved unskilled labor. I did not acquire any kind of marketable job skills from picking trash off a conveyor belt at the MRF.

9. There were many days the other inmates and I got back to the Detention Center in the evening after dinner was served. When this occurred, the food was cold and piled up waiting for us. They had one microwave in our kitchen area which was shared by 30+ inmates, a significant number of whom worked at MRF and similarly arrived back at the Detention Center at the same time after dinner had already been served and gotten cold. As such, I would have to wait a long time just to heat up my food so I could have a hot dinner, or I would have to eat my food cold, if I did not want to wait.

10. All of the inmates who worked at MRF were filthy at the end of each workday. We all needed to shower. There was 1 shower shared by 6-7 inmates in each sleeping pod. I therefore often had to wait a long time to shower and get clean after working with garbage and waste all day.

11. There were 2 washing machines and dryers for each wing of the jail where the inmates on outside work assignments were housed. Normally, only one washer and one dryer were working. Each inmate had limited clothing at the jail. Virtually all of the inmates had to wash and dry their clothes every workday. Again, there were about 30 inmates who shared this service. I therefore often had to wait a long time to wash my clothes after a long day working with garbage and waste.

12. Even though I have personally attended Alcoholic Anonymous ("AA") meetings both before and after my incarceration, I was unable to attend any AA meetings at the Detention Center because of the long hours I was required to work six days (i.e., Monday – Saturday)

Doc ID: 0662786073b54e5bae0d2e789aae94712afa53c3

a week. The Detention Center did not offer any AA meetings after 6:00 p.m. or on Sundays.

13. I am not aware of (nor was I made aware of), nor did I participate in any type of any type of resource fairs for inmates during my incarceration. I do not believe that these programs were offered or available to all of the sentenced inmates, because I never received any notice (nor was I ever told about) any resource fairs, job or career counseling or classes provided by the Detention Center, Community Corrections, the Baltimore County Department of Workforce Development or the Offenders Employment Network during my incarceration.

14. To the extent these programs were allegedly offered to certain inmates, the inmates working at the MRF, such as myself, would be unable to participate due to our extremely long workdays, Monday through Saturday, and because no programs (other than religious services) were offered on Sundays. There were no resource fairs, job counseling or other classes available to the inmate MRF detail workers when they returned to the Detention Center after 6:00 pm. Similarly, there were no resource fairs, job counseling or other classes available to inmate MRF detail workers in the morning when they left the Detention Center between 5:00 am and 6:00 am. I am not aware of (nor was I made aware of) any substance abuse classes that were offered before 5:00 am or after 6:00 pm.

15. Moreover, there were no workforce development mobile vans at the Detention Center in the mornings before inmates left or in the evenings when the inmates returned from the MRF. In any event, inmates were not allowed to go outside of the Detention Center unless they were working, and therefore I would not have been able to enter the van to work on resumes or fill out applications for employment after I was released.

Doc ID: 0662786073b54e5bae0d2e789aae94712afa53c3

16. I am also not aware of (nor was I made aware of), nor did I participate in any type of re-entry group or program, nor have I ever heard of a Community Re-entry Group.  To the extent that this program was allegedly offered to certain inmates, it was not available to the inmates, including me, who worked at the MRF.  The only assistance I received in connection with being released for home detention consisted of being given bus fare, pointed to York Road, and told good luck.

17. I did not receive any special status as a result of working at the MRF.  To the contrary, it severely limited my ability to access whatever services were provided to inmates.

I affirm under the penalties of perjury that the foregoing is true and correct based upon my personal knowledge.

11 / 23 / 2022
Date

Harold Snyder, Jr.

Doc ID: 0662786073b54e5bae0d2e789aae94712afa53c3