## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| | * | |
| **MICHAEL A. SCOTT,** *et al.*, | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| | * | **Civil Case No.: SAG-21-00034** |
| **v.** | * | |
| | * | |
| **BALTIMORE COUNTY, MARYLAND** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Michael Scott and other Class Members—all current or former inmates at the Baltimore County Detention Center ("BCDC")—brought this class action against Defendant Baltimore County ("the County"). ECF 1. Plaintiffs allege the County violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA" or "the Act") and its state-law equivalent, by failing to pay them minimum wage and overtime when they worked off-site during their incarceration as work detail employees at the Baltimore County Department of Public Works's recycling facility. *Id.*

Following discovery, the County filed a motion for summary judgment. ECF 169. Plaintiffs responded and filed a cross-motion for summary judgment. ECF 175. The County replied and opposed, respectively. ECF 180. With the permission of the Court, ECF 181, both parties filed amended oppositions and replies. ECF 183; ECF 185. Plaintiffs then filed a reply to Defendant's opposition to Plaintiffs' cross-motion. ECF 190. The County filed a surreply, ECF 193, and Plaintiffs responded, ECF 194. The Court has reviewed the motion and all of the related briefing and has determined that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons

that follow, the County's motion for summary judgment, ECF 169, will be GRANTED, and the Plaintiffs' cross-motion for summary judgment, ECF 175, will be DENIED.

## I.    BACKGROUND

Defendant Baltimore County's Executive Branch is comprised of multiple agencies, including the Department of Corrections ("DOC") and the Department of Public Works ("DPW"). *See* ECF 175-3 at 16[1] (Deposition of former Baltimore County Administrative Officer Frederick Homan). DOC oversees the Baltimore County Detention Center ("BCDC"), where Plaintiffs served or are serving sentences as inmates. DPW operates the County's Material Recovery Facility ("MRF"), a recycling facility where Plaintiffs helped process collected recycled material by standing along conveyor belts and sorting trash from recyclable material. *See* ECF 175-1 at 30 (Deposition of John Jones, MRF Facility Manager).

According to the Defendant, DOC runs a Community Corrections Program that seeks to reduce the recidivism of inmates by providing work programs and resources to prepare inmates for reentry into the community. *See* ECF 169-3 at 8 (Deposition of Gail Watts, former manager of the program). The Community Corrections Program oversees work "release" opportunities, which enable inmates to work for private employers without DOC supervision if permitted by the sentencing court. *See* ECF 169-17 at 4 (Deposition of Audra Parish, Supervisor of the Community Corrections Program). The Community Corrections Program also operates a work "detail" program, which assigns supervised work assignments to inmates. *See* ECF 169-3 at 8–9. Work detail assignments have included assisting the County's animal shelter, loading shipments at the prison, maintaining the BCDC front lobby, setting up for events hosted by the Baltimore County

---

[1] Cited page numbers refer to the ECF number unless otherwise noted.

Chamber of Commerce, and—relevant to this case—sorting recycled material at the County's recycling facility. *See* ECF 169-4 at 10 (Deposition of Justin Halligan, Community Corrections Program supervisor).

MRF first shifted to single-stream recycling in 2013 to encourage recycling by the County's residents. *See* ECF 169-10 at 7 (Deposition of Michael Beichler, DPW Chief of Solid Waste). Based on the record, operations of the facility generally went as follows. First, contractors collected recycled material from around the County, transported the material to the facility, and dumped the materials into an open bay/floor exposed to outside weather conditions. ECF 175-1 at 30–32. From there, County DPW employees transported the materials onto conveyor belts. *Id.* Both humans and machines sorted the recyclables, removing trash and separating the remaining recyclables into their respective materials (*e.g.*, paper, aluminum). *Id.* at 34; *see also* ECF 175-6 at 20–23 (Deposition of Anthony Robinson, former MRF shift supervisor). Once sorted, the recycled material was gathered into a bale, which the County later sold to the highest bidder. ECF 175-1 at 35, 55.

Although the parties dispute specifics regarding the inmates' work experiences, Plaintiffs generally stood at the conveyor belts picking out trash from the recycled material brought into the facility. From the record it appears that work detail inmates worked approximately nine-to-ten hours a day (including breaks), and worked closer to eleven-to-twelve hours a day during the holiday season, when DPW anticipated an increase in recycling. *See* ECF 175-1 at 94–95, 102–03, 106; ECF 175-6 at 27–28; *see also* ECF 175-28 at 16 (email from DOC supervisor to DPW noting "we are prepared to increase the number of inmate workers at MES to a minimum of 30 per day, working 10 hours six days a week."). DPW requested from DOC the additional work hours from the inmates during the busier holiday season, which DOC typically accommodated. *See* ECF

175-1 at 108. Plaintiffs worked alongside temporary employees hired by DPW to perform the same job for fewer hours, in exchange for minimum wage. ECF 175-55 ¶ 8.

The recycling facility was open-air, causing especially cold working conditions in the winter. ECF 175-6 at 82. Inmates changed into street clothes for their work detail; however, they had to provide their own clothes from family and friends. ECF 175-55 ¶ 6 (Decl. of Pl. Scott). Keeping warm was a challenge, and DOC at times failed to provide sufficient clothing. ECF 175-39 at 3 (Community Corrections Supervisor, Audra Parrish, suggesting a clothing drive to collect clothing for the MRF work detail inmates "because the supply is diminishing and the sizes are limited," and providing the anecdote that "a pair of female dress pants was issued to one of the [MRF] workers so he could go out to [MRF] the next day."). Plaintiff Scott describes that inmates sometimes grabbed coats and other discarded clothing that came through on the conveyor belt to better protect themselves from the cold conditions. ECF 175-55 ¶ 6.

It is unclear from the record the degree of actual supervision exercised by DOC over its work detail inmates at the MRF. Mr. Dias, a DOC correctional officer, reports that DOC supervised inmates at all times during the workday, and he conducted head counts of the inmates every 20–30 minutes while circulating throughout the work area to check for security issues or misconduct. ECF 169-26 ¶¶ 21–22. In contrast, Plaintiff Scott reports "extremely limited" interaction with the correctional officers, because  they would "generally sit in the office and/or break room at the MRF while the other inmates and I were working at the recycling facility." ECF 175-55 ¶ 10. Plaintiff Scott further notes, "The correctional officers were not consistently present or supervising the inmates at the MRF. It would have been very easy to just walk-off. There were no check-points, and anybody could (and frequently did) just drive into the MRF. I was amazed by the lack of security." *Id.* Although the parties dispute the degree of supervision, they agree that

DOC and DPW could remove inmates from the work detail at the recycling center for poor performance, bad behavior, or some other infraction. ECF 175-55 ¶ 4; ECF 169-26 ¶ 24.

Inmates ate their breakfasts at BCDC before leaving early in the morning for their recycling shifts, and they received dinner when they returned from their shifts. ECF 169-25 at 6–7 (Deposition of Pl. Scott); ECF 175-55 ¶ 15. Mr. Dias reports that DOC provided inmates with a bagged lunch from the BCDC kitchen for the workday. ECF 169-26 ¶ 13. According to Plaintiff Scott, this bagged lunch typically consisted of bologna sandwiches that the inmates called "sweaty betty[s]," ECF 175-55 ¶ 11; ECF 175-6 at 137, which were at times missing from their bags, ECF 175-41 at 5 (email from DOC supervisor Ms. Parish noting complaints from inmates). Inmates complained that these small, bagged lunches were insufficient sustenance for the long workdays. ECF 175-14 at 46 (Deposition of Philip Pokorny, former supervisor of the Community Corrections Program). Mr. Robinson, a former County shift supervisor at the recycling facility, recalls looking the other way while inmates ate food that came down the conveyor belt. ECF 175-6 at 138–39. Food motivated the inmates, and DPW rewarded the inmates with pizza or sub lunches when they met their recycle bale quotas. ECF 175-41 at 5 (email from DOC supervisor Ms. Parish noting that DPW Operations Manager Mr. Bruce "will order food just to help motivate the workers, especially since it is cold out."); *see also* ECF 175-1 at 96–97.

Ultimately, Plaintiffs received $20 per day for their labor, along with some opportunities for bonuses and industrial credits to reduce their remaining time served. ECF 169-10 at 9; ECF 169-23 at5 (Deposition of Eric Brooks, DOC manager). The MRF work detail was the highest paying assignment, given the inmates' general disinterest in working at the facility and the County's interest in using inmate labor to staff the sorting positions. ECF 175-3 at 45–46

(Baltimore County Administrative Officer noting, "Fewer still were interested in working at the recycling facility so the stipend was higher at the recycling facility," *id.* at 43).

In January 2021, Plaintiff Scott, on behalf of himself and other Class Members, brought this case against the County for its alleged violation of federal and state employment laws. ECF 1. Specifically, Plaintiffs assert that the County willfully violated the FLSA by failing to pay minimum wage (Count I) and overtime (Count II), willfully violated the Maryland Wage and Hour Law ("MWHL") by failing to pay minimum wage (Count III) and overtime (Count IV), and willfully violated the Maryland Wage Payment and Collection Law ("MWPCL") (Count V), which requires an employer to timely pay an employee all wages owed. *See* Md. Code Ann., Labor & Empl. Art. ("LE") §§ 3-502(a)(ii), 3-505(a).

Defendant moved for summary judgment, ECF 169, arguing that Plaintiffs could not be "employees" under the FLSA. In the alternative, Defendant asserted that even if Plaintiffs are "employees" under the FLSA, there is no evidence of any willful violation of the federal and state employment laws. In Plaintiffs' cross-motion for summary judgment, they argue that the economic reality of their working relationship is one of employment, and therefore the FLSA applies. ECF 183 at 51–53. In the alternative, Plaintiffs request this Court grant summary judgment for the Plaintiffs who were recommended for work release but kept on the work detail program, *id.* at 54, or grant summary judgment against Defendant's claim that the work was involuntary, *id.* at 54–55.

## II.    LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of

showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.  DISCUSSION

### A.  Applicable Law

Although Plaintiffs have brought this suit pursuant to the FLSA, MWHL, and MWPCL, Plaintiffs may only seek recovery under one theory of liability. *See Gen. Tel. Co. of the Nw. v. EEOC*, 446 U.S. 318, 333 (1980); *see also Re: Butler et al. v. PP&G, Inc., et al.*, No. CV 20-3084-JRR, 2023 WL 3580374, at *4 (D. Md. May 22, 2023). "[T]he MWHL and the MWPCL are wage enforcement laws, with the MWHL aiming 'to protect Maryland workers by providing a minimum wage standard[,]' and the MWPCL requiring 'an employer to pay its employees regularly while employed, and in full at the termination of employment.' " *Re: Butler et al.*, 2023 WL 3580374, at *4 (internal citations omitted). Both the MWHL and the FLSA have similar purposes and almost identical definitions of "employer," and the MWHL contains internal references to the FLSA. *Watkins v. Brown*, 173 F. Supp. 2d 409, 416 (D. Md. 2001). Thus, the MWHL is "the state's equivalent of the FLSA." *Id.*

Importantly, all of Plaintiffs' claims rise or fall on the success of their FLSA claim. If Plaintiffs are not employees under the FLSA, then they are not employees under the MWHL. *See McFeeley v. Jackson St. Ent., LLC*, 47 F. Supp. 3d 260, 267 n.6 (D. Md. 2014), aff'd, 825 F.3d 235 (4th Cir. 2016) ("The requirements under the MWHL are so closely linked to the FLSA that 'plaintiffs' claim under the MWHL stands or falls on the success of their claim under the FLSA.'" (citing *Turner v. Human Genome Sci., Inc.*, 292 F. Supp. 2d 738, 744 (D. Md. 2003)). Similarly, if Plaintiffs are not entitled to unpaid wages, then they cannot claim the wages were improperly withheld under the MWPCL. *See Chavez v. Besie's Corp.*, No. GJH-14-1338, 2014 WL 5298032, at *4 (D. Md. Oct. 10, 2014) ("[A] violation of the MWPCL depends entirely on violation of

another law, either the MWHL or the FLSA, which set wage rates."). Thus, this Court analyzes Plaintiffs' claims under the FLSA.

**B.  Summary of the FLSA's Applicability to Inmate Labor**

At heart, the question is whether Plaintiffs' work conducted outside the prison's walls constitutes employment under the FLSA. The Fourth Circuit has categorically excluded work conducted within a prison from the FLSA's purview; however, it has yet to directly opine on a case involving work conducted off-site. *See Harker v. State Use Indus.*, 990 F.2d 131 (4th Cir. 1993) (inmate claiming entitlement to minimum wage for work performed in workshop within the Maryland Correctional Institution); *Matherly v. Andrews*, 859 F.3d 264, 268 (4th Cir. 2017) (inmate seeking minimum wage for work performed at the Federal Correctional Institution); *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369 (4th Cir. 2021) (former civil immigration detainees bringing claim for minimum wage for janitorial work performed in the Cibola County Correctional Center while their immigration cases were processed). Other courts, such as the Third Circuit Court of Appeals, have reached different outcomes when confronted with prisoners working outside the prison's walls for employers other than the prison. *See Burrell v. Staff*, 60 F.4th 25, 44 (3d Cir. 2023) ("Plaintiffs' work, however, was not the sort of 'intra-prison work' for which inmates are categorically 'not entitled to minimum wages under the FLSA.'") (citing and distinguishing *Tourscher v. McCullough*, 184 F.3d 236, 243 (3d Cir. 1999)). Given the Fourth Circuit has yet to directly address this issue, this Court first reviews how other circuit courts have approached the legal question before proceeding to consider Plaintiffs' specific factual circumstances. *See Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983) ("Although the underlying facts are reviewed under the clearly erroneous standard, the

legal effect of those facts—whether appellants are employers within the meaning of the FLSA—is a question of law.").

The FLSA requires an "employer" to pay an "employee" no less than the federal minimum wage. 29 U.S.C. § 206(a). Unhelpfully, the Act circularly defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1); *see also Ndambi*, 990 F.3d at 372 (quoting *Harker*, 990 F.2d at 133). The Act further defines "employer" as "any person acting . . . in the interests of an employer in relation to an employee," and defines "employ" as "to suffer or permit to work." 29 U.S.C. § 203(d), (g). The Act exempts a long list of positions from the definition of "employee," ranging from a "casual" babysitter to a "seaman" on a non-American vessel. *Id.* § 213; *see also Ndambi*, 990 F.3d at 372. Additionally, "[t]here are some excepted classes of employees, § 203(e)(2), (3), (4), but prisoners are not among them." *Bennett v. Frank*, 395 F.3d 409, 409 (7th Cir. 2005).

Most circuit courts have weighed, in some context, whether inmates can qualify as "employees" under the Act. On the one hand, courts have noted that the statute includes a long list of excepted positions and classes of employees, without expressly excluding prisoners. *See Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 13 (2d Cir. 1984) ("Congress has set forth an extensive list of workers who are exempted expressly from the FLSA coverage. The category of prisoners is not on that list. It would be an encroachment upon the legislative prerogative for a court to hold that a class of unlisted workers is excluded from the Act."); *see also Powell v. United States Cartridge Co.*, 339 U.S. 497, 517 (1950) ("[S]pecificity in stating exemptions strengthens the implication that employees not thus exempted . . . remain within the Act."). Likewise, the Supreme Court instructed courts to expansively construe the terms "employee" and "employer" under the FLSA. *See Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992). On the other hand, "[p]eople

are not imprisoned for the purpose of enabling them to earn a living." *Bennett*, 395 F.3d at 410. As explained by the Seventh Circuit, "[t]he reason the FLSA contains no express exception for prisoners is probably that the idea was too outlandish to occur to anyone when the legislation was under consideration by Congress." *Id.*

Generally, courts have considered the legislative history of the Act and have concluded that, despite the lack of an express exception, the "FLSA's protections do not extend to the custodial context generally." *Ndambi*, 990 F.3d at 373; *id.* at 373–74 (collecting cases from each circuit). As a result, courts analyze each case independently to determine whether the specific facts amount to employment under the FLSA.

Some circuits—including the Fourth Circuit—categorically exclude inmate work performed *inside* the prison's walls. *See Tourscher v. McCullough*, 184 F.3d 236, 238 (3d Cir. 1999) (holding that both pre-trial and convicted inmates are "not entitled to minimum wages under the FLSA" for "intra-prison work"); *Harker v. State Use Indus.*, 990 F.2d 131, 136 (4th Cir. 1993) ("If the FLSA's coverage is to extend within prison walls, Congress must say so, not the courts."); *Loving v. Johnson*, 455 F.3d 562, 563 (5th Cir. 2006) (holding "that a prisoner doing work in or for the prison is not an 'employee' under the FLSA"). In contrast, other circuits—such as the Second and D.C. Circuits—ignore this inside/outside distinction. *See, e.g.*, *Danneskjold v. Hausrath*, 82 F.3d 37, 44 (2d Cir. 1996) ("[W]e also believe that whether the labor is performed inside or outside the physical walls of the institution is irrelevant"); *Henthorn v. Dep't of Navy*, 29 F.3d 682, 685–86 (D.C. Cir. 1994) ("Neither the inside/outside nor the public/private distinction alone provides an adequate answer to which prisoner work situations should be covered by the FLSA.").

For inmate work not categorically excluded, courts analyze the economic relationship between the inmate and the alleged employer; however, circuit courts have differed in what factors to consider.

### i. *Bonnette*'s Four-Factor Economic Reality Test

Some courts originally applied the traditional four-factor economic reality test developed by the Ninth Circuit Court of Appeals in *Bonnette v. California Health & Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983). The *Bonnette* case did not involve prison labor, but rather sought to understand whether the state was a joint employer of persons providing domestic in-home care to disabled public assistance recipients. *Id.* In *Bonnette*, the Ninth Circuit recognized that "[t]he determination of whether an employer-employee relationship exists does not depend on 'isolated factors but rather upon the circumstances of the whole activity[,]'" *id.* at 1469 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)), and that "[t]he touchstone is 'economic reality.'" *Id.* (citing *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1961)). To determine whether the state was a joint employer, the Ninth Circuit considered, in part, the four factors typically considered in joint-employer cases. Specifically, it inquired into "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."

The *Bonnette* factors first appeared in the prison context in the Second Circuit. In the early 1980s, there were "sparse prior decisions" on the issue of whether the FLSA applied to inmates. *See Alexander v. Sara, Inc.*, 721 F.2d 149, 150 (5th Cir. 1983). The Second Circuit Court of Appeals heard a case involving an inmate hired by Dutchess Community College to act as a teaching assistant in conjunction with courses offered by the College to inmates. *See Carter*, 735

F.2d at 10. The district court had granted summary judgment, concluding there could be no employee-employer relationship under the FLSA between the inmate and the College when the prison held "ultimate control." *Id.* at 12. On appeal, the Second Circuit reversed, approving of the district court's consideration of control but noting that "[a] full inquiry into the true economic reality is necessary." *Id.* at 14. The Second Circuit cited *Bonnette* as the relevant case for determining the "economic reality" of the working relationship. *Id.* at 12.

Six years later, the *Bonnette* factors next appeared in the Fifth Circuit in a case involving an "egregious" abuse of prison labor.[2] *Watson v. Graves*, 909 F.2d 1549, 1550 (5th Cir. 1990). In *Watson*, inmates served life sentences in a parish jail for commission of non-violent crimes. *Id.* at 1551. The sheriff and warden of the jail developed a work-release program that permitted the inmates to work outside the jail for the sheriff's daughter and son-in-law to assist their construction business at a rate of $20 per day. *Id.* The sheriff's relatives fully relied on the work-release program to provide labor for their construction business. *Id.* To determine whether the inmates were employees under the FLSA, the Fifth Circuit applied the *Bonnette* factors to assess the economic reality of the inmates' situation. *Id.* at 1553–54 ("We also agree that in order to determine the true 'economic reality' of the Inmates' employee status, we must apply the [*Bonnette*] four factors of the economic realities test to the facts in the instant case in light of the policies behind FLSA," *id.* at 1554). After application of the *Bonnette* factors, the Fifth Circuit concluded that the inmates were employees of the construction business for the purposes of the FLSA coverage. *Id.* at 1556.

---

[2] The Fifth Circuit wrote: "Up to now this court believed, apparently naively, that in the last decade of the twentieth century scenarios such as the one now before us no longer occurred in county or parish jails of the rural south except in the imaginations of movie or television script writers. The egregious nature of this misanthropic situation in the instant case, however, disabuses us of that innocent misconception." *Watson*, 909 F.2d at 1550.

*Watson* proved to be the high-water mark of *Bonnette*'s application in the prison labor context. Two years after *Watson*, the Seventh Circuit addressed a *pro se* complaint from an inmate seeking minimum wage for his work within the prison (*e.g.*, working as a janitor or kitchen worker for the prison). *See Vanskike v. Peters*, 974 F.2d 806, 806 (7th Cir. 1992). Like other courts, the Seventh Circuit recognized that an inmate's "employee" status depended on the totality of the circumstances and required an examination of the "economic reality" of the working relationship. *Id.* at 808. However, the Seventh Circuit explicitly questioned and rejected the applicability of *Bonnette* to its case. The Seventh Circuit wrote:

> As noted earlier, several other courts have applied the four-factor *Bonnette* standard in determining the status of prisoners who work. We think, however, that that standard is not the most helpful guide in the situation presented here. The *Bonnette* factors, with their emphasis on control over the terms and structure of the employment relationship, are particularly appropriate where (as in *Bonnette* itself) it is clear that some entity is an "employer" and the question is which one. . . . In those cases the question is essentially whether there is enough control over the individual to classify him as an employee. But here we are coming at the definition of "employee" from the opposite direction: there is obviously enough control over the prisoner; the problematic point is that there is too much control to classify the relationship as one of employment. The *Bonnette* factors thus primarily shed light on just one boundary of the definition of "employee," and we are concerned with a different boundary. Prisoners are essentially taken out of the national economy upon incarceration. When they are assigned work within the prison for purposes of training and rehabilitation, they have not contracted with the government to become its employees. Rather, they are working as part of their sentences of incarceration.

*Id.* at 809–10. Thus, the *Vanskike* court refused to apply the *Bonnette* factors and instead took a more holistic view of the economic reality of the inmate's circumstances.

The Seventh Circuit's rejection of *Bonnette* proved to be persuasive. The Ninth Circuit, which had applied the *Bonnette* factors just two months prior to the *Vanskike* decision, reheard the case *en banc* and expressly rejected the *Bonnette* factors in light of the Seventh Circuit's decision.

*Compare Hale v. State of Ariz.*, 967 F.2d 1356, 1366 (9th Cir. 1992) ("We therefore proceed to a case-by-case application of the *Bonnette* factors."), *with Hale v. State of Ariz.*, 993 F.2d 1387, 1394 (9th Cir. 1993) ("Regardless of how the *Bonnette* factors balance, we join the Seventh Circuit in holding that they are not a useful framework in the case of prisoners who work for a prison-structured program because they have to.") (citing *Vanskike*, 974 F.2d 806). In *Hale*, Arizona law required prisoners to work not less than forty hours per week. *Id.* at 1390. The Ninth Circuit concluded this "hard-time obligation" and the "totality of the circumstances does not bespeak an employer-employee relationship as contemplated by the FLSA." *Id.* at 1395.

Four years later, the two circuits that had first employed the *Bonnette* factors—the Second and Fifth Circuits—likewise rejected their applicability in intra-prison work cases. *See Danneskjold v. Hausrath*, 82 F.3d 37, 41 (2d Cir. 1996) ("In the prison context, however, application of *Bonnette* leads to a radical result. Literally applied, the *Bonnette* factors would render all prison labor, including involuntary labor inside the penal institution, such as in a prison laundry, subject to minimum wage laws.") ("We believe that the caselaw described above has essentially read *Bonnette*, but not necessarily the economic reality test, out of the determination of whether a particular prisoner's labor is subject to the FLSA, *id.* at 43"); *Reimonenq v. Foti*, 72 F.3d 472, 475 (5th Cir. 1996) ("We find that the [*Bonnette*] test, which is cast as a 'control' question designed to identify the responsible employer in a free-world work environment, is unserviceable, and consequently inapplicable, in the jailer-inmate context."). Other circuit courts followed suit for similar reasons. *See, e.g.*, *Henthorn v. Dep't of Navy*, 29 F.3d 682, 686 (D.C. Cir. 1994) (rejecting the *Bonnette* four-factor test in cases where "the prisoner is legally compelled to part with his labor as part of a penological work assignment"); *Villarreal v. Woodham*, 113 F.3d 202, 206 (11th Cir. 1997) ("[We] adopt the reasoning articulated by the Seventh Circuit in *Vanskike*,

974 F.2d at 809–12, in rejecting the *Bonnette* four factor standard in the prison context."); *cf.* *Franks v. Oklahoma State Indus.*, 7 F.3d 971, 973 (10th Cir. 1993) (rejecting application of an economic reality test).

        ii.   ***Vanskike* Factors**

     Without the *Bonnette* framework, courts have taken a more holistic, largely considering whether the relationship between inmates and their alleged employers is the type of relationship likely contemplated by Congress to fall under the FLSA. On the whole, courts consider the (1) purpose of the inmate's work program, (2) the bargained-for nature of the working relationship, and (3) the purposes of the FLSA.

     In *Vanskike*, having rejected the *Bonnette* factors, the Seventh Circuit was first to lay out and consider these new factors. To begin, the Seventh Circuit considered the underlying purpose of the inmate's work program, noting that the Illinois legislature's goal in authorizing prisoner work assignments was to "equip such persons with marketable skills, promote habits of work and responsibility and contribute to the expense of the employment program and the committed person's cost of incarceration." *Vanskike*, 974 F.2d at 809. The Seventh Circuit emphasized that the petitioner's working relationship did "not stem from any remunerative relationship or bargained-for exchange of labor for consideration, but from incarceration itself." *Id.* The Seventh Circuit also analyzed the FLSA's two underlying purposes: (1) the correction of labor conditions detrimental to the minimum standard of living, and (2) the prevention of unfair competition in commerce from the use of underpaid labor. *Id.* (citing 29 U.S.C. § 202(a)). The Seventh Circuit found that applying the FLSA's protections "would not further the policy of ensuring a 'minimum standard of living,' because a prisoner's minimum standard of living is established by state policy[.]" *Id.* Similarly, it concluded that application of the FLSA would not further the statute's

second goal because Congress had already addressed the problem of unfair competition by regulating prison-made goods through the Ashurst-Sumners Act. *Id.* at 811–12 (citing 18 U.S.C. §§ 1761–62) ("The Ashurst-Sumners Act . . . penalizes the knowing transportation of prison-made goods in commerce and was specifically intended to combat unfair competition."). Consequently, the Seventh Circuit affirmed the district court's grant of summary judgment against the inmate.

A year after *Vanskike*, the Fourth Circuit addressed the inmate-work question for the first time in *Harker v. State Use Industries*, 990 F.2d 131 (4th Cir. 1993), and largely adopted *Vanskike*'s analysis. In *Harker*, an inmate at the Maryland Correctional Institution at Jessup worked at the graphic print shop run by State Use Industries of Maryland ("SUI"), an organization within the Maryland Division of Corrections created by the Maryland legislature to meet the rehabilitative needs of inmates. *Id.* at 132. SUI did not generate a profit and could only sell its products on the open market in very limited circumstances. *Id.* The Fourth Circuit concluded that the FLSA did not apply to "inmates engage[d] in prison labor programs like the one in this case." *Id.* at 133. In reaching this outcome, the Fourth Circuit first considered the purpose of the work program. *Id.* The Fourth Circuit noted that "[i]nmates perform work for SUI not to turn profits for their supposed employer, but rather as a means of rehabilitation and job training." *Id.* Next, the Fourth Circuit cited *Vanskike*, noting that the inmates had "not made the 'bargained-for exchange of labor' for mutual economic gain that occurs in a true employer-employee relationship" but rather had a "custodial relationship." *Id.* Finally, the Fourth Circuit, like the Seventh Circuit in *Vanskike*, considered the two primary purposes of the FLSA. It similarly found that application of the FLSA to the inmates in *Harker* would not promote the standard of living necessary for health, efficiency, and general wellbeing because the prison met such needs. *Id.* It likewise made the same arguments about the Ashurst-Sumners Act, concluding the passage of the Ashurst-Sumners Act

indicated that Congress did not intend the FLSA to apply to inmates such as Harker. *Id.* at 134. Thus, it concluded that Harker's situation did not amount to the "extraordinary circumstances necessary to trigger FLSA." *Id.* at 135, 136.

The majority of circuit courts to address this issue in depth have since adopted this more holistic analysis from *Vanskike*. *See Miller v. Dukakis*, 961 F.2d 7, 9 (1st Cir. 1992) (rejecting application of the FLSA to "sexually dangerous persons" who work at the institution because it would not further the FLSA's purposes); *Danneskjold*, 82 F.3d 37, 44 (2d Cir. 1996) (rejecting the FLSA application where an inmate worked as a clerk-tutor for an association of colleges, assisting and tutoring student inmates, because his work "served only the institutional purpose of the prisoner rehabilitation," *id.* at 44); *Reimonenq*, 72 F.3d 472, 476–77 (5th Cir. 1996) (embracing the "categorical rule that prison custodians are not 'employers' of inmates in work release programs" because the purpose of the work program is to prepare inmates for release and it would not serve the purposes of the FLSA); *Abdullah v. Myers*, 52 F.3d 324 (6th Cir. 1995) (unpublished decision) (rejecting prisoner's FLSA claim "because the prison has a rehabilitative rather than a pecuniary interest in encouraging inmates to work, because the relationship is not an employment relationship but a custodial one, and because the purposes of the [FLSA] are not implicated in this situation."); *Gamble v. Minnesota State-Operated Servs.*, 32 F.4th 666, 670 (8th Cir. 2022) (concluding that sexually dangerous civil detainees are not state employees when they work for the prison's work program because there is no bargained-for exchange of labor, it would not further the purposes of the statute, and the work program does not generate a profit); *Burleson v. State of Cal.*, 83 F.3d 311, 314 (9th Cir. 1996) (denying the FLSA applicability to California's work requirement statute because "the 'economic reality' of plaintiffs' relationship to the [work program] is penological."); *Villarreal v. Woodham*, 113 F.3d 202 (11th Cir. 1997) (refusing to

apply the FLSA to pretrial detainees providing translation services to the sheriff without pay because it would not serve the FLSA's purposes and the translation services were for the benefit of the prison) ("By so holding, our sister circuits have adopted a broader approach to situations involving the FLSA and prisoners. This approach focuses on the economic reality of the situation as a whole. We agree with this approach and adopt the reasoning articulated by the Seventh Circuit in *Vanskike*, 974 F.2d at 809–12, in rejecting the *Bonnette* four factor standard in the prison context," *id.* at 206).

Relatively recently, the Fourth Circuit restated what it referred to as the "*Harker* factors" when wrestling with the application of the FLSA to persons civilly committed as sexually dangerous, and then again when considering application of the FLSA to immigrant detainees. *See Matherly*, 859 F.3d at 278 ("We based [the *Harker*] decision on three considerations: (1) the inmates work 'not to turn profits for their supposed employer, but rather as a means of rehabilitation and job training'; (2) there is no 'bargained-for exchange of labor for mutual economic gain that occurs in a true employer-employee relationship'; and (3) the FLSA's purpose[.]"); *see also Ndambi*, 990 F.3d at 372–74. In both cases, the Fourth Circuit refused to expand the scope of the FLSA to such custodial detentions. On the whole, it is clear that the factors laid out in *Vanskike* govern and seek to understand the economic reality of an inmate's working relationship.

### iii.   D.C. Circuit's Two-Factor Test

The D.C. Circuit stands apart with its own two-factor test, asking simply whether (1) the work is voluntary, and (2) whether an outside employer pays the inmate. *Henthorn*, 29 F.3d at 682; *see also Nicastro v. Reno*, 84 F.3d 1446, 1447 (D.C. Cir. 1996) ("To qualify, a prisoner must have 'freely contracted with a non-prison employer to sell his labor.'"). Other circuits have been

reluctant to adopt this two-factored test. *E.g.*, *Burrell*, 60 F.4th at 45 ("the *Henthorn* test's muddled application to this case proves it too narrow and rigid to serve the FLSA's purposes.").

### iv.    *Burrell* and Modern Revival of *Bonnette*

The *Bonnette* factors have found a recent revival in the Third Circuit, albeit under a different name. In a case with some factual similarity to the present case, the Third Circuit heard a case involving plaintiffs held in civil contempt and sentenced to incarceration for not paying child support. *See Burrell v. Staff*, 60 F.4th 25, 31 (3d Cir. 2023). The *Burrell* plaintiffs challenged Lackawanna County's policy of conditioning their access to regularly paid work-release programs (such that they could pay off their child support debt and secure their freedom) on first working for half of their sentences sorting through trash at the Lackawanna County's recycling center for five dollars per day. *Id.* Of note, Lackawanna County did not operate the recycling center itself, but rather, outsourced its operation to a private corporation. *Id.* Under an operating agreement between the government and the corporation, the County's Solid Waste Management Authority retained the first $60,000 in revenue. *Id.* at 38. Any profits beyond that were shared between the municipal authority and the private corporation. *Id.* The municipal authority further agreed it would use its best efforts to provide the recycling center with a steady number of inmates necessary to run operations. *Id.* at 39.

The district court initially granted the defendants' motion to dismiss, applying the D.C. Circuit's two-factored test and concluding that no employment relationship could exist given the involuntary nature of the work. *See Burrell v. Lackawanna Recycling Ctr., Inc.*, No. 3:14-CV-1891, 2021 WL 3476140, at *21 (M.D. Pa. Aug. 6, 2021). On appeal, the Third Circuit first acknowledged that it had previously categorically excluded intra-prison work, but that it had not yet considered a scenario involving off-site work done for the benefit of a public-private

partnership, such as this one between the County and the recycling center. *Burrell*, 60 F.4th at 44. After review of relevant cases, the Third Circuit adopted the joint-employer test from one of its previous cases, *In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 683 F.3d 462, 468 (3d Cir. 2012), which had adopted the *Bonnette* factors for joint-employment analysis. *Id.* In *Burrell*, the Third Circuit concluded that "[a]pplication of the *Enterprise* test proves far more useful" and held that these *Enterprise* factors "indicate plaintiffs' joint employment by [Lackawanna] County, its Municipal Authority, and the Corporation." *Id.* at 46. Thus, in effect, the Third Circuit applied the *Bonnette* factors and concluded a joint-employment relationship existed.

From there, the Third Circuit went on to discuss other considerations it deemed "relevant to the economic reality" of plaintiffs' working relationship with Lackawanna County and the recycling center. The Third Circuit noted that Lackawanna County contracted out plaintiffs' work for a joint economic benefit and that the plaintiffs "did the [recycling] facility's integral and necessary grunt work of hand-sorting garbage in lieu of the Corporation employing hourly-paid workers." *Id.* As a result, the plaintiffs' work benefited the recycling center by reducing its need for paid employees and artificially reducing labor costs "through access to a steady supply of sub-market rate labor for which [d]efendants did not provide unemployment and health insurance, worker's compensation, minimum wages, and/or overtime premiums." *Id.* These considerations mirrored the second purpose of the FLSA – preventing unfair competition.

The Third Circuit next considered the first purpose of the FLSA – ensuring an appropriate standard of living. Here, the Third Circuit recognized that the prison met the plaintiffs' basic needs, but also noted that as civil detainees, they "needed money for a reason that the typical incarcerated person does not: to satisfy their contempt orders and secure their freedom from incarceration." *Id.* at 47. The Third Circuit likewise concluded that "the passage of the Ashurst-Sumners Act of 1935

. . . is [not] reason to preclude from the FLSA protection prisoners who partake in labor outside prison walls and who perform labor that does not benefit the prison." *Id.* The Third Circuit was more persuaded by unfair competition concerns when prisoners work in part for a private company that competed with companies required to pay wages set by the FLSA. *Id.* Ultimately, after considering the purposes of the FLSA and "looking at *all* of those facts," the Third Circuit concluded that plaintiffs had sufficiently alleged they were employees of the County, the Authority, and the Corporation, acting as joint employers. *Id.* at 48.

### C.  The Present Case

#### i.  Applicable Test for Inmate Employment

As noted, the Fourth Circuit has yet to analyze off-site inmate work under the FLSA. Consequently, the parties disagree about what factors this Court should consider. Defendant argues that the *Vanskike* factors adopted in *Harker* should govern. *See* ECF 169-1 at 29–36 (asserting that *Harker*'s considerations counsel against application of the FLSA to Plaintiffs); *see also* ECF 193 (arguing that the "joint-employer test utilized in *Burrell* is at-odds with the Fourth Circuit's decisions). In contrast, Plaintiffs suggest that *Vanskike*/*Harker* is inapposite in cases with inmate work outside of the prison's walls. *See* ECF 183 at 27 ("*Harker* is clearly limited to prison labor occurring *within* a prison. *Harker* does not define the test for inmates loaned to another sister agency who is running a veritable business operation."). Rather, Plaintiffs assert that the decisions of *Watson*, *Carter*, and *Burrell* are more applicable and should govern. *Id.* at 28; *see also* ECF 190 at 8 n.6 (alternatively suggesting that "even if [the D.C. Circuit's test in] *Henthorn* was applied to this case, an employment relationship would still exist between the parties").

Upon review of the case law, this Court believes the *Vanskike* factors, as adopted in *Harker*, govern the question of whether Plaintiffs are "employees" for the purposes of the FLSA. Plainly,

inmate work programs—inside or outside the prison—involve a degree of control unlike typical employment relationships. The *Bonnette* factors address a distinct question – whether multiple entities are joint employers of plaintiffs, which was relevant in cases such as in *Carter*, *Watson*, and *Burrell*, but is not relevant here as there is no private third-party employer. The County oversees both DOC and DPW. Thus, this Court reviews Plaintiffs' circumstances in light of (1) the purpose of Plaintiffs' work program, (2) the nature of the working relationship between Plaintiffs and Defendant, and (3) the purposes of the FLSA.

       **ii.**    **Employment Analysis**

*Purposes of the Recycling Facility Work Detail Program*

Defendant asserts that Plaintiffs' participation in the recycling facility work detail program served a rehabilitative goal and provided job skills to inmates, much like in past cases that have denied the FLSA's protection. ECF 169-1 at 36. Indeed, evidence in the record demonstrates that DOC operated the work detail program for rehabilitative purposes and to provide structure to the inmates' day. DOC staff, including its director, testified that the intent of the Community Corrections Program was to offer programs and services to assist inmates with their reintegration into the community following their release from BCDC. *See, e.g.*, ECF 169-3 at 8 (Director of DOC describing the "main focus" of the work detail program as preparation of inmates for reentry into the community)[3]; ECF 169-17 at 15; ECF 169-2 at 10. As described by a former DOC

_____

[3] In Plaintiffs' Amended Memorandum in Opposition to Defendant's Motion for Summary Judgement, Plaintiffs object to various references and evidence used by Defendant in its motion.

correctional captain, the MRF recycling work detail prepared inmates for entering into the community by teaching them the "ability to get up in the morning," "various work ethics," the specific tasks required by work at the recycling facility detail, along with giving the inmates something to do with otherwise idle time. *See* ECF 175-5 at 120–21. DOC staff viewed the work detail program as a steppingstone to the work release program, which enabled inmates to work for private employers outside of the prison. *See* ECF 169-4 at 16[4] (DOC informed work detail inmates

---

*See* ECF 183 at 48–51. "While a party may support its position on summary judgment by citing to almost any material in the record, the party's reliance on that material may be defeated if 'the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.'" *Whittaker v. Morgan State Univ.*, 524 F. App'x 58, 60 (4th Cir. 2013) (quoting FED. R. CIV. P. 56(c)(2)).

Plaintiffs object to Defendant's witnesses' testimony that there was a rehabilitative purpose to the work detail program as inadmissible lay opinion under Rule 701 of the Federal Rules of Evidence. *See* ECF 183 at 50. Federal Rules of Evidence 701 and 702 draw a "critical distinction" between lay witness and expert witness testimony: under Rule 702, an expert witness "must possess some specialized knowledge or skill or education that is not in the possession of the jurors." *Certain Underwriters at Lloyd's, London v. Sinkovich*, 232 F.3d 200, 203 (4th Cir. 2000) (quoting KENNETH R. REDDEN & STEPHEN A. SALTZBURG, FEDERAL RULES OF EVIDENCE MANUAL 225 (1975)); *see* Fed. R. Evid. 702. Rule 701, on the other hand, only allows lay witnesses to express opinions "on the basis of relevant historical or narrative facts that the witness has perceived." *MCI Telecomm. Corp. v. Wanzer*, 897 F.2d 703, 706 (4th Cir. 1990) (quoting *Teen-Ed, Inc. v. Kimball In'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980)); *see* Fed. R. Evid. 701.

Plaintiffs argue that whether certain work is rehabilitative requires an expert opinion, but they offer no citation that suggests such a determination would require expert testimony. Although this Court has previously required expert opinion for DNA evidence involving "scientific complexities and nuances," *see Al-Sabah v. Agbodjogbe*, No. CV SAG-17-730, 2019 WL 6498049, at *3 (D. Md. Dec. 3, 2019), testimony regarding the prison's purpose in designing a work detail program does not require expert opinion. Defendant's witnesses sufficiently demonstrate their familiarity with the work detail program and its effect on its participants, and in this Court's view, their lay testimony is admissible.

[4] Plaintiffs object to evidence supporting the claim that the work detail program served as a steppingstone to the work release program, asserting that the evidence does not demonstrate a pattern of conduct sufficient to be admissible under Rule 406. ECF 183 at 51. However, Defendant does not require Rule 406 to introduce evidence demonstrating the personal observations of DOC staff and the actions taken by them to advance the inmates' work statuses.

that they would recommend them for work release if they satisfactorily performed at the recycling facility for a period of thirty days); *see also* ECF 169-1 at 28 n.12 (listing examples of Plaintiffs who were subsequently recommended for the work release program upon successful performance at the recycling facility). There was likewise hope, although it seems to have been infrequent, that experience at the recycling facility could lead to a job upon release from BCDC. ECF 169-5 at 19 (noting transportation often becomes an issue for hiring released inmates); *see also* ECF 169-11 at 15 (testimony suggesting that the recycling facility has subsequently hired "like six" inmates from the work detail program over the course of the program's existence). For these reasons, Defendant asserts that the primary purpose of the program was rehabilitative and consequently no employment relationship existed.

In contrast, Plaintiffs argue that DPW used inmate labor through the work detail program to cut costs and generate greater profits at the recycling facility. ECF 183 at 32. Indeed, the record also demonstrates that the County operated the facility as a business and benefited from using cheaper inmate labor. *See* ECF 175-4 at 96 (Deposition of Mr. Beichler, DPW Bureau Chief) (Q: "Did [Mr. Homan] ever tell you why he wanted inmates to run the MRF?" A: "I don't believe anyone had to tell me. They were being paid $5 a day."); *see also* ECF 175-61 (DPW Bureau of Solid Waste Chief noting that "the bottom line is a business decision that creates economic efficiencies"). The County recorded and analyzed records regarding the operational cost of the recycling facility. *See, e.g.*, ECF 175-53. The fact that DPW now chooses to hire temporary employees at minimum wage rather than continue working with inmates paid at minimum wage further reflects DPW's economic motive for opting for inmate labor in the past. ECF 175-1 at 49, 72 (DPW now staffs the positions with temporary workers); *see also* ECF 175-73 at 1 (DOC refusing to resume work details for the County outside the prison given the "pending lawsuit" and

the limited amount of detainees available to work). Although the County asserts that profit generation was not the goal of updating the recycling facility to single stream and notes that there have been years where the facility operated at a loss, it does acknowledge that it hoped the recycling center could turn a profit. ECF 169-1 at 14; ECF 169-5 at 13; *see also* ECF 175-51 (news report titled, "New Recycling Facility Turns Green into Gold"). Indeed, over the course of seven years (January 2014 – December 2020), the single-stream recycling facility resulted in $41.0 million in revenue, although the County asserts that this number does not account for all costs incurred. ECF 175-59 at 3; ECF 175-3 at 47.

There is also evidence that DPW and DOC negotiated a "quota," or minimum number of inmate workers. *See* ECF 175-29. DOC often struggled to recruit enough inmates to reach this quota given the harsh winter weather working conditions at the facility, rejections of medical clearances, and releases of inmates on parole, among other issues. *Id.* at 9. The Community Corrections Program at times had to reshuffle detail assignments to meet the quota, for example pulling workers from the Animal Shelter to place them at the recycling facility. ECF 175-62 at 1. No evidence suggests that this inmate-labor quota existed to ensure the maximum number of inmates received the best possible rehabilitative training. In contrast, the evidence reflects DPW's concerns that a lack of inmate labor "severely [a]ffects [MRF's] operating efficiency, and [] costs the county a great deal of money." *See* ECF 175-29 at 12.

Plaintiffs reject Defendant's assertion that the recycling facility work detail provided useful job training and note that there was no formal process for hiring former work detail inmates as employees after their incarceration. The record suggests that only six inmates have subsequently been hired at MRF. Mr. Jones, the facility manager of the recycling facility, did not make job referrals and if any inmate came to him looking for a job down the road, he would direct them to

"look on the website" and "just apply for it" when there was a job opening. ECF 175-1 at 102. The record of emails between the two departments provides examples where the long work hours at MRF caused inmates to miss or reschedule other job-training opportunities, community-reentry meetings, and important health services. ECF 175-55 ¶ 18; ECF 175-79 (rescheduling an inmate's dentist appointment "so the inmate could be allowed to report to the [MRF] detail achieving the 30 needed for the detail"); ECF 175-80 (inmate could not attend a Community Reentry Group meeting given his work detail assignment at the recycling facility); *cf.* ECF 175-50 (email noting that inmates had been pulled out of the substance abuse program "in order to provide coverage at the Animal Shelter").

Though the evidence must be viewed in the light most favorable to Plaintiffs, in this Court's view, there is no factual dispute. Uncontroverted evidence shows that the MRF work detail program served both economic and rehabilitative purposes. Despite Plaintiffs' evidence of the County's economic motivations, the program provided structure to inmates' days, provided inmates with work experience, provided pay (albeit very little) to inmates, and provided other benefits, such as institutional credits for time served—all of which demonstrate a rehabilitative purpose. Thus, even taking Plaintiffs' evidence as true and crediting the County's economic incentives, the uncontroverted record nonetheless reflects some rehabilitative purpose for the work detail program.

As reflected in the case law, the rehabilitative purpose of the work detail program weighs against application of the FLSA in this case, regardless of the additional profit motive. The Fourth Circuit has held that a profit "does not eliminate the non-pecuniary goals" of the rehabilitative work program. *Ndambi*, 990 F.3d at 374. Thus, the "nonemployee-status of detainees is not altered by the private, for-profit nature of the detention facility" *Id. Ndambi*'s logic applies here because

one entity—Baltimore County—shares both the rehabilitative and pecuniary goals, much like the prison in *Ndambi*. The fact that the County runs and operates the recycling center, and therefore receives the benefit of the cheaper inmate labor, distinguishes this case from *Burrell*, where a private corporation operated the facility and joined in the profit. *See Burrell*, 60 F.4th at 44 ("Plaintiffs' off-site work [was] not done for the benefit of the jail but rather for the benefit of the public-private partnership"). For this reason, the fact that Defendant, through DOC, has a rehabilitative purpose for its program weighs against application of the FLSA.

*Bargained-For Exchange of Labor*

The next factor to consider is whether there was a bargained-for exchange of labor between the Plaintiffs and Defendant. Other cases have relied on the involuntariness of the work, examining whether plaintiffs have the ability to walk off the job site or negotiate. *See, e.g.*, *Villarreal*, 113 F.3d at 207 (concluding Plaintiff's relationship was a custodial one given he could not walk off the job site at the end of the day and he performed his services for the benefit of the correctional facility). Courts have often found that cases of forced labor, or "hard-time" obligations, do not constitute employment for this reason. *See, e.g.*, *McMaster v. State of Minn.*, 30 F.3d 976, 980 (8th Cir. 1994) ("The inmates have not volunteered or contracted to work for the State; they are assigned and required to do so."); *Gamble*, 32 F.4th at 670 (concluding there is no "'bargained-for exchange of labor' because the detainees work at the state's discretion").

Here, although DOC's policy suggests that inmates do not have a choice in the matter, *see* ECF 169-21 at 48 ("BCDC Inmate Handbook & Rules," listing "refusal to work" as a Class 3

offense)[5]; *but see* ECF 169-20 at 3 ("Work Assignments for Sentenced inmates *may* be mandatory" (emphasis added)), DOC supervisors acknowledge that they did not force individuals to work who did not want to work. ECF 175-5 at 127–29; ECF 169-17 at 11 (Deposition of Ms. Parish noting that inmates "could be assigned to the [MRF] detail but if they choose not to work it, then we can't make them work it.").[6] Further, DOC accounted for inmates' work preferences when determining work detail assignments. ECF 169-20 at 3 (inmates can request a specific assignment via an inmate request form). Plaintiffs' work detail incorporated a greater degree of voluntariness than the "hard time" requirements of other cases.

---

[5] Plaintiffs object to Defendant's use of the BCDC's Inmate Handbook & Rules to assert that the work detail program was involuntary. *See* ECF 183 at 48–51.  Plaintiffs assert that this handbook does not comport with Rule 406 of the Federal Rules of Evidence, which permits evidence of an organization's routine practice. Regardless of whether this handbook falls under the purview of Rule 406, it is clearly admissible as a business or public record. *See* Fed. R. Evid. 803(6)(B), (8). Thus, this Court considers the handbook for the purposes of summary judgment.

[6] Plaintiffs object to "selected excerpts" of Ms. Parish's deposition as inadmissible under Rule 701 because they are "so self-contradictory and without an adequate basis or foundation." *See* ECF 183 at 49–50, 51. Specifically, Plaintiffs point to the portion of her testimony that refers to the Code of Maryland Regulations ("COMAR") and her testimony regarding BCDC resource fairs for inmates. First, this Court does not rely on Ms. Parish's interpretation of any COMAR regulation in its decision. Second, her testimony regarding the resource fairs simply describes how they took place and does not require an expert opinion. *See* ECF 169-17 at 17–18. She does not offer any expert opinion regarding their success on preventing recidivism. Thus, her testimony would be admissible at trial.

The more voluntary nature of the work perhaps resulted in a greater degree of bargaining power than usually enjoyed by inmates in work programs.[7] DPW and DOC considered a variety of measures to recruit more inmate workers to the recycling facility. For example, an email from a DOC Community Corrections Program supervisor to DPW staff recognized that an approved increase in MRF workers, hours, and workdays would "in all likelihood be perceived negatively by the inmates," and therefore proposed a pay increase to $20 per day, an extension of lunch breaks to 45 minutes, an extension of other breaks to 20 minutes, "random food 'surprises,'" and floor padding to "ease the strain of standing for such a long period of time." ECF 175-29 at 16. Additionally, DPW used pizza/sub lunches as reward and motivation for the inmates reaching their bale quota. ECF 175-41 at 5; *see also* ECF 175-1 at 96–97. Although the parties dispute the degree of supervision by DOC over Plaintiffs throughout the workday, Plaintiffs have adduced enough undisputed facts to show they had more negotiating power than other inmate-labor cases where hard labor constituted a part of the inmates' sentence. *Cf. Hale*, 993 F.2d at 1389 (acknowledging that prisoners are not categorically excluded from the FLSA, but refusing to extend the statute's protections to inmates sentenced to "hard labor").

Nonetheless, the Fourth Circuit has been skeptical of inmates' negotiating power. In *Ndambi*, the Fourth Circuit decided that "the mere voluntariness of participating in a work program or the transfer of money between a detainee and detainer does not manufacture a bargained-for

---

[7] In the alternative, Plaintiffs request that this Court grant summary judgment "against Defendant's claim that the work was involuntary," asserting that "there is no *genuine* dispute that the work was voluntary." ECF 183 at 54 (emphasis in original). Upon review of the record, there is a dispute as to the precise nature of the involuntariness of the work detail given the conflicting policies in the handbook versus DOC staffs' recounts of operations. Further, this Court concludes that Plaintiffs are not employees under FLSA, even taking the voluntariness of Plaintiffs' work detail in the light most favorable to them. Therefore, this Court denies Plaintiffs' alternate grounds for partial summary judgment.

exchange of labor." *Ndambi*, 990 F.3d at 372. Thus, although Plaintiffs "may choose whether or not to participate in a voluntary work program, they have that opportunity solely at the prerogative of the custodian." *Id.* The Fourth Circuit noted that "DOC wields virtually absolute control over [the inmates] to a degree simply not found in the free labor situation of true employment. Inmates may voluntarily apply for [work detail] positions, but they certainly are not free to walk off the job site and look for other work. When a shift ends, inmates do not leave DOC supervision, but rather proceed to the next part of their regimented day. [The parties] do not enjoy the employer-employee relationship contemplated in [FLSA], but instead have a custodial relationship to which the Act's mandates do not apply." *Harker*, 990 F.2d at 133. Thus, although this case presents more facts than *Harker* or *Ndambi* to suggest some bargaining power between the parties, the Fourth Circuit's strong language against the recognition of any inmate argaining power necessitates that this Court view this factor as weighing against the application of the FLSA.

*Two Purposes of the FLSA*

The first purpose of the FLSA is to correct labor conditions that are "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a); *see also Vanskike*, 974 F.2d at 810. Courts have generally recognized that providing minimum wage to inmates fails to further this particular purpose because "unlike workers in a free labor market who use their wages to maintain their 'standard of living' and 'general well-being,' . . . detainees in a custodial institution are entitled to the provision of food, shelter, medicine, and other necessities." *Ndambi*, 990 F.3d at 373; *see also Vanskike*, 974 F.2d at 810 ("Prisoners' basic needs are met in prison, irrespective of their ability to pay. Requiring the payment of minimum wage for a prisoner's work in prison would not further the policy of

ensuring a "minimum standard of living," because a prisoner's minimum standard of living is established by state policy; it is not substantially affected by wages received by the prisoner.").

Plaintiffs assert that Defendant did not meet their basic needs and that they needed the wages from their work detail to purchase necessities such as toiletries and warmer clothing to wear in the open-air recycling facility in the middle of the winter. *See* ECF 175-55 (Decl. Pl. Scott) at 4 ("The Detention Center did not provide basic necessities to inmates working at the MRF. For example, when an inmate began earning money at the MRF and had a small amount of money in his account, the Detention Center would stop providing toiletries, *i.e.*, soap, shampoo, toothpaste, deodorant, etc."). The inmates filed multiple complaints about insufficient food and excessive hours. A former County shift supervisor at the recycling facility admits to looking the other way while inmates ate food scraps that came down the conveyor belt. Plaintiffs also report taking discarded clothing from the conveyor belt to wrap around their bodies to keep warm in the winter months.

Other courts have rejected similar FLSA arguments regarding poor living conditions, concluding that the FLSA is not the appropriate tool to remedy a prison's failures to meet the basic needs of its inmates. For example, in *Smith v. Dart*, 803 F.3d 304 (7th Cir. 2015), the Seventh Circuit acknowledged that the plaintiff had stated a claim for inadequate food and contaminated water. *Id.* at 314. However, the Seventh Circuit concluded that this did not entitle him to minimum wage under the FLSA. The Seventh Circuit explained: "It is the jail's constitutional obligation to provide Smith with his basic needs, including adequate food and drinkable water. When the jail fails to do so, it is that failure that must be remedied (the Constitution demands it); it does not entitle him to receive minimum wage under the FLSA." *Id.* On this point, *Burrell* is distinguishable. There, plaintiffs were incarcerated solely because they could not pay child

support. The Third Circuit noted that plaintiffs "needed money for a reason that the typical incarcerated person does not: to satisfy their contempt orders and secure their freedom from incarceration. Thus, while courts may conclude that typical prisoners do not need a minimum wage because they are fed and housed by the state, plaintiffs here had a concrete, important financial objective that they contend was the reason they worked at the Center." *Burrell*, 60 F.4th at 47.

On the whole, Congress did not intend the FLSA to serve as a legal backstop to ensure prisoners' quality living conditions, and Plaintiffs do not present any atypical reason for needing income, as in *Burrell*. Thus, the application of the FLSA to Plaintiffs does not serve the statutory purpose of ensuring a minimum standard of living.

The second purpose of the FLSA is to prevent unfair competition in commerce from the use of underpaid labor. *See* 29 U.S.C. § 202(a); *see also Vanskike*, 974 F.2d at 810. Generally, cases involving inmates working for the prison itself, or for a prison-run state-industries program, do not find an unfair competitive advantage or an employer-employee relationship under the FLSA. *See, e.g.*, *Villarreal*, 113 F.3d at 206 (noting that cases that have denied the FLSA's application "generally have involved inmates working for prison authorities or for private employers *within* the prison compound"); *Gamble*, 32 F.4th at 672 (holding there is no unfair-competition received by the Minnesota State Industries because it does not provide goods or services to private entities); *Miller*, 961 F.2d at 9 (plaintiffs incarcerated and working for sub-minimum wages at a treatment center "presents no threat of unfair competition . . . because the Treatment Center does not operate in the marketplace and has no business competitors").

In contrast, cases involving inmate work for private, third-party entities often find an unfair competitive advantage. *See, e.g.*, *Burrell*, 60 F.4th at 48 (noting "the stark differences between work done for the prison's benefit and outside work done at least partially to benefit a private

corporation"); *Gamble*, 32 F.4th at 671 ("[P]rison labor might implicate unfair-competition concerns when prisoners are paid below minimum wage to work for 'a company that was not providing services to the prison and that competed with companies required to pay wages set by the FLSA.'") (quoting *Danneskjold*, 82 F.3d at 44); *Watson*, 909 F.2d at 1555 (noting the "grossly unfair competition" where a private construction business operated purely with inmates paid $20 per day and had to pay no overtime, no unemployment insurance, social security, worker's compensation insurance, or other employee benefit plans); *Carter*, 735 F.2d at 13 (noting that payment of minimum wage to inmates by a community college employer "results in the elimination of unfair competition, not only among employers, but also among workers looking for jobs").

The present case finds itself in the middle of these two categories. Although the recycling center was not run by a private, third-party corporation, it also was not run by the prison itself, or a program associated with the prison (such as a state use industries program). Rather, it is run by another department within the County's executive branch of government.

This Court concludes that this case more closely resembles work programs operated by or for the prison. For one, any economic advantage attained by DPW through the work detail program flowed up to the County, and in turn, financed BCDC and its inmates. ECF 169-1 at 48; *see also* ECF 175-3 at 47 (deposition of Mr. Homan that the profits of the recycling facility enter the "general fund dollars," which in part fund DOC); ECF 169-15 ¶ 16. Granted, the record is unclear about the precise flow of revenue and the benefit that BCDC specifically received. *See* ECF 169-15 ¶ 19 (Declaration of Mr. Carpenter, the County's Chief of Budget Administration, noting that the general funds pay for a variety of government services, including community improvements, government buildings, public schools, fire and police departments, and the upkeep of streets,

highways, and waterways in the County). However, the fact that the economic benefits remain within the County and are not transmitted, in whole or in part, to a private third party distinguishes this case from *Burrell* and other cases concerned about unfair competitive advantage. As explained by the Seventh Circuit, "A governmental advantage from the use of prisoner labor is not the same as a similar low-wage advantage on the part of a private entity: while the latter amounts to an unfair windfall, the former may be seen as simply paying the costs of public goods—including the costs of incarceration." *Vanskike*, 974 F.2d at 811–12. Thus, the County's economic advantage in the market similarly does not merit application of the FLSA. Taken together, the relevant factors do not counsel application of the FLSA to Plaintiffs' case.[8] As the Fourth Circuit has emphasized, "If Congress wishes to apply the FLSA to custodial detentions, it is certainly free to do so. But the corollary is that courts are not." *Ndambi*, 990 F.3d at 375.

Given Plaintiffs are not "employees," Plaintiffs' claims under the FLSA, the MWHL, and the MWPCL fail as a matter of law.

_____

[8] In the alternative, Plaintiffs request this Court grant summary judgment "as to liability in favor of at least those Plaintiffs who were recommended for work release." ECF 183 at 53–54. Plaintiffs assert that the County denied them earned work release opportunities, arguing that inmates "were used as pawns by Defendant in order to maintain their inmate worker quota at the MRF." *Id.* at 54. Defendant disputes this characterization, suggesting that as a general practice the Community Corrections Program prioritized work release over work detail assignments, and that work release approved inmates were assigned to the MRF work detail only if they did not have an outside job. ECF 185 at 58. A review of the record affirms that there is a dispute of fact on this point. *See* ECF 175-31 at 105 (Deposition of Mr. Halligan, Community Corrections Program supervisor) ("Q: My question is do you know whether inmates who were recommended for work detail assignments who were recommended by the judge for private work release were denied that opportunity by Corrections because Corrections had to provide a certain number of inmates to work at the MRF? A: No, they would not be denied based on that. . . . even if the numbers were down at the [MRF] and there was somebody that had outside employment, then we would pull that person off of outside employment to have them work."). Therefore, even if this Court had not concluded that inmates did not constitute employees for FLSA purposes, it would deny Plaintiffs' alternative argument for summary judgment.

IV.   **CONCLUSION**

For the reasons stated above, the County's motion for summary judgment, ECF 169, will be GRANTED, and the Plaintiffs' cross-motion for summary judgment, ECF 175, will be DENIED.

A separate Order follows.


Dated: June 9, 2023                                    _____/s/_____
                                                       Stephanie A. Gallagher
                                                       United States District Judge